**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| ERIC DOUGLAS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>NORWEGIAN CRUISE LINES, FRANK J. DEL RIO, and MARK A. KEMPA,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Eric Douglas ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Norwegian Cruise Line Holdings Ltd. ("Norwegian" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly

1

traded securities of Norwegian from February 20, 2020 through March 12, 2020, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the Company conducts business in this judicial district. The Company's headquarters are located in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Norwegian securities at artificially inflated prices during the Class Period and was economically damaged thereby.

7.      Defendant Norwegian is a global cruise company which operates the Norwegian

Cruise Line, Oceania Cruise Line, Oceania Cruises, and Regent Seven Seas Cruises brands. The Company is incorporated in Bermuda and its principal executive office is located at 7665 Corporate Center Drive, Miami, Florida, 33126. The Company's stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "NCLH."

8. Defendant Frank J. Del Rio ("Del Rio") has served as the Company's Director, President, and Chief Executive Officer ("CEO") throughout the Class Period.

9. Defendant Mark A. Kempa ("Kempa") has served as the Company's Executive Vice President and Chief Financial Officer ("CFO") throughout the Class Period.

10. Defendants Del Rio and Kempa are collectively referred to herein as the "Individual Defendants."

11. Each of the Individual Defendants:

   a. directly participated in the management of the Company;

   b. was directly involved in the day-to-day operations of the Company at the highest levels;

   c. was privy to confidential proprietary information concerning the Company and its business and operations;

   d. was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

   e. was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

   f. was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

3

g.  approved or ratified these statements in violation of the federal securities laws.

12. Norwegian is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

13. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Norwegian under *respondeat superior* and agency principles.

14. Defendants Norwegian and Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

15. On August 1, 2017, the Company updated its Code of Ethical Business Conduct which is posted to the Company's website. The Code of Ethical Business Conduct, available throughout the Class Period, discussed health and safety standards, stating in relevant part:

> NCLH and its team members are expected to conduct business in compliance with applicable environmental, health and safety ("EHS") laws and regulations. ***NCLH's EHS programs are designed to ensure the preservation of the environment, and safety and security of NCLH's guests, team members and vendors.***

(Emphasis added).

16. In December of 2019, a novel coronavirus strain, now called COVID-19, was detected in the city of Wuhan in Hubei province, China. Since then, the virus has spread to numerous countries.

17. The spread of COVID-19 has had a significant impact on the cruise industry, with

reports of "canceled trips and half-empty ships."[1]

## Materially False and Misleading
## Statements Issued During the Class Period

18.     On February 20, 2020, the Company filed a Form 8-K with the SEC. Attached to the Form 8-K was a press release reporting on the Company's financial results for the quarter and full year ended December 31, 2019. In that press release, Defendants discussed positive outlooks for the Company in spite of the COVID-19 outbreak stating, in relevant part:

> •    Company entered year with a record booked position and at higher pricing. ***Despite the current known impact from the COVID-19 coronavirus outbreak, as of the week ending February 14, 2020, the Company's booked position remained ahead of prior year and at higher prices on a comparable basis***, which excludes cruises to Cuba in the prior year and the recent redeployment of Norwegian Spirit from Asia in the current year.
>
> \*     \*     \*
>
> While the effect of these impacts cannot be fully quantified at this time, ***our Company has an exemplary track record of demonstrating its resilience in challenging environments and we remain confident in our ability to deliver strong financial performance over the long-term.***

(Emphasis added).

19.     The Company also touted the procedures they had in place to protect its guests and crew. In pertinent part, the press release stated:

> The Company has proactively implemented ***several preventative measures to reduce potential exposure and transmission of COVID-19 and to protect the health, safety, security and well-being of its guests and crew.*** These measures include enhanced pre-boarding and onboard health protocols that go above and beyond standard operating procedures.

(Emphasis added).

20.     On February 27, 2020, the Company filed its Form 10-K with the SEC for the year ending December 31, 2019 (the "2019 10-K"). The 2019 10-K was signed by Defendants

---

[1] https://www.wsj.com/articles/coronavirus-leaves-cruise-industry-with-canceled-trips-and-half-empty-ships-11583330402

5

Del Rio and Kempa. Attached to the 2019 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Del Rio and Kempa attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. The 2019 10-K discussed the Company's focus on health and safety of the guests and crew, stating in relevant part:

> ***We place the utmost importance on the safety of our guests and crew***. We operate all of our vessels to meet and exceed the requirements of SOLAS and International Management Code for the Safe Operation of Ships and for Pollution Prevention ("ISM Code"), the international safety standards which govern the cruise industry. Crew members are trained in the Company's stringent safety protocols, participating in regular safety trainings, exercises and drills onboard every one of our ships to familiarize themselves and become proficient with the safety equipment onboard.
>
> \*   \*   \*
>
> *Passenger Well-Being*
>
> In the U.S., we must meet the U.S. Public Health Service's requirements, which include vessel ratings by inspectors from the Vessel Sanitation Program of the Centers for Disease Control and Prevention ("CDC") and the FDA. We rate at the top of the range of CDC and FDA scores achieved by the major cruise lines. In addition, the cruise industry and the U.S. Public Health Service have agreed on regulations for food, water and hygiene, aimed at proactively protecting the health of travelers and preventing illness transmission to U.S. ports.
>
> \*   \*   \*
>
> ***Epidemics and viral outbreaks could have an adverse effect on our business, financial condition and results of operations.***
>
> Public perception about the safety of travel and adverse publicity related to passenger or crew illness, such as incidents of viral illnesses, stomach flu or other contagious diseases may impact demand for cruises and result in cruise cancellations and employee absenteeism. For example, the recent outbreak of the COVID-19 coronavirus has resulted in costs and lost revenue related to customer compensation, itinerary modifications, travel restrictions and advisories, the unavailability of ports and/or destinations, cancellations and redeployments and has impacted consumer sentiment regarding cruise travel. The spread of the COVID-19 coronavirus, particularly in North America, could exacerbate its effect on us. Any future wide-ranging health scares would also likely adversely affect our business, financial condition and results of operations.

6

21. The statements contained in ¶¶ 18-20 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company was employing sales tactics of providing customers with unproven and/or blatantly false statements about COVID-19 to entice customers to purchase cruises, thus endangering the lives of both their customers and crew members; and (2) as a result, Defendants' statements regarding the Company's business and operations were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **The Truth Emerges**

22. On March 11, 2020, *Miami New Times* reported in the article "Leaked Emails: Norwegian Pressures Sales Team to Mislead Potential Customers About Coronavirus" that leaked emails from a Norwegian employee showed that the Company directed its sales staff to lie to customers regarding COVID-19. The article stated, in pertinent part:

> In the wake of the epidemic, a Norwegian Cruise Line (NCL) employee in South Florida tells *New Times* some managers have asked sales staff to lie to customers about COVID-19 to protect the company's bookings.
>
> \*   \*   \*
>
> Emails leaked to New Times show that a senior sales manager at NCL's Miami office came up with canned responses for the sales team to use if potential customers expressed concerns about COVID-19.
>
> \*   \*   \*
>
> Some of the lines in the script pressure a fictitious customer to book a cruise immediately to avoid paying more later.
>
> "Mr Becker," the line reads, "due to the Coronavirus we have cancelled all of our Asia cruises on the Norwegian Spirit. This has caused a huge surge in demand for

> all of our other itineraries. I suggest we secure your reservation today to avoid you paying more tomorrow." (News reports, on the other hand, suggest cruise lines are suffering from a spate of canceled trips rather than experiencing high demand. NCL's stock price has fallen more than 35 percent in recent days.)
>
> Other script lines simply reassure customers not to be afraid.
>
> "The only thing you need to worry about for your cruise is do you have enough sunscreen?" one of the suggested talking points reads.
>
> Some of the recommended responses are blatantly false. For instance, cruise bookers were instructed to tell potential customers that coronavirus is not a concern in warm Caribbean climates.
>
> "The Coronavirus can only survive in cold temperatures, so the Caribbean is a fantastic choice for your next cruise," one talking point reads.
>
> "Scientists and medical professionals have confirmed that the warm weather of the spring will be the end of the Coronavirus," reads a second.
>
> Another line says coronavirus "cannot live in the amazingly warm and tropical temperatures that your cruise will be sailing to."

23. Further, the *Miami New Times* article revealed the financial impact the COVID-19 outbreak was causing on the Company and its employees, stating in part:

> "We are hardly selling anything," the employee says. "Sales are at serious lows."
>
> Members of the sales team lose any commission on a booking if the cruise is canceled, according to the employee. They are required to meet daily quotas — about 150 calls to potential customers, five hours on the phone, and three to five bookings.
>
> "If you don't hit quota, you will absolutely be fired," the employee says. "No exceptions for [the] current virus situation. You may be put on a personal improvement plan for 30 days, but [that] basically means you're done."
>
> The employee says managers are trying to downplay the disruption in sales "at all costs."

24. On this news, the Company's shares fell $5.47 per share or approximately 26.7% to close at $15.03 per share on March 11, 2020, damaging investors.

25. On March 12, 2020, the *Washington Post* published the article, "Norwegian Cruise Line managers urged salespeople to spread falsehoods about coronavirus." The article revealed even more about Norwegian's sales tactics from leaked internal memoranda including dangerous statements such as:

> "Focusing all of your attention is actually illogical, especially when we live in a world of daily threats and dangers anyhow," the manager wrote under the headline "The coronavirus will not affect you." "Fact: Coronavirus in humans is an overhyped pandemic scare."

26. The *Washington Post* article also disclosed Company executive's reaction to the leaked memorandum, including:

> The whistleblower told The Post that company leaders are trying to find out who shared the emails. ***In one email sent Monday evening, after a Miami New Times journalist contacted the company, an executive wrote, "One of our own ratted."***

(Emphasis added).

27. On this news, the Company's shares fell a further $5.38 or approximately 35.8% to close at $9.65 on March 12, 2020, further damaging investors.

28. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

29. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Norwegian securities publicly traded on NYSE during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Norwegian, members of the Individual Defendants'

9

immediate families and their legal representatives, heirs, successors or assigns and any entity in which the Individual Defendants have or had a controlling interest.

30. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Norwegian securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

31. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

32. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

33. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a. whether the Exchange Act was violated by Defendants' acts as alleged herein;

    b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business Norwegian;

    c. whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements

        made, in light of the circumstances under which they were made, not misleading;

    d.    whether the Defendants caused the Company to issue false and misleading SEC filings during the Class Period;

    e.    whether Defendants acted knowingly or recklessly in issuing false and SEC filing

    f.    whether the prices of Norwegian's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

    g.    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

34. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

35. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

    a.    Norwegian securities met the requirements for listing, and were listed and actively traded on NYSE, a highly efficient and automated market;

    b.    As a public issuer, the Company filed periodic public reports with the SEC and NYSE;

      c.      The Company regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

      d.      The Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

36. Based on the foregoing, the market for Norwegian securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

37. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I

### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

38. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

39. This Count is asserted against Defendants based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

12

40.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

41.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Norwegian securities during the Class Period.

42.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Norwegian, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

43.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material

statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertan and disclose the true facts in the statements made by them or other Company personnel to members of the investing public, including Plaintiff and the Class.

44. As a result of the foregoing, the market price of Norwegian securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Norwegian securities during the Class Period in purchasing Norwegian securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

45. Had Plaintiff and the other members of the Class been aware that the market price of Norwegian securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Norwegian securities at the artificially inflated prices that they did, or at all.

46. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

47. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Norwegian securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

48. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

49. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Norwegian's misstatement of revenue and profit and false financial statements.

50. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

51. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Norwegian securities.

52. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by The Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c) awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 12, 2020  Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence Rosen
Laurence Rosen, Esq.
Fla. Bar No. 0182877
Email: lrosen@rosenlegal.com
275 Madison Avenue, 34th Floor
New York, NY  10116
Phone: (212) 686-1060
Fax: (212) 202-3827

*Counsel for Plaintiff*