UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No. 20-21107-Civ-SCOLA
(Consolidated with No. 20-21386 and 20-21685)

| | | |
|---|---|---|
| ERIC DOUGLAS, Individually and on Behalf of All Others Similarly Situated, | ) ) | <u>CLASS ACTION</u> |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| NORWEGIAN CRUISE LINES, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
<u>VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

# TABLE OF CONTENTS

**Page**

I.      NATURE OF THE ACTION ..................................................................1

II.     JURISDICTION AND VENUE ..........................................................8

III.    PARTIES ..............................................................................................9

IV.    SUBSTANTIVE ALLEGATIONS ...................................................11

        A.       Background on the Company.................................................11

        B.       Leading up to the Class Period, Defendants Touted Norwegian's Growth and Strong Business Prospects..................................................13

        C.       Norwegian's Marketing and Sales Teams Are the Engines that Drive the Company's Revenue Stream..................................................14

        D.       A Novel Coronavirus Is Discovered and Begins Wreaking Havoc On the Cruise Industry.................................................................17

        E.       Despite the Deadly Health Consequences of COVID-19 and its Rapid Spread on Cruise Ships, Norwegian Deliberately Misled Customers About the Danger and Impact of the Coronavirus Outbreak to Protect the Company's Bookings.................................................19

        F.       While Norwegian Misled Customers, Defendants Misled Investors....................22

        G.       Detailed Whistleblower Accounts and Internal Company Emails Expose Norwegian's Dangerously Misleading Sales Campaign, Causing Substantial Losses to Investors When the Truth is Revealed ................................23

        H.       After the Class Period Ends, the Fallout from Norwegian's Deceptive Sales Practices Continues .......................................27

V.      DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD.....................................29

        A.       February 20, 2020 Press Release and Earnings Conference Call .........................29

        B.       February 27, 2020 10-K...................................................34

        C.       Norwegian's Code of Ethical Business Conduct ..................................35

VI.    LOSS CAUSATION AND THE CLASS MEMBERS' ECONOMIC LOSS..................37

VII.   ADDITIONAL ALLEGATIONS OF SCIENTER...........................................40

# TABLE OF CONTENTS

Page

A.  Passenger Ticket Revenue and the Company's Sales and Marketing Strategies Were Critical to Norwegian's Operations and Financial Performance, and Their Importance Supports a Strong Inference of Scienter ...................................................................................................41

B.  By the Beginning of the Class Period, the Coronavirus Was the Number One "Topic on Everyone's Mind," and Defendants Were Closely Tracking Norwegian's Bookings...................................................................................42

C.  Whistleblower Accounts and Internal Emails Confirm that Norwegian's Senior Managers Approved and Directed the Company's Sales Personnel to Carry Out the Dangerously Misleading Sales Campaign .................................44

D.  Defendants' Own Public Statements Support an Inference of Scienter ...............45

E.  Post-Class Period Events Support an Inference of Scienter .................................46

F.  Norwegian's Manipulative and False Sales Campaign Violated the Company's Code of Ethical Business Conduct, Further Supporting a Strong Inference of Scienter ..................................................................................47

VIII.  APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ...................................................................................................49

IX.  NO SAFE HARBOR .........................................................................................................50

X.  CLASS ACTION ALLEGATIONS ..................................................................................52

By and through the undersigned counsel, Lead Plaintiff Employer-Teamsters Local Nos. 175 & 505 Pension Trust Fund ("Plaintiff" or "Lead Plaintiff") alleges the following against Norwegian Cruise Line Holdings Ltd. ("Norwegian" or the "Company"), Frank J. Del Rio ("Del Rio"), and Mark A. Kempa ("Kempa"), (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Norwegian with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain Defendants and other related non-parties; (c) review of news articles, securities analyst reports, and shareholder communications; (d) review of other publicly available information concerning Defendants; and (e) information readily obtainable on the Internet.  Many of the facts supporting the allegations contained herein are known only to Defendants named herein or are exclusively within their custody and control. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

1.      This is a securities fraud class action on behalf of all purchasers and/or acquirers of Norwegian securities between February 20, 2020 and March 10, 2020, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), against Norwegian and certain of its senior executives for violations of the federal securities laws.

2.      This case involves a deadly campaign of misinformation and deception implemented by Norwegian in order to convince potential customers to book cruises and to prevent existing customers from cancelling reservations in the face of the global COVID-19 pandemic.

Defendants' scheme, which was omitted from their Class Period statements, included overtly false and unproven statements such as:

- "[T]he only thing you need to worry about for your cruise is if you packed enough sunscreen."

- "The Coronavirus can only survive in cold temperatures."

- "Scientists and medical professionals have confirmed the warm weather of the spring will be the end of the Coronavirus."

- The coronavirus "cannot live in the amazingly warm and tropical temperatures that your cruise will be sailing to."

3.      These, and undoubtedly other similar statements, were not simply the lies of rogue sales agents, but were explicit talking points and scripts provided by Company executives to its sales force that were used in an attempt to bolster the Company's Class Period bookings and future financial performance.

4.      Defendants were highly motivated to maintain Norwegian's bookings and financial performance.  Since its formation in 2011, Norwegian has grown to be the third largest cruise line company in the world, behind Carnival Corporation and Carnival plc ("Carnival") and Royal Caribbean Cruise Ltd. ("Royal Caribbean").  In the five years leading up to the Class Period, the Company grew rapidly, as Norwegian's total revenue increased 49%, from $4.3 billion to more than $6 billion annually, while its earnings per share ("EPS") increased by 129%.  Defendants achieved this rapid growth while assuring the market that Norwegian, and all its officers, directors, and employees, strictly adhered to a policy of always complying with the "letter and spirit of applicable legal requirements" and upholding the "highest possible standards of ethical business conduct."  This ethos was maintained in the Company's "Code of Ethical Business Conduct" (the "Code"), which recognized that unethical or illegal business practices could seriously damage the Company's reputation and brand equity.  Simply put, investors expected Norwegian to carry itself

equitably while maintaining its trends of rapid growth, increased revenues, and rising EPS, all of which were crucial to the price of Norwegian securities.  By all accounts, 2020 was shaping up to be another year of solid growth for Norwegian, as the Company reported solid bookings growth to end 2019 and was poised to grow its capacity by 8% in 2020.

5.     Norwegian derives the lion's share of its revenue, approximately 70%, from passenger ticket sales, with the remaining 30% coming from passenger spending once on board.  As such, Del Rio, Norwegian's Chief Executive Officer ("CEO"), has stated that "[o]ne of the basic tenets of [Norwegian's] business model" and "[o]ne of the hallmarks of the cruise industry," generally, "is that we always sail with full ships."  To fill its ships, the Company employed a "market-to-fill" strategy designed to drive demand and convince guests to book their cruises early.  According to Del Rio, "[t]he earlier we can get a customer to absolutely commit to a cruise, the better we all are."  Indeed, by extending the "booking window" for its cruises, Norwegian has driven pricing higher, generated more onboard revenue, and improved its overall financial performance.

6.     One of the key drivers of demand was the Company's sales force.  In exchange for lucrative commissions, Norwegian's sales personnel were tasked with ensuring cruises were booked early and booked at maximum capacity and that, whenever possible, cancellations were minimized.

7.     In December 2019, a novel strain of the highly-contagious coronavirus, COVID-19, was discovered in Wuhan, China.  In the early stages of the virus' rapid spread, the largest cluster of COVID-19 cases outside of mainland China occurred in February 2020 on a cruise ship owned by one of Norwegian's biggest competitors, Carnival.  Of the 3,700 passengers and crew on Carnival's Diamond Princess ship, more than 700 tested positive and at least eight people died.

8.     The unrelenting, negative news coverage of the rapidly spreading outbreak and the Diamond Princess tragedy caused a swift and severe impact to the cruise industry.  Norwegian, of course, was not immune to these events, which began negatively impacting the Company's financial performance in late January 2020.  Norwegian saw demand for its cruises vanish rapidly, and Norwegian's ability to redeploy its ships to different parts of the world was limited by the rapid global spread of the coronavirus.

9.     As the Company began to see a decrease in new bookings and an increase in cancellations, and as the outbreak continued to spread, Norwegian was forced to cancel or modify 40 different voyages, resulting in an estimated $0.75 hit to EPS for fiscal year 2020.  But Defendants assured customers – and investors – that Norwegian was taking "several aggressive and proactive measures" to ensure the safety and security of its guests and "working tirelessly to do what is right for our guests, crew and shareholders while protecting the equity of our brands." Defendants also claimed that by February 20, 2020 – the start of the Class Period – Norwegian was seeing an "improvement" in bookings and a "decrease" in cancellations.

10.     Defendants failed to disclose, however, that in the face of the deadly global pandemic, which was negatively and materially impacting the Company's financial performance and operations, Norwegian had violated the Code and implemented and engaged in a host of dangerously misleading and unethical sales practices aimed at luring and duping customers into booking new cruises or rebooking, and not cancelling, their previously scheduled cruises.

11.     Under the direction of the Company's sales managers, including Norwegian Cruise Line's ("NCL") sales "guru," the high-ranking executive Robert "Bob" Becker ("Becker"), Norwegian's sales personnel were directed to lie to and mislead the Company's customers in order

to protect its bookings and combat the negative financial effects of COVID-19 on the Company.[1] Specifically, the Company's sales force was provided with canned responses and one-liners, and was instructed, "DO NOT USE THESE unless the coronavirus is brought up."  For example, during the Class Period, the Company's sales force told concerned customers that booking a cruise on the Company's ships was safe, that "the only thing you need to worry about is if you packed enough sunscreen," and that "[s]cientists and medical professionals have confirmed that the warm weather of the spring will be the end of the Coronavirus."

12.     The Company required its sales force to continue meeting stringent sales quotas even in the face of the deadly COVID-19 outbreak.  Specifically, the sales force was required to make upwards of 150 calls per day, and was threatened with losing previously earned commissions or being fired for failing to meet the daily quotas.  Sales personnel, who were worried about meeting their quotas and the associated repercussions, were pressured to – and did – carry out the Company's deceptive sales campaign, relaying the dangerously false messaging to hundreds or thousands of customers **on a daily basis**.

13.     Defendants were motivated to mislead customers and, in turn, investors, not only to protect the Company's bookings, but to avoid cancellations.  Indeed, under Norwegian's revenue recognition policies, revenue from passenger ticket sales is recognized ratably once a cruise sails, but cancellations must be recognized in the month the cancellation occurs.  Thus, by using deceptive and misleading tactics to pressure customers into rebooking their voyages, rather than cancel outright, Norwegian was able to defer deducting the cancellations from passenger ticket revenue.

---

[1]     NCL was critical to the Company's overall financial performance.  In 2017, Norwegian derived 72% of its gross revenue and 89% of its onboard revenue from the NCL brand alone.

14.     Rather than disclose the truth, Defendants falsely and misleadingly told investors that notwithstanding the negative impact to Norwegian's business from the COVID-19 outbreak, there were still "some silver linings" that pointed to the resilience of Norwegian's business, most importantly "an **improvement** in week-over-week booking volumes," a "moderation" in the declines of bookings, and a "decrease in cancellations."  And in response to analyst questions about how the Company would respond to "panicked" investors concerned about the potential "material long-term impact on bookings," Defendants bragged about Norwegian's marketing acumen, telling investors, "***we're good marketers***" and "***[w]e know how to market our product***."

15.     As a result of these, and other materially false and misleading statements and omissions, described below, Norwegian's securities traded at artificially inflated prices during the Class Period, with the stock reaching a high of $51.58 per share on February 20, 2020, the first day of the Class Period.

16.     Defendants' Class Period fraud and material omissions were ultimately exposed by investigative journalists who published articles based on detailed whistleblower accounts and internal Company emails.  Specifically, on March 11, 2020, the *Miami New Times* published an explosive article, titled "Leaked Emails: Norwegian Pressures Sales Team to Mislead Potential Customers About Coronavirus," which described the Company's deceptive sales campaign, quoted internal Company emails, and confirmed that managers asked sales staff to lie to customers about COVID-19 in order to protect the Company's bookings.

17.     The next day, on March 12, 2020, *The Washington Post* and the *Miami Herald* revealed more disturbing facts about the Company's misleading sales tactics.  For example, *The Washington Post* confirmed that the canned responses and one-liners had been disseminated to "dozens" of employees in Norwegian's two Florida-based sales offices and that, according to a

Company whistleblower, "This is what they're expecting everyone on our sales team to be saying to all of our customers." *The Washington Post* also quoted another internal Company email, in which a ***different*** sales manager based in the Company's Miami office told employees, "[t]he coronavirus will not affect you" and is "an overhyped pandemic scare."

18.     The *Miami Herald* reported that Norwegian's sales managers told employees to be "aggressive" and use the canned responses to "hook in customers."  The *Miami Herald* also disclosed additional details about Becker, who wrote an email to sales personnel, on which Harry Sommer ("Sommer"), NCL's President, CEO and direct report of Del Rio, and other executives were copied, stating that "[n]o one knows or cares about the Coronavirus" and adding, "This is where we turn it up, for every cancellation you get, work harder for your next 3 bookings."  The *Miami Herald* reported that, following the publication of the *Miami New Times* article, Norwegian's Executive Vice President and General Counsel, Daniel Farkas ("Farkas"), told staff, "[e]ffective immediately, if you are referencing the [one-liners] please discontinue using them." Soon thereafter, Becker abruptly took a leave of absence and has since left the Company.

19.     The market reaction to the disclosures in the articles was swift and severe.  After closing at $20.50 per share on March 10, 2020, Norwegian common stock fell nearly ***27%***, or $5.47 per share, to close at $15.03 per share on March 11, 2020, on abnormally high trading volume.  The steep decline accelerated on March 12, 2020, with Norwegian stock dropping an additional ***36%***, or $5.38 per share, to close at $9.65 per share.  The declines in the prices of Norwegian securities caused investors to suffer substantial damages.

20.     Its reputation and important brand equity tarnished, the Company now finds itself the subject of public condemnation by two United States Senators and the target of multiple government investigations.  On March 12, 2020, United States Senators Richard Blumenthal and

Edward Markey sent a letter personally addressed to Del Rio demanding that Norwegian "immediately end the dissemination of any misinformation regarding the COVID-19 pandemic" and calling the Company's "prioritization of profits over people" during the pandemic "truly appalling."  On March 23, 2020, Florida Attorney General Ashley Moody announced that the Consumer Protection Division was conducting an "extensive investigation to get to the bottom of the disturbing allegations against Norwegian Cruise Lines."  And on May 15, 2020, Norwegian revealed in a SEC filing that the Company has "received notification from other attorneys general and governmental agencies that they are conducting similar investigations."

## II.    JURISDICTION AND VENUE

21.    This action arises under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 CFR §240.10b-5.

22.    This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

23.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b)-(d).  Norwegian's principal executive offices are located in this District, many of the acts and practices complained of herein occurred in substantial part in this District, and Defendants disseminated the materially false and misleading statements and omissions complained of herein from this District to investors in Norwegian securities.

24.    In connection with the acts and conduct complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange.

### III.     PARTIES

25.     Lead Plaintiff Employer-Teamsters Local Nos. 175 & 505 Pension Trust Fund, as set forth in the certification previously filed with the Court (ECF No. 19-1) and incorporated herein by reference, purchased shares of Norwegian common stock at artificially inflated prices during the Class Period and was damaged as a result of Defendants' alleged misconduct.

26.     Defendant Norwegian is a global cruise company incorporated in Bermuda with its principal office located at 7665 Corporate Center Drive, Miami, Florida 33126.  Norwegian stock is listed and trades on the NYSE, an efficient market, under the ticker symbol "NCLH."

27.     Defendant Del Rio has served as the Company's Director, President, and CEO since 2015.  Del Rio has extensive experience in the cruise, travel, leisure and hospitality-related industries.  As CEO of Norwegian, Del Rio spoke on Norwegian's behalf in press releases, conference calls, and SEC filings.  In the last five years, Del Rio has earned over $85,000,000 in compensation from Norwegian.  In 2018, his annual salary was *more than 1,000 times* that of an average crew member on one of Norwegian's ships.  As CEO, Del Rio oversees the financial, operational and strategic performance of the NCL, Regent Seven Seas Cruises ("Regent") and Oceania Cruises ("Oceania") brands, the latter of which he founded in October 2002.  Del Rio holds a B.S. in Accounting from the University of Florida and is a Certified Public Accountant (inactive license).

28.     Defendant Kempa has served as the Company's Executive Vice President and Chief Financial Officer ("CFO") since August 31, 2018, and has worked for Norwegian in several different capacities for more than two decades.  As CFO, Kempa spoke on Norwegian's behalf in press releases, conference calls, and SEC filings.  Kempa has extensive experience in the cruise, travel, leisure and hospitality-related industries.  Prior to his appointment as CFO, he served as the Company's Interim CFO from March 2018 to August 2018, and as Norwegian's Senior Vice

President, Finance, from November 2014 to August 2018.  From September 2008 to November 2014, he served as Vice President, Corporate and Capital Planning, and was an instrumental figure in the completion of Norwegian's IPO in 2013.  Kempa holds a Bachelor's degree in Accounting from Barry University.

29.     Defendants Del Rio and Kempa are collectively referred to herein as the "Individual Defendants."

30.     During the Class Period, the Individual Defendants, as senior executive officers of Norwegian, were in possession of confidential and proprietary information concerning the Company, its operations, business prospects, and overall financial condition.  By reason of their positions within the Company, the Individual Defendants also had access to material, adverse, nonpublic information concerning Norwegian via internal corporate documents and communications with other corporate officers and employees, attendance at management and/or Board meetings, and via the reports, presentations, and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or disregarded with severe recklessness that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

31.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors of the Company, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly control the conduct of Norwegian's business.

10

32.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Norwegian's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, and, through them, to the investing public.  The Individual Defendants had the ability and opportunity to prevent the issuance of the false and/or misleading statements and omissions described herein or cause them to be corrected.  Because of their positions within the Company, and their access to material, nonpublic information, the Individual Defendants knew, or disregarded with severe recklessness, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then false and misleading.  The Individual Defendants had the opportunity to commit the fraudulent acts alleged herein and are liable for the false statements pleaded herein.

33.     As senior executive officers of Norwegian, and as controlling persons of a publicly traded company whose stock was and is registered with the SEC pursuant to the Exchange Act, and was and is traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding Norwegian's operations, business, financial metrics, and financial statements, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Norwegian securities would be based upon truthful and accurate information.  Defendants' materially false and misleading misstatements and omissions during the Class Period violated these requirements and obligations.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background on the Company

34.     Formed in 2011, Norwegian has grown rapidly to become the third largest cruise line company in the world.  The Company describes itself as a "leading global cruise company"

and operates three cruise line brands, NCL, Oceania, and Regent, with a total of 27 ships in its fleet as of 2019.  The Company offers cruises to approximately 450 destinations worldwide.

35.    NCL is the Company's largest, and most well-known brand, with 17 ships, including the popular Norwegian Encore, the best booked, highest priced Caribbean-introduced ship in the Company's history.  In 2017, the Company derived 72% of its gross revenue and 89% of its onboard revenue from the NCL brand alone.  During the Class Period, Sommer was the President and CEO of NCL and reported directly to Del Rio.  Sommer and Del Rio have a long history, having worked together in the cruise industry for over 25 years.

36.    The Company categorizes revenue from its cruise and cruise-related activities as either "passenger ticket" revenue or "onboard and other" revenue.  In 2019, nearly **70%** of the Company's total revenue was derived from passenger ticket revenue, which primarily consists of the cruise fare, accommodations, meals on the ship, certain onboard entertainment, port fees and taxes, among other items.  "Onboard and other revenue" is comprised of revenue from additional products and services not included in the cruise fare, such as revenue from casino operations, beverage sales, shore excursions, specialty dining, retail sales, spa services, and photo services.

37.    Although Norwegian sells cruises on an international basis, the Company's U.S.-sourced customers is its largest and most important demographic, as the majority of Norwegian's passenger ticket revenue comes from U.S.-based guests who make reservations in the U.S.  For example, in 2019, 81% of the Company's revenue was attributable to U.S.-sourced guests.

38.    When a customer books a cruise, a deposit is typically required at or soon after the time of booking, with the final payment due between 120 and 180 days before the voyage.  Under the Company's revenue recognition policies, deposits on advance ticket sales are deferred when received and subsequently recognized as revenue ratably during the voyage sailing days as services

are rendered on the ship.  However, cancellation fees are recognized in passenger ticket revenue in the month of the cancellation.

**B.     Leading up to the Class Period, Defendants Touted Norwegian's Growth and Strong Business Prospects**

39.     In the years leading up to the start of the Class Period, Norwegian was barreling "full speed ahead," and was poised to grow its capacity by 8% in 2020, which was set to a "banner year."  Indeed, year-after-year, Norwegian reported increasing revenue and rapidly rising EPS to shareholders:

|               | 2015    | 2016    | 2017    | 2018    | 2019    |
|---------------|---------|---------|---------|---------|---------|
| Total Revenue | $4.345B | $4.874B | $5.396B | $6.055B | $6.462B |
| EPS           | $1.89   | $2.79   | $3.33   | $4.28   | $4.33   |

40.     As demonstrated by the table above, in the five-year period from 2015 to 2019, Norwegian's total revenue increased 49%, to more than $6 billion annually, while its EPS increased by an incredible 129%.  There was, put simply, an expectation among investors and analysts following the Company that Norwegian's trend of rapid growth, increasing revenues, and rising EPS would continue.  Maintaining that expectation, and delivering on that growth, was crucial to the price of Norwegian securities.

41.     In fact, at the end of 2019, analysts and investors alike took particular notice of certain key metrics reported by the Company that indicated strong growth and future prospects. Specifically, Defendants told investors that Norwegian's booking window (the period of time between when a reservation is made by the guest and their check-in date) had expanded 10% in the third quarter of 2019, and that advance ticket sales had increased 12.5% over the prior year, outpacing the expected capacity increase of 8.7% in 2020.  A longer booking window means customers are committed to the cruise further out from the departure date, which decreases the likelihood of cancellation and increases onboard spending, as guests who pay for their cruise far

13

in advance bring a "fresh wallet" on their trip and are inclined to spend more once on board.  As Del Rio has stated, "[t]he earlier we can get a customer to absolutely commit to a cruise, the better we all are."

42.     Moreover, entering 2020, Norwegian reported "the best booked position" at "prices higher than last year's record levels" across all three brands, which put the Company in an excellent position as it entered the cruise industry's high season for ticket sales, known as "Wave Season."  Wave Season is akin to the "Black Friday" of cruising.  But instead of lasting a single day, Wave Season stretches from January through March, and represents a busy season when many cruises are booked as travelers seek to schedule their trips early in the year, giving them something to look forward to, such as a warm weather escape from cold northern winters.

43.     During this period, cruise lines typically push their best promotions, which can include anything from discounted prices on a specific cruise to boosts on amenities, like onboard internet or beverage packages.  Wave Season is of critical importance to cruise companies, which typically see bookings take off, and Norwegian was no different.  For example, during the 2019 Wave Season, Norwegian "witnessed the highest pricing of sold inventory in the history of the company."  For Norwegian, early 2020 Wave Season activity saw an acceleration of both booking volumes and pricing across all three of its brands through late January 2020, until the COVID-19 outbreak began having an adverse impact on its business, as discussed in more detail below.

C.     **Norwegian's Marketing and Sales Teams Are the Engines that Drive the Company's Revenue Stream**

44.     According to Del Rio, "[o]ne of the basic tenets of [Norwegian's] business model" and "[o]ne of the hallmarks of the cruise industry," generally, "is that we always sail with full ships."  Selling cruises to passengers, which in turn, increases passenger ticket revenue and keeps the Company's ships sailing at full capacity, was of the utmost importance to Norwegian's

financial success.  Unsold cabins, on the other hand, mean lower passenger ticket revenue, fewer passengers to boost "onboard and other" revenue, and less capital to allocate to long-term improvements and new cruise ships.  Extending the Company's booking window, *i.e.*, locking in customer reservations far in advance of voyage departure dates, was also important to Norwegian's ability to maximize ticket prices and increase revenue.

45.     The Company has described its marketing and sales initiatives as the "engines" that power Norwegian's revenue stream, and to that end, made substantial investments in marketing in the years leading up to the Class Period.  For example, Norwegian has described its marketing organization as "extremely data-driven" and the Company constantly monitors and optimizes marketing performance to expand the booking curve.  The Company also supports its marketing initiatives with state-of-the-art resources and seeks to foster a corporate culture that encourages its team to work in tandem and across all of its brands to "fine tune" the Company's "customer-centric" offerings and maximize its top and bottom line results.

46.     In order to attract vacationers to its products and services, Norwegian relies heavily on "effective marketing and sales initiatives" along with its market-to-fill strategy, which encourages guests to book earlier, extends the Company's booking window, and drives higher pricing and onboard spending.  Norwegian employs multichannel marketing campaigns, including television and digital advertisements and targeted mail campaigns designed to entice customers with "a message of a value-packed cruise offering."

47.     Norwegian's sales force also played a critical role in increasing passenger ticket revenue, and was one of the Company's key "drivers of demand."  The Company's sales employees were tasked with ensuring cruises were booked early and at maximum capacity.  To that end, Norwegian's sales employees were required to meet sales quotas, including making over

150 sales calls per day to potential customers while working five (or more) hours a day making calls.  On top of booking new reservations, Norwegian's sales personnel were also tasked with deterring customers from cancelling previously booked voyages.  This was important to the Company, because while deposits for future travel and the cost of trips themselves were not recognized as revenue until the voyage commenced (at which point they were recognized ratably), cancellations were deducted from the Company's passenger ticket revenue *in the month that the cancellation was requested*.  As a result, if a customer wanted to cancel a previously-booked trip, Norwegian's sales representatives were instructed to encourage the customer to defer, rebook, or modify their itinerary, rather than provide a refund.

48.    During the Class Period, Sommer was the President and CEO of Norwegian's biggest and most popular brand, NCL, having taken the helm at the beginning of 2020.  Upon assuming the role of President and CEO, Sommer made certain changes to NCL's sales organization, including doubling the size of the sales service team in Miami.  Becker, who had already worked at the Company for over a decade, was NCL's Executive Vice President of Consumer Research & Passenger Services.  Upon joining the Company in 2008, Becker received a salary of $250,000, plus an incentive bonus between $350,000 and $750,000, along with equity in the Company.  During the Class Period, Becker reported directly to Sommer, who in turn, reported directly to Del Rio.

49.    Sommer has praised Becker for "changing the culture of our call center people." At Norwegian, Becker was known for his aggressive sales tactics.  Under his direction, employees who had previously focused on customer service were given training on how to "close" sales. According to one employee, "[i]t's a 'whatever you have to do to save the sale' mentality ever since [Becker] came into play."

50.   Even outside the Company, Becker was known as a sales "guru" who would often host and lead seminars on sales techniques.  For example, during the "How to be a Sales Superstar" presentation, given at the American Society of Travel Advisors' 2014 Global Convention onboard Norwegian's Breakaway ship, Becker pronounced that sales was "a phone game," advising those looking to increase their sales to "make 100 outbound dials a day," and reminding them "[y]ou are in a sales position, not customer service."  Becker explained, "[t]he people who think they are in customer service make a lot of friends, but they go belly up" and told attendees, "[t]o be a successful sales person, you must be great at customer service – but get the credit card first."

51.   The Company's sales staff was incentivized to follow Becker's aggressive sales techniques because they made most of their income from cruise booking commissions, which ranged from 1% to 5% depending on the number of bookings closed per month.  Conversely, cancellations result in sales staff losing their commissions, with sales agents being docked commissions for every cancelled ticket – even if that commission had already been paid.  In other words, in some instances sales personnel were required to pay back the previously earned commission to the Company.

### D.   A Novel Coronavirus Is Discovered and Begins Wreaking Havoc On the Cruise Industry

52.   On December 31, 2019, the World Health Organization ("WHO") was formally notified about a cluster of cases of pneumonia in Wuhan City, China.  By January 5, 2020, there were 59 known cases, though none had been fatal.  By January 20, 2020, the WHO was aware of 282 confirmed cases, four of which were in Japan, South Korea, and Thailand.  The cause of the severe acute respiratory syndrome was a novel virus, initially known as severe acute respiratory syndrome coronavirus 2, (SARS-CoV-2), or, more generically, coronavirus.  The disease caused by the coronavirus would later be named COVID-19.

53.     While the coronavirus had, initially, been contained in mainland China, with smaller clusters of cases being reported in other Southeast Asian countries, the largest cluster of COVID-19 cases outside mainland China first occurred on the Diamond Princess, a cruise ship operated by Carnival Corp.'s Princess Cruises, dubbed "the cruise ship from hell," as a result of its experience with the coronavirus.

54.     On January 20, 2020, an 80-year old passenger from Hong Kong embarked in Yokohama, Japan, sailed one segment of the itinerary, and disembarked in Hong Kong on January 25, 2020.  Six days after leaving the ship, he visited a local Hong Kong hospital, and on February 1, 2020, he tested positive for COVID-19.

55.     On January 30, 2020, the WHO declared COVID-19 outbreak a global health emergency.  The Diamond Princess continued its voyage.  On February 4, 2020, the ship was in Japanese waters when 10 passengers were diagnosed with COVID-19.  The ship and its 3,700 passengers and crew were quarantined at the port of Yokohama, Japan.  In a horrible and well-documented tragedy, more than 700 Diamond Princess passengers and crew ultimately tested positive for COVID-19, and at least eight people died.

56.     On February 21, 2020, the CDC recommended avoiding travel on cruise ships in Southeast Asia.  The cruise industry became the focus of intense and relentless media scrutiny, with some headlines referring to the "coronavirus cruise ship nightmare," the "pariah cruise ship," or "floating petri dishes."

57.     By the beginning of March, the number of cases outside China had increased 13-fold, and the number of affected countries had tripled.  Behind China, South Korea, Italy, and Iran became the hardest hit countries at the outset, but within weeks, the virus became a global pandemic.

58. Despite the pandemic, cruise ships continued to sail. As the *Miami Herald* reported: "Just how many passengers and crew got sick or died [on cruise ships] is impossible to know. No global health body or regulatory agency is known to be tracking those statistics. And the cruise industry – which downplayed the dangers to consumers and kept sending out ships despite outbreaks on board and warnings from public health officials – has largely stayed silent about the toll."

**E.  Despite the Deadly Health Consequences of COVID-19 and its Rapid Spread on Cruise Ships, Norwegian Deliberately Misled Customers About the Danger and Impact of the Coronavirus Outbreak to Protect the Company's Bookings**

59. By the beginning of the Class Period, the COVID-19 outbreak, and the unrelenting and continuous global news coverage of it, had caused a "swift and severe" negative impact to Norwegian's business. As customer concerns about traveling to China quickly expanded to trepidation about the broader Asia region, Norwegian was forced to cancel or modify 40 voyages: six for Regent, 10 for Oceania, and 24 for NCL. And, as news of the Diamond Princess's quarantine in Japan became the focus of negative media and customer attention, Norwegian began experiencing a broader and more meaningful slowdown in bookings and an increase in cancellations for sailings outside of Asia.

60. In the face of the rapidly spreading coronavirus, Norwegian assured investors that the Company was taking "aggressive and proactive measures to assure the safety, security and well-being" of its guests and crew. In truth, however, and unbeknownst to investors, Norwegian's sales personnel had been instructed to deliver the Company's newest sales pitch: providing dangerously misleading and blatantly false information to customers about the coronavirus – in compete disregard of their "safety, security and well-being" – in order to protect the Company's bookings, decrease cancellations, and buoy revenues.

61.     According to an internal Company email, Becker was at a bar in Buffalo, New York, when he realized "they do not sell Corona so therefore Coronavirus is a non-issue. . . .  No one knows or cares about the Coronavirus."  In an email to employees, on which Sommer and other executives were copied, Becker wrote, "*[t]his is where we turn it up, for every cancellation you get, work harder for your next 3 bookings*."  Becker's message on behalf of the Company was loud and clear: Norwegian would *increase* its sales efforts in the face of the coronavirus outbreak, customer health be damned.

62.     Becker developed a script of canned responses for sales personnel to use in order to "help close your guests that are on the fence," but instructed, "DO NOT USE THESE unless the coronavirus is brought up."  According to whistleblower employees, however, "[e]very single call" the Company received during the Class Period was "about the virus.  Everyone wants to know what's going on, what's happening to the ships.  Most people just want to cancel."

63.     The one-liners sales employees were directed to use, which were distributed via email to dozens of employees in Norwegian's two Florida-based sales offices, contained misleading, unproven, and dangerously false information about the coronavirus.  For example, sales employees were instructed to tell customers:

- "The only thing you need to worry about for your cruise is do you have enough sunscreen?"

- "The Coronavirus can only survive in cold temperatures."

- "Scientists and medical professionals have confirmed that the warm weather of the spring will be the end of the Coronavirus."

- The coronavirus "cannot live in the amazingly warm and tropical temperatures that your cruise will be sailing to."

64.     These and similar statements crafted by Norwegian's sales managers lacked any basis in fact, and the Company certainly had no data beyond rank speculation and disregard for

human health for requiring the Company's sales staff to use them on existing and potential customers.

65.     Employees were also told to be "aggressive" and apply high-pressure sales tactics to "hook in customers" and induce them into booking cruises.  Specifically, according to an internal Company email, employees were instructed to create a false sense of ***increased*** demand for Norwegian's cruises by telling customers, "due to the Coronavirus we have cancelled all of our Asia cruises on the *Norwegian Spirit*.  This has caused a huge surge in demand for all of our other itineraries.  I suggest we secure your reservation today to avoid you paying more tomorrow."

66.     According to a Company whistleblower, the same message was relayed to sales employees at department meetings, during which managers downplayed the risk of the coronavirus to employees, telling them that the coronavirus "isn't a big deal," that "more people die from other things" and that "the coronavirus is not as bad as the media says."  Sales employees, who were worried about hitting quotas, losing previously earned commissions, being put on personal improvement plans, or being fired, felt pressured to – and did – carry out Norwegian's top-down directed, dangerously misleading sales pitch.  And, because sales personnel were required to make more than 150 calls per day, hundreds or thousands of people were receiving this false information ***on a daily basis***.

67.     Indeed, customers on the receiving end of the Company's dangerously misleading sales campaign complained about Norwegian's high-pressure sales tactics.  For example, customers posted warnings and negative reviews on consumer watchdog websites like www.consumeraffairs.com, writing:

- We booked a cruise for April 2020, about a month after making the reservation the new coronavirus outbreak occurred.  We contacted customer service by telephone and email communications for weeks inquiring about the status of the cruises during this outbreak.  ***We were assured everything***

>*was fine and that the virus would not affect the area we were traveling to due to the warmer climate*. . . .  Out of growing concern that the virus was not controlled and that cruising was a poor choice at this time, we cancelled our cruise on February 28th 2020 incurring a 75% cancellation penalty.

- I would never book NCL again.  I have cruised with them before, but when COVID-19 appeared, I canceled as I am in the at-risk age group.  *I started calling in February to ask about their policy and they assured me that all was well and I would not get sick on my April 26 cruise.*

- . . . *I won't even get into the lies NCL is stating, but there are many.*  I will not do business with a company who treats customers so poorly!!!

**F.      While Norwegian Misled Customers, Defendants Misled Investors**

68.      As the Company actively engaged in a coordinated, top-down sales campaign to mislead Norwegian's existing and potential customers, Defendants' Class Period statements omitted material information, rendering them false and misleading when made.  For example, Defendants assured investors that the Company had "taken several proactive measures to protect the health and safety of our guests" while concealing that Norwegian's sales personnel had been instructed to provide customers with unproven or dangerously false information about the coronavirus – in blatant disregard of their "health and safety" – in order to protect the Company's bookings.

69.      Additionally, Defendants told investors that, notwithstanding the negative impact to Norwegian's business from the coronavirus outbreak, there were still "some silver linings" that "point to the underlying resilience of our business and the potential for a reasonably timed recovery."  According to Defendants, the "most important[]" indicator was that the Company was seeing "an improvement in week-over-week booking volumes," was "no longer seeing week-over-week acceleration in the declines of bookings," and was experiencing "moderation" and a "decrease in cancellations."  And, incredibly, when questioned by analysts during the Class Period on how the Company planned to counter investor concerns that the coronavirus "is going to linger

for a long time" and "have a material long-term impact on bookings," Del Rio touted Norwegian's marketing expertise, bragging that "***we're good marketers.  We know how to market our product***."

70.     But Defendants were not – as they falsely told investors – "working tirelessly to do what is right for our guests, crew and shareholders while protecting the equity of our brands." Rather, unbeknownst to investors, the Company's sales personnel – the key "drivers of demand" – were following orders by engaging in a sales campaign that threatened its customers' health and Norwegian's brand image, and would result in enormous losses to shareholders once the truth was revealed.

### G.     Detailed Whistleblower Accounts and Internal Company Emails Expose Norwegian's Dangerously Misleading Sales Campaign, Causing Substantial Losses to Investors When the Truth is Revealed

71.     Before the market opened on March 11, 2020, the *Miami New Times* published an explosive article titled, "Leaked Emails: Norwegian Pressures Sales Team to Mislead Potential Customers About Coronavirus," which provided a detailed whistleblower account describing how Norwegian instructed its sales staff to "lie to customers about COVID-19 to protect the company's bookings."  The article reported that, according to one whistleblower employee, "These discussions take place every day.  And even during our department meetings, managers tell us that it isn't a big deal, that more people die from other things."

72.     Among other disturbing information, the article included exact quotes from leaked internal Company emails distributed to Norwegian's sales staff, which provided "one liner's [*sic*] to help you close your guests that are on the fence.  DO NOT USE THESE unless coronavirus is brought up."  Specifically, the email instructed sales personnel to engage in high-pressure sales tactics, like creating a (false) sense of demand for the Company's cruises by telling customers:

> [D]ue to the Coronavirus we have cancelled all of our Asia cruises on the *Norwegian Spirit*.  This has caused a huge surge in demand for all of our other

itineraries.  I suggest we secure your reservation today to avoid you paying more tomorrow.

73.    The email also told sales personnel to assuage customer concerns about the COVID-19 outbreak by providing unproven and blatantly false information about the deadly disease, such as:

- "The only thing you need to worry about for your cruise is do you have enough sunscreen?"

- "The Coronavirus can only survive in cold temperatures, so the Caribbean is a fantastic choice for your next cruise."

- "Scientists and medical professionals have confirmed that the warm weather of the spring will be the end of the Coronavirus."

- Coronavirus "cannot live in the amazingly warm and tropical temperatures that your cruise will be sailing to."

74.    The *Miami New Times* article also revealed, based on statements by a Company whistleblower, that, contrary to Defendants' public statements that they were taking "aggressive and proactive measures" to assure the "security and well-being of our guests" and "working tirelessly to do what is right for our guests," Norwegian was more concerned about its profits than the health and safety of travelers.  According to the Company whistleblower, sales personnel, who were concerned about meeting sales quotas, losing previously earned commissions, being put on a personal improvement plan, or being fired, felt "pressured to persuade customers not to cancel their trips."  Notwithstanding these high-pressure and deceptive sales tactics, the Company was "hardly selling anything" and sales were "at serious lows."

75.    In addition, the *Miami New Times* article detailed how Norwegian had failed to respond to "multiple requests for comment" and that after the paper sent those requests, a Company manager emailed some Company employees to say the paper was "working on a nasty story" and that the Company "won't be responding as agreed."  The article made clear that the Company was

24

focused on profits, not passenger safety, and that internal Company emails showed that Norwegian's managers were "trying to find the employee who 'ratted and lied' about the company."

76.     The next day, on March 12, 2020, *The Washington Post* and the *Miami Herald* revealed more disturbing facts about the Company's misleading sales tactics.  *The Washington Post* published an article titled, "Norwegian Cruise Line managers urged salespeople to spread falsehoods about coronavirus," which confirmed that the misleading one-liners had been distributed via-email to "several dozen" Norwegian salespeople in two Florida-based offices by a seasoned manager and that, according to a whistleblower employee, "[t]his is what they're expecting everyone on our sales team to be saying to all of our customers."  The whistleblower also confirmed that "[e]very single call we're getting right now is about the virus" and that most people "just want to cancel" their cruises.

77.     *The Washington Post* article quoted from another internal Company email, in which a Norwegian sales manager based in the Company's Miami office wrote that "The coronavirus will not affect you" and called the virus in humans "an overhyped pandemic scare."  According to a Company whistleblower, the manager mocked those with health and safety concerns, writing, "[f]ocusing all of your attention is actually illogical, especially when we live in a world of daily threats and dangers anyhow[.]"  *The Washington Post* also reported that, rather than deny the incriminating allegations, a Norwegian executive was trying to determine which "[o]ne of our own ratted."

78.     Also on March 12, 2020, the *Miami Herald* published an article titled, "After encouraging staff to mislead cruise customers about COVID-19, Norwegian reverses," reporting that the Company had "backpedaled" after "encouraging staff to mislead concerned customers

about the risks of taking cruises during the COVID-19 outbreak." The article confirmed that the Company's deceptive sales scheme was not only relayed via email, but also during sales meetings, and that managers told employees to "keep being aggressive." According to a whistleblower, sales personnel were using the one-liners "to hook in customers." The *Miami Herald* reported that "[s]enior vice president in the marketing department Bob Becker repeatedly downplayed the virus to employees," including writing in an email that "[n]o one knows or cares about the Coronavirus." Rather than protect customer safety and Norwegian's brand equity, the article reported that Becker wrote, "This is where we turn it up, for every cancellation you get, work harder for your next 3 bookings." The article also confirmed that NCL's CEO Sommer and "other executives" were copied on the email.

79.     The *Miami Herald* also revealed that on March 5, 2020, a Company sales manager instituted a "March Madness challenge" designed to boost sales. As reported in the article, the challenge was that "[f]or employees who agree to work 28 days out of the month, the company will waive half of the cancellation fees they incurred in February." Additionally, the *Miami Herald* revealed that Becker was actively trying to keep the deceptive sales tactics from being reported to the public, and told Company employees in a March 9, 2020 email to avoid journalists, writing, "nobody speaks to the media ever." And, according to the *Miami Herald*, shortly after the publication of the *Miami New Times* article, Norwegian's Executive Vice President and General Counsel Farkas sent an email to the Company's sales staff that stated, "Effective immediately, if you are referencing the below, please discontinue using them." Notably, Farkas' email included a list of the lines previously approved and distributed to the sales force.

80.     The market's reaction to the disclosures in the articles was swift and severe. After closing at $20.50 per share on March 10, 2020, Norwegian common stock fell nearly **27%**, or

$5.47 per share, to close at $15.03 per share on March 11, 2020, on abnormally high trading volume.  The steep decline continued and accelerated on March 12, 2020, with Norwegian stock dropping an additional *36%*, or $5.38 per share, to close at $9.65 per share.

81.    On March 12, 2020, in a statement to the *Miami New Times*, Norwegian wrote, "We remain committed to operating with integrity and providing our guests with the best possible vacation experiences across the globe.  We are aware of the article in question and are looking into the matter."  Conspicuously absent from Norwegian's statement, however, was any denial of the sales practices in question.

> **H.    After the Class Period Ends, the Fallout from Norwegian's Deceptive Sales Practices Continues**

82.    On March 12, 2020, in an extraordinary move, United States Senators Richard Blumenthal of Connecticut and Edward J. Markey of Massachusetts sent a letter ***personally addressed to Del Rio*** publicly condemning him for Norwegian's dangerously misleading sales practices.  Specifically, the Senators wrote to "demand that Norwegian Cruise Line immediately end the dissemination of any misinformation regarding the COVID-19 pandemic" and "strongly urge[d] [Del Rio] to consider suspending all operations until sufficient measures are in place to protect the health and safety of your passengers and crewmembers."

83.    The letter also referenced the "disturbing reports" that "indicated that some members of Norwegian's management asked sales staff to provide false information to customers regarding the COVID-19 pandemic in order to protect the company's bookings."  Quoting the canned responses sales staff had been instructed to give customers, the letter observed that "[t]hese claims are simply untrue, and – under the circumstances – dangerous to public health[.]"  The Senators chastised Del Rio, writing, "***Norwegian's prioritization of profits over people during***

*this pandemic is truly appalling, and we demand that the company take action to cease all such behavior immediately*."

84.     The recklessness of Norwegian's deceptive sales campaign, which contradicted Defendants' Class Period statements regarding the Company's commitment to passenger and crew safety and the express need to protect the Company's brand equity, was brought even more into focus the next day, on March 13, 2020, when the Cruise Lines International Association ("CLIA"), the world's largest cruise industry trade association, announced a suspension of cruise operations from United States ports of call for thirty days.  Norwegian, along with other cruise companies, suspended all its voyages on that day.  On March 14, 2020, the Director of the CDC issued a "No Sail" Order for cruise ships, concluding that "cruise ship travel markedly increases the risk and impact of the COVID19 disease outbreak in the United States," "exacerbates the global spread of COVID19," and that the cruise industry failed to control the spread of the disease sufficiently, causing an unnecessary burden on the already over-burdened local, state, and national healthcare systems.  In other words, only one day after Norwegian's General Counsel directed the Company's sales personnel to "discontinue using" the dangerously misleading one-liners, the Director of the CDC proclaimed that cruise ships were, in part, responsible for the COVID-19 outbreak in the United States.

85.     On March 19, 2020, *Business Insider* reported that Becker had taken a leave of absence from Norwegian "after encouraging his sales teams to downplay the coronavirus when selling cruises."  Though the Company did not make any formal announcements regarding his leave, a Norwegian employee told the media outlet that "[a]n automatic response to Becker's work email address. . . said he is 'temporarily unavailable' and sent instructions to contact the president and CEO of Norwegian Cruise Line, Harry Sommer, directly."

86. Then, on March 23, 2020, Florida Attorney General, Ashley Moody, issued a press release announcing a consumer protection investigation into "allegations of misleading and potentially dangerous sales pitches by Norwegian Cruise Lines." The press release stated:

> According to reports, NCL provided its sales force with inaccurate one-liners to respond to customer concerns about COVID-19. The misleading sales scripts allegedly downplayed the severity and highly contagious nature of the novel coronavirus in an effort to close cruise package sales.

87. Quoting Moody, the press release further stated:

> We are in the thick of a public health crisis like our modern world has never experienced. My Consumer Protection Division is conducting an extensive investigation to get to the bottom of the disturbing allegations against Norwegian Cruise Lines. Let this serve as a warning to anyone seeking to mislead consumers during these challenging times. I will do everything within the power of this office to hold accountable those who would prey on Floridians during this health crisis.

88. Following the announcement of the investigation by Florida Attorney General Moody, Norwegian revealed to investors in a May 15, 2020 SEC filing that the Company has "received notifications from other attorneys general and governmental agencies that they are conducting similar investigations."

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### A. February 20, 2020 Press Release and Earnings Conference Call

89. The Class Period begins on February 20, 2020. On that date, Norwegian issued a press release announcing its financial results for the fourth quarter and full year ended December 31, 2019, and providing guidance for the first quarter and full year 2020.

90. In addition to reporting financial results and guidance, the Company provided an update on its operations in light of the ongoing COVID-19 outbreak, stating that Norwegian entered the year "with a record booked position and at higher pricing," and assuring investors that,

"[d]espite the current known impact" from the outbreak, the "Company's booked position remained ahead of prior year and at higher prices on a comparable basis."

91.    Quoting Del Rio, the press release also stated that the Company had "taken several proactive measures to protect the health and safety of our guests and crew throughout our fleet" and "in an abundance of caution" had "cancelled or modified several voyages in the Asia region through the third quarter of this year."

92.    On that same day, Norwegian hosted an earnings call for analysts and investors to discuss the Company's financial results, guidance, and operations.  Del Rio began the conference call by acknowledging that the COVID-19 outbreak was "on top of everyone's mind," and assured investors that the Company "aim[ed] to be *as transparent as possible*."

93.    Summarizing Norwegian's 2019 financial results, Del Rio attributed the "record" results to the "strength and resilience" of the Company's "business model" founded, in part, on its "go-to-market strategy of emphasizing value over price as the main lever to drive demand."

94.    Discussing the "chronology of events" following the initial outbreak in China, Del Rio stated that the impact to Norwegian was "minimal" at first given that the Company had zero capacity "dedicated to the Chinese source market," but concerns then "extended very quickly to include 10 Asian voyages that originated outside of China, but that called on Chinese ports" and "trepidation by American and other western consumers resulted in increased cancellations and a slowdown in new bookings for sailings in the region."  Del Rio acknowledged that, as negative news coverage of the outbreak and the cruise industry intensified, the Company began experiencing "a broader and more meaningful slowdown in new bookings and an increase in cancellations" for "sailings outside of Asia."

95.     Del Rio told investors and analysts that the Company had "taken several aggressive and proactive measures to assure the safety, security and well-being of our guests and crew" and that, "[i]n an abundance of caution," the Company had "canceled or modified the remainder" of its voyages in the Asia region through the end of the third quarter, affecting a total of 40 voyages in all.

96.     Notwithstanding the negative impact from the coronavirus, Del Rio assured investors that there were still "some silver linings" that pointed to the resilience of Norwegian's business, including that in "the previous 5 days, [the Company had] *seen an improvement in week-over-week booking volumes and a decrease in cancellations when compared to the prior 3 weeks*."

97.     In prepared remarks, Kempa made clear that Norwegian would "continue to monitor" the COVID-19 outbreak "and its potential impact to our results."  Continuing, Kempa added that "*[t]he team at Norwegian Cruise Line Holdings is working tirelessly to do what is right for our guests, crew and shareholders while protecting the equity of our brands*."

98.     During the question-and-answer portion of the conference call, in response to an analyst question about "customers rebooking interest at this point," Del Rio claimed the situation was "similar to what we see – we have seen in past similar events" and again reassured investors that "*over the last 5 booking days*" the "*decline*" in bookings *"has moderated.  So that we are no longer seeing week-over-week acceleration in the declines of bookings and increasing cancellations, we're seeing a moderation* . . . ."

99.     As the call continued, Defendants were asked to discuss Norwegian's "strategy on price integrity" in light of the "small improvement" in "bookings and cancellations," including how Norwegian was "thinking strategically about stimulating demand."  Del Rio stated that the

Company did not intend to deviate from its "***long-term proven go-to-market strategy of focusing on value to consumers over using low price as a lever to stimulate demand.***"  Recognizing that the Company "[would] need to stay competitive," Del Rio reassured investors that "***we will not do it in a way in which we believe will hurt the long-term brand equity*** . . . [w]e're going to compete in the marketplace with that elusive customer" but "do it in a way that does not have price as the main driver" instead focusing on "***the value proposition to lure that customer that may be out there***."

100.    Later in the February 20, 2020 conference call, Defendants were asked how the Company planned to counter investors who were "absolutely panicking" over concerns that the coronavirus "is going to have a material long-term impact on bookings and crews" and that the coronavirus is "going to linger for a long time."  In response, Del Rio stated that "[c]onsumers do have a relatively short memory, thank God" and specifically touted the Company's marketing prowess, stating "***we're good marketers***" and adding that, "***We know how to market our product. We market value over price, and I think that our go-to-market strategy will serve us well in these challenging times, more so than if all we did was drop price.***"

101.    As the call went on, Defendants were asked specifically for commentary on the Company's "shorter-term bookings" and whether Norwegian was "seeing any sort of differentiation" or "shifting preferences" to locations "that are further away from Asia or other areas" that might be "deemed 'safer.'"  In response, Del Rio stated, "[w]hen you peel back the onion [on bookings and cancellations] and do a deeper dive[, w]hat we're seeing is, especially by the American customer, those destinations that they deem to be safer" like Alaska and the Caribbean "are faring better than others" and that because "[i]n many cases, you don't have to get

on an airplane to get to the Caribbean ports those seem to be doing better than some of the more exotic or far-flung destinations."

102.   When an analyst asked Defendants "how many cases of coronavirus" Norwegian had experienced on its sailings and with passengers year-to-date, Del Rio responded aggressively, shooting down the question and seeking to differentiate Norwegian from its competitors, stating, "Are you kidding me?  Do you know who you're talking to, which company you're talking with? Zero, absolutely zero. . . .  There's been only one company with coronavirus outbreaks, one, and it's not us."  As the exchange continued, Defendants were pressed to quantify the indirect impact of the coronavirus if "bookings went back to normal tomorrow," in response to which Del Rio stated clearly, "There will be no indirect impact."  When the same analyst attempted to ask a follow-up question, stating, "[B]ut you said there's been weak bookings for about a month so. . . ," Del Rio abruptly cut the analyst off and told the conference call operator to move to the "[n]ext one up on the lineup, please."

103.   Analysts were cautiously optimistic about Defendants' comments during the conference call.  In particular, they viewed the improvement in bookings and the decrease in cancellations as a positive.  For example, in a report dated February 20, 2020, Morningstar pointed to comments that highlighted the strength of Norwegian's business, including that "over the past five days, Norwegian has experienced an improvement in week-over-week bookings and a decrease in cancellations relative to the last three weeks."

104.   Similarly, in a February 20, 2020 analyst report, JPMorgan stated that one "positive" from the conference call is that "bookings over the past week improved (week-over-week) and cancellations were lower than the prior 3 weeks; meanwhile, NCLH's booked position is still 'slightly' ahead year-over-year despite the material slowdown (like-for-like)."

B.     **February 27, 2020 10-K**

105.     On February 27, 2020, the Company filed its Form 10-K with the SEC for the year ended December 31, 2019 ("2019 10-K").  The 2019 10-K included sworn certifications pursuant to the Sarbanes-Oxley Act of 2002 signed by Del Rio and Kempa, certifying, among other information, that: "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

106.     With respect to Norwegian's "Business Strategies" for "Driving Demand," the 2019 10-K told investors that the Company "seek[s] to attract vacationers to our products and services in several ways" including "*utilizing effective marketing and sales initiatives with a market-to-fill strategy*."  The 2019 10-K explained that the Company also seeks to "increase demand" via "[e]ffective marketing campaigns across various channels" and through its "sales forces" which "are also drivers of demand."

107.     Additionally, the 2019 10-K stated that Norwegian's "*targeted and high-frequency marketing campaigns communicate a message of a value-packed cruise offering*" and that the Company "utilize[s] call centers to drive high potential targeted customers and increase the effectiveness of these targeted marketing programs."

108.     Discussing the Company's ship operations and cruise infrastructure, the 2019 10-K assured investors that Norwegian "*place[s] the utmost importance on the safety of our guests and crew*."

109.     The 2019 10-K also provided a list of risk factors, purportedly warning investors of potential risks that could impact the Company's business, financial condition, and operations.

The risk factors included a warning regarding "[e]pidemics and viral outbreaks," which stated, in relevant part:

> *Public perception about the safety of travel and adverse publicity related to passenger or crew illness, such as incidents of viral illnesses, stomach flu or other contagious diseases may impact demand for cruises and result in cruise cancellations and employee absenteeism. For example, the recent outbreak of the COVID-19 coronavirus has resulted in costs and lost revenue related to customer compensation, itinerary modifications, travel restrictions and advisories, the unavailability of ports and/or destinations, cancellations and redeployments and has impacted consumer sentiment regarding cruise travel.*

110.    Relatedly, in the 2019 10-K's section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations," the Company provided an "Executive Overview" of the COVID-19 outbreak, referring investors back to its previously outlined risk warnings, and specifically stating:

> *In late January 2020, the COVID-19 coronavirus outbreak began impacting the Company's financial performance and operations. The Company has experienced costs and lost revenue related to itinerary modifications, travel restrictions and advisories, the unavailability of ports and/or destinations, cancellations and redeployments. The COVID-19 coronavirus is also impacting consumer sentiment regarding cruise travel generally, and the full impact of this indirect effect cannot be quantified at this time.*

**C.      Norwegian's Code of Ethical Business Conduct**

111.    Norwegian bolstered investor confidence in its reported financial results and the legitimacy of its operating activities, as well as Defendants' stated desire to preserve the equity of Norwegian's brands, by directing investors to the Company's Code of Ethical Business Conduct. The Code was published on the Company's website and referenced in Norwegian's 2019 10-K, which confirmed that the Code "applies to all of our employees, including our principal executive officer, principal financial officer . . . and persons performing similar functions, and our directors."

112.    According to its terms, the Code also applied equally to all of the Company's "directors, officers and all other exempt (salaried) and non-exempt (hourly), full-time and part-

time, ship and shore side team members," who were "responsible for adhering to all provisions of

the Code."

113.   The Code provided, in pertinent part:

You are expected to observe the highest standards of ethics and integrity in your conduct.  ***Conduct that may raise questions as to NCLH's honesty, integrity, impartiality, reputation or activities that could cause embarrassment to NCLH or damage its reputation are prohibited***.  Any activity of unethical, illegal or improper business conduct must be avoided, and any activity or any business conduct with known criminals or unethical organizations or individuals is strictly prohibited.

***NCLH seeks to outperform our competition fairly and honestly.  We seek competitive advantage through superior performance, never through unethical or illegal business practices . . .  You shall comply with all applicable laws and regulations and are expected to deal honestly, ethically and fairly with customers, clients and fellow NCLH team members, NCLH management and the general public.  You are required to apply the highest possible standards of ethical business conduct in the performance of your job responsibilities.  No team member should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other intentional unfair-dealing practice***.

114.   Defendants' statements on February 20, 2020, in the Company's 2019 10-K, and

Norwegian's Code of Ethical Business Conduct, referenced above in ¶¶89-102, 105-110, 111-113,

were materially false or misleading and omitted material facts for the following reasons:

(a)     The Company was neither being "as transparent as possible," nor was it

"assur[ing] the safety" and "well-being" of its guests while making sure to protect Norwegian's

"***long-term brand equity***."  Rather, unbeknownst to investors, Norwegian directed and required its

sales personnel to engage in a deceptive sales campaign designed to induce customers to purchase

or rebook, and not cancel, cruise trips, despite concerns about the COVID-19 outbreak.

Norwegian's deceptive sales campaign included providing customers with unproven and/or

dangerously false information about the coronavirus in complete disregard for the "health and

safety" of Norwegian's customers and crew in order to protect the Company's bookings.  Sales

personnel were also instructed to be "aggressive" and engage in high-pressure sales tactics, such

as creating a false sense of demand for the Company's cruises.  Norwegian's highly manipulative and outrageous sales campaign was not the action of rogue sales agents.  In fact, it was a top-down initiative overseen by Company executives and sales managers, including Becker, with the knowledge and awareness of other high-ranking Company executives.

       (b)    Defendants' statements, including that the Company was experiencing an "improvement in week-over-week booking volumes and decrease in cancellations" and "working tirelessly to do what is right for our guests, crew and shareholders while protecting the equity of our brands" concealed from investors that Norwegian was prioritizing profits over people, and that the Company's deceptive sales campaign threatened Norwegian's brand image and long-term reputation.  Defendants' Class Period statements failed to disclose these material facts, despite a duty to do so.

       (c)    The Company's top-down marketing initiative represented direct and deliberate violations of the Company's Code, which had been held out to investors as a set of requirements designed to protect the Company's critically important image, brand equity, and reputation in the marketplace, rendering the statements in the Code and the 2019 10-K misleading.

## VI.    LOSS CAUSATION AND THE CLASS MEMBERS' ECONOMIC LOSS

      115.    Defendants' materially false and misleading statements and omissions alleged above, individually and collectively, directly and proximately caused the damages suffered by Lead Plaintiff and other Class members.  Defendants' material misstatements and omissions were widely disseminated to the securities markets, investment analysts, and the investing public and had the effect of creating unrealistically positive assessments and characterizations of Norwegian and its business, prospects, operations, and results, which caused Norwegian securities to be overvalued and artificially inflated throughout the Class Period.  Lead Plaintiff and other Class

members purchased or otherwise acquired Norwegian securities at prices that were artificially inflated by Defendants misrepresentations and omissions of material fact alleged herein.

116.    As alleged above, during the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts regarding: (i) the state of Norwegian's operations, including the Company's booked position; (ii) the Company's efforts to take "proactive measures to protect the health and safety" of its "guests and crew throughout [Norwegian's] fleet"; (iii) the Company's transparency regarding its handling of the COVID-19 outbreak and its impact on bookings and the Company's financial performance; (iv) the strength and resilience of the Company's business model and ability to drive demand through sales and marketing, while protecting Norwegian's long-term "brand equity"; (v) the reasons for the "improvement in week-over-week booking volumes" and the "moderation" or "decrease in cancellations"; (vi) the Company's marketing strategies, including the "market-to-fill" strategy, as well as the sales force as a driver of demand; and (vii) the Company's adherence to its Code of Ethical Business Conduct. Had Defendants been truthful about these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired their Norwegian securities at artificially inflated prices.

117.    As certain relevant and true facts became known and/or the risks previously concealed by Defendants' material misstatements and omissions materialized, the artificial inflation was removed from the price of Norwegian securities, causing the losses of Lead Plaintiff and other Class members.  The timing and magnitude of the decline in the price of Norwegian securities negates any inference that the losses suffered by Lead Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to Defendants' fraudulent conduct.

118.    As the true state of affairs and true nature of Norwegian's business was publicly revealed by detailed whistleblower accounts and internal Company emails, memoranda, and sales directives, the falsity of Defendants' omissions, prior misrepresentations, and fraudulent conduct was revealed to the public, and the price of Norwegian securities declined significantly as the prior artificial inflation came out of the Company's securities. *See supra* at ¶¶71-81.  In addition, the disclosures at the end of the Class Period represented the materialization of the risks concealed by Defendants' misrepresentations and omissions identified herein.

119.    As a direct and proximate result of the disclosures on March 11 and 12, 2020, and the materialization of the concealed risks, the price of Norwegian securities suffered significant declines.  Specifically, shares of Norwegian common stock declined 26.7%, or $5.47 per share, falling from a close of $20.50 per share on March 10, 2020, to a close of $15.03 per share on March 11, 2020.  The price of Norwegian stock continued to fall the next day, declining an additional 35.8%, or $5.38 per share, from $15.03 per share on March 11, 2020 to a closing price of $9.65 per share on March 12, 2020.

120.    In sum, the rapid declines described herein served to remove the artificial inflation from the price of Norwegian securities, and were the direct and foreseeable consequence of the revelation of the falsity of Defendants' Class Period misrepresentations and omissions to the market, and a materialization of the risks concealed by Defendants' fraud.  Thus, the revelations of truth, as well as the resulting clear market reactions, support a reasonable inference that the market understood that Defendants' prior statements were false and misleading and omitted material information.  In short, when the truth about Defendants' prior misrepresentations and omissions was revealed, the price of Norwegian securities quickly sank, the artificial inflation was

removed from the price of the securities, and Lead Plaintiff and similarly situated investors were damaged, suffering true economic losses.

121.     Accordingly, the economic losses, *i.e.*, damages, suffered by Plaintiff and similarly situated investors in response to the disclosures on March 11 and 12, 2020, were the direct and proximate result of Defendants' misrepresentations and omissions that artificially inflated the price of Norwegian securities and the subsequent significant declines in the price of Norwegian securities when the truth concerning Defendants' prior misrepresentations, omissions, and fraudulent conduct entered the marketplace.

## VII.    ADDITIONAL ALLEGATIONS OF SCIENTER

122.     As alleged above, Norwegian and the Individual Defendants acted with scienter in that they: (i) knew or recklessly disregarded that the statements identified above in ¶¶89-102, 105-110, 111-113, were materially false and misleading when made and omitted material facts necessary to make the statements made not misleading; (ii) knew or recklessly disregarded that such statements would be issued or disseminated to the investing public; (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents; and (iv) knowingly or recklessly engaged in the fraudulent scheme alleged herein as primary violators of the federal securities laws.  Norwegian and the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Norwegian's manipulative and deceptive sales and marketing practices, and their control over Norwegian's materially false and misleading statements, including the omitted material facts, actively participated in the fraudulent scheme alleged herein.

123.     The following additional facts, when considered collectively and holistically with those alleged elsewhere herein, support a strong inference that Defendants knowingly made

materially false or misleading statements and/or omissions, or acted with recklessness in doing so, during the Class Period.

A.   **Passenger Ticket Revenue and the Company's Sales and Marketing Strategies Were Critical to Norwegian's Operations and Financial Performance, and Their Importance Supports a Strong Inference of Scienter**

124.   Passenger ticket revenue comprises almost **_70%_** of Norwegian's **_total revenue_**.  As a result, the Company's ability to sell cruises to customers, which was necessary to keep ships sailing at full capacity, was of the utmost importance to Norwegian's financial performance.  The Company drives demand for its cruises, and therefore increases passenger ticket revenue, by "seek[ing] to attract vacationers to [its] products and services" and creating product scarcity, which in turn leads to higher pricing.  To do so, Norwegian relies heavily on "utilizing effective marketing and sales initiatives" along with its "market-to-fill strategy," which "encourage[s] guests to book earlier which extends [the Company's] booking window and drives higher pricing."  Norwegian also employs "high-frequency marketing campaigns," which include television and digital advertisements as well as targeted mail campaigns, that are designed to entice customers with "a message of a value-packed cruise offering."  Defendants also constantly monitored and optimized Norwegian's marketing performance in order to expand the Company's booking window.  This included fostering a culture that encouraged Norwegian's teams to work together, across all of Norwegian's brands, which enabled Defendants to fine tune Norwegian's customer-centric offerings and maximize the Company's top and bottom line results.  Indeed, the Company referred to its marketing and distribution initiatives as the "engines" that powered Norwegian's revenue stream, and during the Class Period, Defendants routinely touted the importance of the Company's marketing and sales initiatives and emphasized their marketing expertise.

125.    Norwegian's sales force, in particular, was one of the Company's key "drivers of demand."  The Company maintained call centers for its sales force, including in Miami and Sunrise, Florida, "to drive high potential targeted customers and increase the effectiveness of [the Company's] targeted marketing programs."  Through its sales force, the Company sought to maximize the revenue potential from each customer contact generated.  To that end, Norwegian's sales personnel were required to meet daily quotas, including approximately 150 calls to potential customers, spending five hours (or more) on the phone, and three to five bookings.  Sales personnel who did not hit their quotas were threatened with a personal improvement plan, losing their jobs, and/or risked losing their previously earned commissions, which ranged from 1% to 5% depending on the number of bookings closed per month, on any cruises that were subsequently cancelled.

126.    Given the critical importance of the Company's marketing and sales strategy generally, and its sales force specifically, to Norwegian's operations and financial results, there is a strong inference that Defendants were keenly aware of (or recklessly disregarded) the deceptive sales practices implemented by the Company's sales force, including those formulated by Becker, and conveyed to hundreds, if not thousands, of customers.

**B.      By the Beginning of the Class Period, the Coronavirus Was the Number One "Topic on Everyone's Mind," and Defendants Were Closely Tracking Norwegian's Bookings**

127.    As Defendants have admitted, by the beginning of the Class Period, the COVID-19 outbreak, and its impact on Norwegian and the rest of the cruise industry, was the number one "topic on everyone's mind."  Even before the start of the Class Period, Norwegian was experiencing "swift and severe" effects from the coronavirus outbreak, including "trepidation by American and other western consumers" and a "broader and more meaningful slowdown in new bookings and an increase in cancellations," including for sailings outside of Asia.  In response to the outbreak, Norwegian was forced to cancel or modify 40 voyages in the Asia region, including

the outright cancelation of 10 voyages, eight of which were completely sold out cruises on the Company's luxury Regent brand, which were typically booked far in advance and had very high per diem spending by passengers. The cancelled and/or modified voyages resulted in a "significant impact" to the Company, including a $0.75 hit to EPS for 2020. Moreover, the spread of the coronavirus from Asia to other parts of the world coincided with the cruise industry's peak booking season, referred to as "Wave Season," during which Norwegian typically experienced an increase in both booking volumes and pricing across all three of its brands.

128. Company bookings are a critical metric Defendants closely tracked using sophisticated data analytics and discussed frequently in the Company's press releases, SEC filings, and during conference calls. With the COVID-19 outbreak impacting the Company, Defendants were very closely monitoring the Company's bookings and discussing them with the market. Indeed, during Norwegian's February 20, 2020 conference call, Defendants spoke at length about the Company's bookings and answered questions from analysts on the topic. *See* ¶¶89-102. The day after the call, at the christening gala for the Regent Seven Seas Splendor, management gave a "real-time update" that purported to show "sequential improvement in bookings." Specifically, according to a February 24, 2020 JPMorgan analyst report, the Company reported that "bookings for the two days post 4Q19 earnings report improved over the previous 5 days, and those 7 days taken together were 'meaningfully better' than the previous week." JPMorgan analysts further reported that Norwegian appeared "cautiously optimistic the worst was over and the '[bookings]' rebuilding process could begin." That Defendants were closely monitoring the Company's bookings, and by extension, any underlying cause of the purported "improvement" in booking trends, further supports an inference of scienter.

    **C.**    **Whistleblower Accounts and Internal Emails Confirm that Norwegian's Senior Managers Approved and Directed the Company's Sales Personnel to Carry Out the Dangerously Misleading Sales Campaign**

129.    Norwegian's dangerously misleading sales campaign was not the action of a few rogue, low-level employees.   Rather, internal Company emails and detailed whistleblower accounts confirm that Becker, who had over a decade of experience working at Norwegian and was NCL's Executive Vice President of Consumer Research & Passenger Services, along with other Company sales managers, created and approved the canned responses and one-liners, distributed them to sales personnel, and directed them to implement the deceptive sales campaign. During the Class Period, Becker told the sales team in an email, "[n]o one knows or cares about the Coronavirus" and pressured them to "turn it up, for every cancellation you get, work harder for your next 3 bookings."  Becker reported directly to Sommer, who in turn reported directly to Del Rio.  Sommer, who in the past had publicly praised Becker for "changing the culture of our call center people," was copied on the email along with other executives.

130.    According to a Company whistleblower, sales managers told sales employees to "keep being aggressive" and "create urgency" for their clients.  This message was relayed via email and during department meetings.   Among other deceptive tactics, Becker gave sales personnel a list of one-liners to help hook in customers and "close your guests that are on the fence," by creating a (false) sense of urgency, such as by telling customers that cancellations in Asia have "caused a huge surge in demand" for other trips.  Sales personnel were also told to give customers unproven and blatantly false information, such as "medical professionals have confirmed that the warm weather of the spring will be the end of the Coronavirus" and that the virus "cannot live in the amazingly warm and tropical temperatures that your cruise will be sailing to."  A whistleblower employee confirmed that "everyone" on the "sales team" was expected to

provide the false and misleading information "to all of our customers."  And, according to the whistleblower, because each person on the sales team was expected to call more than 150 people a day, the dangerously misleading sales pitch was disseminated to hundreds, if not thousands, of customers *on a daily basis*.

131.    Norwegian and, by extension, its sales force, were motivated to induce worried customers to rebook, rather than cancel their voyages, in order to protect the Company's bookings. Indeed, under Norwegian's revenue recognition policy, deposits on advance ticket sales are deferred when received and subsequently recognized as revenue ratably during voyage sailing days.  Cancellation fees, however, are recognized in passenger ticket revenue *in the month of the cancellation*.  Thus, by pressuring customers to rebook, rather than letting them cancel their voyages, Defendants were in effect able to defer recognizing cancellations and delay the corresponding negative impact to Norwegian's financial results.

### D.    Defendants' Own Public Statements Support an Inference of Scienter

132.    Cruise ships, with their emphasis on communal dining and group activities, are notorious for being incubators of infectious and communicable disease.  Defendants knew, as they had stated to investors, that "[p]ublic perception about the safety of travel and adverse publicity related to passenger or crew illness, such as incidents of viral illness" could have a severe, negative impact on demand for cruises, result in cruise cancellations, and could damage the reputation of the cruise line involved.  Indeed, in 2019, the Company experienced first-hand the fallout from a viral outbreak that occurred onboard the Norwegian Joy, including widespread negative media coverage and public accusations about the ship's cleanliness.

133.    During the Class Period, Defendants knew that the coronavirus had already "caused near panic in the traveling public" and had "impacted consumer sentiment regarding cruise travel." As a result, Defendants went out of their way to assure the market that Norwegian was taking

"proactive" and "preventative" measures to address the coronavirus, "working tirelessly to do what is right" for the Company's guests and shareholders, and "protecting the equity of our brands."

134.    In fact, when asked by an analyst during the February 20, 2020 conference call "how many cases of coronavirus [the Company] had," Del Rio defensively responded, "***Are you kidding me?  Do you know who you're talking to, which company you're talking with?  Zero, absolutely zero***."  Del Rio sought to distinguish Norwegian from its competitors and stated emphatically, "[t]here's been only one company with coronavirus outbreaks, one, and it's not us."

135.    Given the "near panic" and "trepidation" among customers and investors alike, and the potential reputational risk to Norwegian from a viral outbreak, including its impact on bookings, there is a strong inference that Defendants were closely monitoring and directly involved in the Company's marketing efforts to concerned customers, and therefore knew or recklessly disregarded that Norwegian's sales force had been directed to provide blatantly false information about the coronavirus in order to deceive customers, prevent cancellations, and protect the Company's financial performance.

###    E.    Post-Class Period Events Support an Inference of Scienter

136.    The same day that the *Miami New Times* revealed Norwegian's deceptive sales practices to the public in a stunning exposé, the Company's Executive Vice President and General Counsel Farkas sent an email to sales staff directing them to abandon the misleading sales pitches. As reported by the *Miami Herald* on March 12, 2020, in an email obtained by the paper, Farkas said, "[e]ffective immediately, if you are referencing the below [sales responses], please discontinue using them."  The *Miami Herald* also reported that the email from Farkas included a list of the lines previously approved and distributed.

137.    The following week, Becker abruptly and unceremoniously took a leave of absence from the Company.  His name was removed from an intra-office search feature and an automatic

response to Becker's work email address said he is "temporarily unavailable" and, according to news reports, sent instructions to contact Sommer directly. Given Becker's direct involvement in Norwegian's misleading sales campaign, and the swift fallout from the revelations of the Company's dissemination of misinformation about the COVID-19 outbreak to protect its bookings and financial performance, it is implausible that Becker left voluntarily. Becker's sudden and suspicious leave of absence, which came only a week after whistleblower accounts and internal Company emails were publicly revealed, further supports an inference of scienter.

### F. Norwegian's Manipulative and False Sales Campaign Violated the Company's Code of Ethical Business Conduct, Further Supporting a Strong Inference of Scienter

138. On August 1, 2017, Norwegian's current Code of Ethical Business Conduct became effective. The Code stated that it was the Company's "strict policy to carry out all company activities in accordance with the letter and spirit of applicable legal requirements and to uphold the highest possible standards of ethical business conduct." The Code was adopted by the Company's directors and applied to "all team members, officers, and members of the Board of Directors . . . in all matters carried out by [Norwegian's] daily business." In other words, it is indisputable that the Code applied to the Individual Defendants, Sommer, and Becker. In fact, Becker's 2008 Employment Agreement referenced the Code explicitly, requiring that "[t]he Executive shall comply with the corporate policies of the Company as they are in effect from time to time throughout the Period of Employment (including, without limitation, the Company's Code of Ethical Business Conduct policy, as it may change from time to time)."

139. The Code made explicit that "commitment to the Code is essential to the success of [Norwegian]." The Code stated that:

> NCLH's policy is to promptly disclose information that is accurate and complete in all material respects regarding our business, financial condition and results of operations. Materially inaccurate, incomplete or untimely reporting will not be

tolerated and can severely damage NCLH and cause legal liability.   Officers, directors and team members should be on guard for, and promptly report, evidence of improper financial reporting.

140.   Under the heading "Compliance," the Code added that officers such as the Individual Defendants were "expected to observe the highest standards of ethics and integrity in [their] conduct."   The Code stated that "[c]onduct that may raise questions as to [Norwegian's] honesty, integrity, impartiality, reputation or activities that could cause embarrassment to [Norwegian] or damage its reputation are prohibited."   The Code further added that "[a]ny activity of unethical, illegal or improper business conduct must be avoided. . . ."   The Company's Code stated clearly that Norwegian would only "seek competitive advantage through superior performance, never through unethical or illegal business practices."

141.   The Code added that the Individual Defendants, along with other Company officers and directors, were required to "comply with all applicable laws and regulations and are expected to deal honestly, ethically and fairly with customers, clients and . . . the general public."   In connection with those compliance requirements, the Individual Defendants were "required to apply the highest possible standards of ethical business conduct in the performance of [their] job responsibilities."   The Code explicitly stated that "[n]o [Norwegian] team member should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other intentional unfair-dealing practice."

142.   The Code added that it was "essential" that all officers and directors, which included the Individual Defendants, be familiar with "all aspects of the Code" and required completion and signing of the Code's certification.   The Individual Defendants were also required to certify annually that they had read the Code and disclosed any potential conflicts.

143.   The Company's Class Period misconduct, including the direct, deliberate manipulation of customers and potential customers regarding a deadly global pandemic was a

direct and unequivocal violation of the Code.  Moreover, the Defendants' false and misleading statements, which omitted material facts, represent additional, independent violations of the Code.

144.    Despite certifying that they would follow the Code, including annual certifications to that effect, Defendants turned a blind eye to high-ranking Norwegian executives, including Becker, who not only violated the Code, but created a pattern and practice of overtly lying to customers and potential customers to protect Norwegian bookings and financial performance, regardless of the potential harm, including death, that such misconduct would cause to Norwegian passengers as well as the Company's reputation, which was also of importance to investors.

145.    Given the explicit requirements of the Code, which stated that Norwegian would never engage in unethical practices, and that adhering to the Code was "essential" to Norwegian's business and operations, Defendants' clear violations of the Code provide additional indicia of their scienter.

## VIII.  APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

146.    At all relevant times, the market for Norwegian stock was an efficient market for the following reasons, among others:

(a)    Norwegian common stock met the requirements for listing, and was listed and actively traded, on the NYSE, a highly efficient, electronic stock market;

(b)    as a regulated issuer, Norwegian filed periodic public reports with the SEC and the NYSE;

(c)    Norwegian regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Norwegian was followed by numerous securities analysts employed by major brokerage firms, including JP Morgan, Barclays, and Deutsche Bank, who wrote reports which were distributed to brokerage firms' sales forces and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

147.    As a result of the foregoing, the market for Norwegian stock promptly digested current information regarding Norwegian from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of Norwegian securities during the Class Period suffered similar injury through their purchase of Norwegian securities at artificially inflated prices, and a presumption of reliance applies.

148.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material, adverse information regarding Norwegian's business and operations – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## IX.    NO SAFE HARBOR

149.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged herein. Many of the statements alleged were not identified as "forward-looking" when made, and, to the extent any statements were forward-looking, there were no meaningful cautionary statements identifying important

factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

150.    Indeed, the risk warnings that were provided by Defendants in their Class Period statements included boilerplate statements,[2] such as:

- The demand for cruises is affected by international, national and local economic conditions.

- Public perception about the safety of travel and adverse publicity related to passenger or crew illness, such as incidents of viral illnesses, stomach flu or other contagious diseases may impact demand for cruises and result in cruise cancellations and employee absenteeism.

- The availability of ports, including the specific port facility at which our guests will embark and disembark, is affected by a number of factors, including, but not limited to, existing capacity constraints, security, safety, health and environmental concerns . . . .

- Limitations on the availability of ports of call or on the availability of shore excursions and other service providers at such ports have adversely affected our business, financial condition and results of operations in the past and could do so in the future.

151.    These or other materially similar risk disclosures were disseminated throughout the Class Period and did not serve to adequately inform the market of the true risks and actual operational experience of the Company.  Indeed, that the stated warnings were inadequate and provided no new, meaningful information, is evident from the market's reaction to the revelation of Defendants' untrue and/or misleading statements.  *See, e.g.*, ¶¶115-121.

152.    Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements alleged, Defendants are liable for such statements because, at the time they were made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Norwegian

---

[2]    *See* Norwegian's 2019 10-K, Item 1A. Risk Factors, at 26, 29.

who knew that the statement was false when made.  Moreover, to the extent that Defendants issued

any disclosures designed to warn or caution investors of certain purported risks, those disclosures

were also false and misleading since they did not disclose that Defendants were actually engaging

in the very actions about which they purportedly warned and/or had actual knowledge of material,

adverse facts undermining such disclosures.

## X.     CLASS ACTION ALLEGATIONS

153.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the

Federal Rules of Civil Procedure on behalf of a Class consisting of all those who purchased and/or

acquired Norwegian securities between February 20, 2020 and March 10, 2020, inclusive, and who

were damaged thereby ("Class").  Excluded from the Class are Defendants, the officers and

directors of the Company, members of their immediate families and their legal representatives,

heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

154.     The members of the Class are so numerous that joinder of all members is

impracticable.  Throughout the Class Period, Norwegian securities were actively traded on the

NYSE.  While the exact number of Class members can only be determined by appropriate

discovery, Norwegian reported 213,202,541 ordinary shares outstanding as of February 14, 2020.

Accordingly, Plaintiff believes that the number of Class members is at least in the thousands and

that they are geographically dispersed.  Record owners and other Class members may be identified

from records maintained by Norwegian or its transfer agent and may be notified of the pendency

of this action by mail, using the form of notice similar to that customarily used in securities class

actions.

155.     Plaintiff's claims are typical of the claims of the other Class members because all

Class members are and were similarly affected by Defendants' wrongful conduct in violation of

federal law, as alleged herein.

156.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

157.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

158.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)    whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d)    whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(e)    whether Defendants acted knowingly or with severe recklessness in omitting and/or misrepresenting material facts;

(f)    whether the market prices of Norwegian securities during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## COUNT I:

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT
### AND RULE 10b-5 PROMULGATED THEREUNDER
### AGAINST ALL DEFENDANTS

159.    Plaintiff repeats and realleges the allegations in ¶¶1-158 above, as if fully set forth herein.

160.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or disregarded with severe recklessness, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

161.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock during the Class Period.

162.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Norwegian securities and experienced losses when the artificial inflation was released from Norwegian securities as a result of the revelations and price declines detailed herein. Plaintiff and the Class would not have purchased Norwegian securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and omissions.

163.    By virtue of the foregoing, Defendants have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II:

### VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
### AGAINST THE INDIVIDUAL DEFENDANTS

164.    Plaintiff repeats and realleges the allegations in ¶¶1-158 above, as if fully set forth herein.

165.    As set forth above, Norwegian and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint.  During the Class Period, the Individual Defendants acted as controlling persons of Norwegian within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about the Company, the Individuals Defendants had the power and ability to control the actions of the Company and their employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.    Determining that this action is a proper class action, certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure, and designating Lead Counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  July 31, 2020                      Respectfully submitted,

ROBBINS GELLER RUDMAN & DOWD LLP

*s/ Robert J. Robbins*
ROBERT J. ROBBINS
(FL Bar No. 0572233)

ROBERT J. ROBBINS (FL Bar No. 0572233)
ELIZABETH A. SHONSON (FL Bar No. 22282)
MAUREEN E. MUELLER (FL Bar No. 110407)
SABRINA E. TIRABASSI (FL Bar No. 0025521)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
rrobbins@rgrdlaw.com
eshonson@rgrdlaw.com
mmueller@rgrdlaw.com
stirabassi@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

CICCARELLO DEL GIUDICE & LAFON
MICHAEL J. DEL GIUDICE
1219 Virginia Street, East, Suite 100
Charleston, WV  25301
Telephone:  304/343-4440
304/343-4464 (fax)

*Additional Counsel for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 31, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

_s/ Robert J. Robbins_
ROBERT J. ROBBINS
(FL Bar No. 0572233)