UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No. 20-21107-Civ-SCOLA
(Consolidated with No. 20-21386 and 20-21685)

| | |
|---|---|
| ERIC DOUGLAS, Individually and on Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>NORWEGIAN CRUISE LINES, et al., )<br><br>Defendants. ) | <u>CLASS ACTION</u> |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS LEAD PLAINTIFF'S CONSOLIDATED AMENDED CLASS
<u>ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................1

II. FACTUAL BACKGROUND .......................................................................3

III. LEGAL STANDARD .................................................................................6

IV. THE CAC ADEQUATELY PLEADS MATERIALLY FALSE OR
MISLEADING STATEMENTS AND OMISSIONS .........................................6

    A. The CAC Adequately Pleads that Norwegian Engaged in a Deceptive
Sales Campaign.....................................................................................6

    B. The CAC Pleads Actionable Misstatements and Omissions with
Particularity.........................................................................................8

    C. Defendants Had a Duty to Disclose Omitted Facts ................................10

    D. Defendants' Code of Conduct Statements Are Actionable....................13

    E. Defendants Cannot Sail into the PSLRA's Safe Harbor......................15

        1. The Misstatements and Omissions Are Not Forward-Looking ...............16

        2. The Purported Accompanying Cautionary Language Was Not
Meaningful .................................................................................17

        3. Any Forward-Looking Statements Were Made with Knowledge of
Their Falsity ...............................................................................18

    F. Defendants' Purported Opinion Statements Are Actionable ................18

    G. The Misstatements Are Not Puffery or Corporate Optimism................19

V. THE CAC ALLEGES FACTS SUPPORTING A STRONG INFERENCE OF
SCIENTER .................................................................................................20

    A. The Unprecedented Threat to Norwegian's Most Important Source of
Revenue Supports an Inference of Scienter .........................................21

    B. Internal Emails, Meetings, and Whistleblower Accounts Contained in
Investigative Reports Make Clear the Deceptive Marketing Scheme Was
Implemented from the Top Down.........................................................24

    C. Norwegian's Attempt to Cover Up Its Serious Misconduct and Becker's
Departure Supports an Inference of Scienter .......................................25

**Page**

D.      Violations of Norwegian's Code of Conduct Are Indicative of Scienter ..............26

E.      Norwegian's Scienter Is Adequately Alleged.........................................................27

F.      Defendants Fail to Offer a Viable Competing Inference of Scienter....................27

VI.    THE SECTION 20(a) CLAIM IS SUCCESSFULLY STATED .....................................27

VII.   CONCLUSION.....................................................................................................................28

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abrams v. MiMedx Grp., Inc.*,
 37 F. Supp. 3d 1271 (N.D. Ga. 2014) .......................................................................15

*Amy v. Carnival Corp.*,
 961 F.3d 1303 (11th Cir. 2020) ...............................................................................15

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
 505 F. Supp. 2d 662 (D. Colo. 2007) .......................................................................15

*Berson v. Applied Signal Tech., Inc.*,
 527 F.3d 982 (9th Cir. 2008) ...................................................................................24

*Bondali v. YumA Brands, Inc.*,
 620 F. App'x 483 (6th Cir. 2015) .............................................................................15

*Brown v. China Integrated Energy, Inc.*,
 875 F. Supp. 2d 1096 (C.D. Cal. 2012) ...................................................................25

*Bryant v. Avado Brands, Inc.*,
 187 F.3d 1271 (11th Cir. 1999) ...............................................................................21

*Christine Asia Co. Ltd. v. Ma*,
 718 F. App'x 20 (2d Cir. 2017) ...............................................................................23

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
 2019 WL 6877195 (N.D. Cal. Dec. 17, 2019) ...................................................7, 12

*City of Sunrise Gen. Emps.' Ret. Plan v. FleetCor Techs., Inc.*,
 2018 WL 4293143 (N.D. Ga. May 15, 2018) ................................................7, 8, 24

*Carvelli v. Ocwen Fin. Corp.*,
 934 F.3d 1307 (11th Cir. 2019) .........................................................................16, 18

*Durgin v. Mon*,
 415 F. App'x 161 (11th Cir. 2011) ...........................................................................22

*Eastwood Enters., LLC v. Farha*,
 2009 WL 3157668 (M.D. Fla. Sept. 28, 2009) ........................................................10

*EEOC v. SunTrust Bank*,
 2014 WL 1763200 (M.D. Fla. Apr. 30, 2014) .........................................................16

**Page**

*Epstein v. World Acceptance Corp.*,
   203 F. Supp. 3d 655 (D.S.C. 2016)...............................................................................24, 25

*FindWhat Inv. Grp. v. FindWhat.com*,
   658 F.3d 1282 (11th Cir. 2011) ...................................................................10, 11, 13, 18

*Fries v. N. Oil & Gas, Inc.*,
   285 F. Supp. 3d 706 (S.D.N.Y. 2018)....................................................................................26

*Garfield v. NDC Health Corp.*,
   466 F.3d 1255 (11th Cir. 2006) ............................................................................................9

*Grand Lodge of Pa. v. Peters*,
   550 F. Supp. 2d 1363 (M.D. Fla. 2008)...............................................................................27

*Halford v. AtriCure, Inc.*,
   2010 WL 8973625 (S.D. Ohio Mar. 29, 2010)................................................................8, 12

*Harris v. Ivax Corp.*,
   182 F.3d 799 (11th Cir. 1999) ......................................................................................15, 18

*Henningsen v. ADT Corp.*,
   161 F. Supp. 3d 1161 (S.D. Fla. 2015) ...............................................................................11

*Hertz Corp. v. Frissora*,
   No. 2:19-CV-08927 (D.N.J. May 12, 2020) ........................................................................26

*Holwill v. AbbVie Inc.*,
   2020 WL 5235005 (N.D. Ill. Sept. 1, 2020) ........................................................9, 12, 14, 23

*In re 21st Century Holding Co. Sec. Litig.*,
   2008 WL 5749572 (S.D. Fla. Nov. 7, 2008)........................................................................18

*In re Acuity Brands, Inc. Sec. Litig.*,
   2019 WL 10246166 (N.D. Ga. Aug. 12, 2019) ....................................................................22

*In re Axis Cap. Holdings Ltd. Sec. Litig.*,
   456 F. Supp. 2d 576 (S.D.N.Y. 2006)...............................................................................7, 12

*In re CenturyLink Sales Practices & Sec. Litig.*,
   403 F. Supp. 3d 712 (D. Minn. 2019)....................................................................14, 25, 26

*In re Equifax Inc. Sec. Litig.*,
   357 F. Supp. 3d 1189 (N.D. Ga. 2019) ...........................................................................7, 20

**Page**

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
   469 F. Supp. 2d 88 (S.D.N.Y. 2006) ........................................................................8

*In re EZCorp, Inc. Sec. Litig.*,
   181 F. Supp. 3d 197 (S.D.N.Y. 2016) ......................................................................25

*In re Faro Techs. Sec. Litig.*,
   534 F. Supp. 2d 1248 (M.D. Fla. 2007) ...........................................................8, 25, 27

*In re Flowers Foods, Inc. Sec. Litig.*,
   2018 WL 1558558 (M.D. Ga. Mar. 23, 2018) ...............................12, 17, 19, 22

*In re Grupo Televisa Sec. Litig.*,
   368 F. Supp. 3d 711 (S.D.N.Y. 2019) ......................................................14, 15, 25

*In re Hertz Glob. Holdings Inc.*,
   905 F.3d 106 (3d Cir. 2018) ....................................................................................26

*In re Home Loan Servicing Sols., Ltd. Sec. Litig.*,
   2016 WL 10592320 (S.D. Fla. June 6, 2016) .........................................................26

*In re Immucor Inc. Sec. Litig.*,
   2006 WL 3000133 (N.D. Ga. Oct. 4, 2006) .....................................................12, 22

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*,
   859 F. Supp. 2d 572 (S.D.N.Y. 2012) ..............................................................11, 15

*In re Natures' Sunshine Prods. Sec. Litig.*,
   486 F. Supp. 2d 1301 (D. Utah 2007) .....................................................................25

*In re OSG Sec. Litig.*,
   12 F. Supp. 3d 622 (S.D.N.Y. 2014) .......................................................................26

*In re PainCare Holdings Sec. Litig.*,
   541 F. Supp. 2d 1283 (M.D. Fla. 2008) ............................................................21, 23

*In re Providian Fin. Corp. Sec. Litig.*,
   152 F. Supp. 2d 814 (E.D. Pa. 2001) ......................................................................12

*In re Royal Caribbean Cruises Ltd. Sec. Litig.*,
   2013 WL 3295951 (S.D. Fla. Apr. 19, 2013) ......................................................9, 18

*In re Sadia, S.A. Sec. Litig.*,
   643 F. Supp. 2d 521 (S.D.N.Y. 2009) .....................................................................26

**Page**

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ...................................................................14, 18

*In re SolarCity Corp. Sec. Litig.*,
  274 F. Supp. 3d 972 (N.D. Cal. 2017) .......................................................................................7

*In re Spear & Jackson Sec. Litig.*,
  399 F. Supp. 2d 1350 (S.D. Fla. 2005) ....................................................................................21

*In re Tenaris S.A. Sec. Litig.*,
  2020 WL 6018919 (E.D.N.Y. Oct. 9, 2020) .......................................................................13, 14

*In re Towne Servs., Inc. Sec. Litig.*,
  184 F. Supp. 2d 1308 (N.D. Ga. 2001) .................................................................................9, 16

*In re Toyota Motor Corp. Sec. Litig.*,
  2011 WL 2675395 (C.D. Cal. July 7, 2011) .............................................................................23

*In re ValuJet, Inc. Sec. Litig.*,
  984 F. Supp. 1472 (N.D. Ga. 1997) ..........................................................................................24

*Keippel v. Health Ins. Innovations, Inc.*,
  2019 WL 5698329 (M.D. Fla. Nov. 4, 2019) .............................................................................8

*Local 703 I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
  2011 WL 12855820 (N.D. Ala. June 7, 2011) ....................................................................22, 25

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) .....................................................................................................13

*Luczak v. Nat'l Beverage Corp.*,
  812 F. App'x 915 (11th Cir. 2020) ..............................................................................8, 10, 20

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ("*Tellabs III*") ....................................................................22, 23

*Matrixx Initiatives v. Siracusano*,
  563 U.S. 27 (2011).................................................................................................................6, 12

*Maverick Fund, L.D.C. v. Lender Processing Servs. Inc.*,
  2015 WL 5559761 (M.D. Fla. Sept. 21, 2015) ........................................................................26

*MAZ Partners LP v. First Choice Healthcare Sols., Inc.*,
  2020 WL 1072582 (M.D. Fla. Feb. 14, 2020) .............................................................11, 21, 27

**Page**

*Mizzaro v. Home Depot, Inc.*,
  544 F. 3d 1230 (11th Cir. 2008) ....................................................................................7, 23

*Mogenson v. Body Cent. Corp.*,
  15 F. Supp. 3d 1191 (M.D. Fla. 2014)..................................................................................23

*Monroe Cnty. Emps.' Ret. Sys. v. Southern Co.*,
  2018 WL 1558577 (N.D. Ga. Mar. 29, 2018)................................................................10, 20

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)...................................................................................................7

*Okla. Firefighters Pens. & Ret. Sys. v. Lexmark Int'l, Inc.*,
  367 F. Supp. 3d 16 (S.D.N.Y. 2019)....................................................................................19

*Omnicare, Inc. v. Laborers Dist. Counsel Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)........................................................................................................18, 19

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
  432 F. Supp. 3d 131 (D. Conn. 2019)...................................................................................10

*Plymouth Cnty. Ret. Sys. v. Carter's Inc.*,
  2011 WL 13124501 (N.D. Ga. Mar. 17, 2011).....................................................................22

*Primavera Invs. v. Liquidmetal Techs., Inc.*,
  403 F. Supp. 2d 1151 (M.D. Fla. 2005) ...............................................................................18

*Robb v. Fitbit Inc.*,
  2017 WL 219673 (N.D. Cal. Jan. 19, 2017) .........................................................................24

*Rok v. Identiv, Inc.*,
  2017 WL 35496 (N.D. Cal. Jan. 4, 2017) .............................................................................26

*Ross v. Career Educ. Corp.*,
  2012 WL 5363431 (N.D. Ill. Oct. 30, 2012)...................................................................24, 25

*Rudolph v. Arthur Andersen & Co.*,
  800 F.2d 1040 (11th Cir. 1986) .....................................................................................10, 13

*Schultz v. Applica, Inc.*,
  488 F. Supp. 2d 1219 (S.D. Fla. 2007) .................................................................................16

*SEC v. Bankatlantic Bancorp, Inc.*,
  2012 WL 1936112 (S.D. Fla. May 29, 2012) .......................................................................16

**Page**

*SEC v. Ginsburg*,
   2000 WL 1299020 (S.D. Fla. Jan. 10, 2000) .........................................................20

*SEC v. Levin*,
   2014 WL 11878357 (S.D. Fla. Oct. 6, 2014) .....................................................17

*SEC v. Merch. Cap., LLC*,
   483 F.3d 747 (11th Cir. 2007) .........................................................11, 17, 20

*SEC v. Revolutions Med. Corp.*,
   2015 WL 11199068 (N.D. Ga. Apr. 3, 2015) .....................................................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).........................................................................6, 20

*Thorpe v. Walter Inv. Mgmt. Corp.*,
   111 F. Supp. 3d 1336 (S.D. Fla. 2015) ...........................................................21

*Tung v. Dycom Indus., Inc.*,
   454 F. Supp. 3d 1244 (S.D. Fla. 2020) ...................................................18, 19, 20

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
   §78u-4(b)(1)(B).......................................................................................8

Federal Rules Civil Procedures
   Rule 11(b)(3).........................................................................................9

S.D. FLA. L.R. 7.1(c)(2) ...........................................................................16

Lead Plaintiff Employer-Teamsters Local Nos. 175 & 505 Pension Trust Fund ("Plaintiff" or "Lead Plaintiff") respectfully submits this memorandum of law in opposition to Defendants'[1] Motion to Dismiss the CAC [ECF No. 60] ("Motion" or "MTD").

## I.      INTRODUCTION

This securities fraud action seeks damages resulting from Defendants' false or misleading statements and omissions, during the February 20, 2020 to March 10, 2020 Class Period, regarding a misleading sales campaign sanctioned by Defendants and Norwegian's high-ranking executives and sales managers.  The sales campaign was designed to, and did provide blatantly false and unproven information about COVID-19 to customers to induce them to book or not cancel cruises. The purpose of the campaign was to offset the negative impact to Norwegian's business from the COVID-19 pandemic, which threatened to eliminate the Company's most important revenue source.  Knowing that public perception about Norwegian's handling of COVID-19 could materially impact its business, Defendants concealed the deceptive sales campaign from investors. Instead, Defendants assured the market that they were taking "aggressive" measures to protect the safety of Norwegian's guests, "working tirelessly" to do what is right for the Company's shareholders, protecting its brand equity, and experiencing an improvement in bookings and a decrease in cancellations, all while adhering to Norwegian's Code of Ethical Business Conduct ("Code").  Indeed, Defendants went out of their way to distinguish Norwegian from other cruise ship companies that had recently experienced on-board outbreaks of COVID-19.

Defendants' concealment of, and failure to disclose, Norwegian's deceptive sales campaign succeeded, duping investors about Norwegian's state of affairs and the risks that the deceptive marketing campaign posed to Norwegian's reputation, until an explosive *Miami New Times* article based on a whistleblower's detailed account and internal company emails revealed the existence of the top-down directed, deceptive sales campaign.  That article was the first of several damaging investigative reports based on detailed whistleblower accounts and internal company emails, which ultimately led to multiple attorneys general investigations into Norwegian's "disturbing" sales practices.  The revelation of Norwegian's egregious conduct in the face of the deadly pandemic resulted in a dramatic decline in the price of Norwegian stock, which,

---

[1]     All defined terms herein shall have the same definitions as set forth in the Amended Complaint [ECF No. 56] ("CAC").  Unless otherwise noted, "¶__" references refer to the CAC's paragraphs; citations, internal quotation marks, and footnotes are omitted; and emphasis is added.

in turn, caused substantial damages to investors.  Now, Plaintiff, individually and on behalf of other investors, seeks to recover, and hold Defendants liable, for those damages by bringing, under the Exchange Act, a Section 10(b) claim against them (Count I) and a Section 20(a) claim against the Individual Defendants (Count II).

Defendants' Motion concedes that the CAC sufficiently pleads reliance, economic loss, and loss causation, as required by Section 10(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and only raises arguments that the CAC fails to plead materially false or misleading statements and scienter.  *See* MTD at 8.  In support, Defendants resort to chicanery concerning the CAC's well-pled allegations and the plausible inferences readily drawn from them, such as subtly altering the alleged misstatements and omissions and mischaracterizing the risks alleged.  Defendants' arguments are not only wrong but unavailing.

To begin, in satisfaction of all applicable pleading standards, the CAC contains ample factual allegations supporting the existence of the misleading sales campaign that Norwegian sanctioned and concealed from investors.  It identifies each of Defendants' misstatements and omissions of historical or contemporaneous fact, explains how each misstatement and omission was both material and false or misleading, and establishes that Defendants had a duty to disclose omitted facts.  These allegations also demonstrate that Defendants' misstatements and omissions, in the context alleged, fall well outside the PSLRA's safe harbor, and are neither inactionable opinion nor immaterial.

The CAC also adequately alleges facts supporting a strong inference of scienter as to each of the Defendants.  These facts include but are not limited to: (1) the crucial nature of passenger ticket revenue and marketing strategies to Norwegian's operations and financial results; (2) the top-down nature of the deceptive sales campaign and the risks it posed to Norwegian's brand equity and, in turn, investors; (3) the content and context of Defendants' own public statements regarding Norwegian's response to the pandemic as it was negatively impacting Norwegian's financial performance; (4) Defendants' active concealment of the misleading sales campaign from the media and investors; (5) the departure of the Norwegian executive primarily responsible for the deceptive sales campaign; and (6) the Individual Defendants' and other executives' violations of the Code.  Not only do the allegations support the Individual Defendants' scienter ***and*** the scienter of other high-level, non-party executives, but also Norwegian's corporate scienter.  The

allegations, taken collectively, far outweigh any competing inference and give rise to a strong inference of Defendants' scienter.

Finally, Plaintiff's Section 20(a) claim must survive dismissal because the CAC successfully states the predicate Section 10(b) claim and the Motion does not challenge the Section 20(a) claim on any other basis, *see* MTD at 29.

Accordingly, for these reasons, as well as those set forth below, the Court should deny Defendants' Motion in its entirety.

## II.    FACTUAL BACKGROUND

Norwegian is one of the largest cruise line companies in the world and operates three brands, Norwegian Cruise Lines ("NCL"), Oceania, and Regent.  ¶34.  The Company categorizes revenue from its cruise and cruise-related activities as either "passenger ticket revenue" or "onboard and other" revenue.  ¶36.  Passenger ticket revenue is by far Norwegian's most significant revenue source, as it comprises *70%* of Norwegian's total revenue.  ¶¶36, 44, 124.  To maximize revenue, the Company sailed its ships at full capacity, employing a "market-to-fill" or "go-to-market" strategy and "high-frequency marketing campaigns" designed to drive demand and secure advance bookings.  ¶¶45-47, 124.  As a result, Norwegian's sales force was one of the key "drivers of demand" and described by the Company as the "engine[]" that powered Norwegian's revenues.  ¶¶46-47, 124-125.

Leading up to the Class Period, Norwegian reported year-over-year revenue growth and rapidly rising earnings per share.  ¶¶39-40.  Entering 2020, Norwegian appeared well-positioned to capitalize on "Wave Season," the cruise industry's version of Black Friday, and saw an acceleration of booking volumes and pricing across all three of its brands.  ¶¶42-43.  Then, in December 2019, a novel strain of the highly-contagious coronavirus, COVID-19, began spreading in mainland China.  By January 2020, the virus spread to other parts of Southeast Asia, and an outbreak occurred on Carnival Corp.'s Diamond Princess cruise ship, ultimately resulting in over 700 COVID-19 cases and the death of at least eight people.  ¶¶52-55.  On January 30, 2020, the World Health Organization declared the COVID-19 outbreak a global health emergency.  ¶55.

By the start of the Class Period, the unrelenting news coverage of COVID-19 and the Diamond Princess tragedy caused Norwegian's customers to re-think their cruise vacations. Norwegian began experiencing a rapid slowdown in bookings, a significant increase in cancellations, and was forced to cancel or modify 40 voyages, resulting in a "swift and severe"

negative impact to the Company's business.  ¶¶9, 59, 91, 94-95, 127.  Defendants knew that the public's perception of how Norwegian responded to the coronavirus, and especially any negative publicity, would materially impact the Company's business, financial results, and stock price. ¶¶109, 132.  Thus, Defendants told investors that the Company was taking "aggressive and proactive measures to assure the safety, security, and well-being" of its guests and crew, told investors that it was "working tirelessly" to do what is right for the Company's shareholders "while protecting the equity of [Norwegian's] brands," and promised to investors that it would be as "transparent as possible" about its response to the coronavirus.  ¶¶92, 97, 99.  Defendants also claimed that, as of February 20, 2020, Norwegian had begun to see an "improvement" in bookings – a key metric the Company routinely discussed and analysts closely followed – and a "decrease" in cancellations.  ¶¶96, 98.

However, unbeknownst to investors, the Company's sales force had been instructed to engage in a deceptive sales campaign designed to mislead customers about COVID-19 in order to secure bookings, minimize cancellations, and buoy revenues.  ¶¶10-12, 61-67.  The Company's dangerously false marketing scheme was developed under the direction of Robert Becker ("Becker"), NCL's high-ranking sales "guru" executive, who reported directly to Harry Sommer, the CEO of NCL.[2]  ¶¶11, 60-67, 129-130.  According to detailed whistleblower accounts corroborated by internal company emails, the sales scripts Becker created and approved were disseminated to employees to use with customers when "[COVID-19 was] brought up."  ¶¶62-63. The scripts included false and unproven statements such as: (1) "the only thing you need to worry about for your cruise is do you have enough sunscreen?"; (2) "The Coronavirus can only survive in cold temperatures."; (3) "Scientists and medical professionals have confirmed the warm weather of the spring will be the end of the Coronavirus."; and (4) "The coronavirus cannot live in the amazingly warm and tropical temperatures that your cruise will be sailing to."  ¶63.  Sales managers also told sales personnel to "be aggressive" and "hook in customers" by creating a false sense of *increased* demand for Norwegian's cruises.  ¶65.  The same messaging was relayed at department meetings, during which managers downplayed the risk of the coronavirus.  ¶¶66, 71, 130.  Sales employees concerned about hitting quotas were pressured into complying with these

---

[2]    NCL was critical to the Company's overall financial performance.  In 2017, Norwegian derived 72% of its gross revenue and 89% of its on-board revenue from the NCL brand alone.

directives due to the threat of losing previously earned commissions, being placed on personal improvement plans, or being fired.  ¶66.

Norwegian's deceptive sales campaign threatened the Company's critically important brand equity and was a direct and unequivocal violation of the Code, which expressly prohibits employees, including the Individual Defendants, Sommer, and Becker, from engaging in conduct that "may raise questions as to NCLH's honesty, integrity, impartiality, reputation or activities" and taking "unfair advantage of anyone" through "manipulation," "misrepresentation of material facts," or "any other intentional unfair-dealing practice."  ¶¶111-113.  Confirming that the Code is not simply aspirational, the Individual Defendants were required to and did file annual certifications stating that they would follow the Code.  ¶144.

Before the market opened on March 11, 2020, an explosive *Miami New Times* article exposed Norwegian's deceptive sales campaign to the public and revealed the falsity of Defendants' Class Period statements.   The article, which was supported by a detailed whistleblower account, described Norwegian's deceptive sales campaign, quoted internal Company emails, and confirmed that managers asked sales staff to lie to customers about COVID-19 in order to protect the Company's bookings.  ¶¶16, 71-75.  The next day, two additional articles published by the *Washington Post* and the *Miami Herald* revealed further details about Norwegian's misinformation campaign.  ¶¶76-79.  These articles confirmed that the misleading sales lines were distributed via email to salespeople in Norwegian's two Florida-based sales offices, quoted additional internal company emails that called the coronavirus "overhyped," and revealed that, after publication of the *Miami New Times* article, Norwegian's General Counsel instructed salespeople to cease using the misleading sales tactics "immediately."  ¶79.

The market's reaction to the disclosures in the articles was swift and severe.  After closing at $20.50 per share on March 10, 2020, Norwegian stock fell nearly 27% to close at $15.03 per share on March 11, 2020, the day the *Miami New Times* article was published.  ¶¶19, 80, 119.  The steep decline accelerated on March 12, 2020, after the additional revelations from the *Washington Post* and *Miami Herald*, with Norwegian stock dropping an additional 36% to close at $9.65 per share.  *Id*.  The declines in the prices of Norwegian securities caused investors to suffer substantial damages.  ¶¶19, 80, 119-120.

The negative reaction to Norwegian's deceptive sales campaign continued in the weeks that followed.  On March 12, 2020, U.S. Senators Richard Blumenthal and Edward Markey sent a

letter personally addressed to Del Rio that publicly condemned him for Norwegian's dangerously misleading sales practices, chastised the "appalling" conduct of prioritizing "profits over people," and demanded that Norwegian immediately stop spreading misinformation regarding the COVID-19 pandemic.  ¶¶82-83.  On March 19, 2020, *Business Insider* reported that Becker had taken a leave of absence from Norwegian.  ¶85.  On March 23, 2019, Florida Attorney General Ashley Moody announced a consumer-protection investigation into "allegations of misleading and potentially dangerous sales pitches by Norwegian Cruise Lines" and vowed "to get to the bottom of the disturbing allegations against [the Company]."  ¶¶86-87.  Then, in a May 15, 2020 SEC filing, Norwegian revealed that it had "received notifications from other attorneys general and governmental agencies that they are conducting similar investigations" into the Company's deceptive sales practices.  ¶88.

## III.     LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(6), the Court must consider the CAC in its entirety, "accept all factual allegations . . . as true," and construe them in the light most favorable to Plaintiff.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).  To state a claim for a violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5, Plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 37 (2011).  Here, Defendants contest only the first and second elements.

## IV.     THE CAC ADEQUATELY PLEADS MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS

### A.     The CAC Adequately Pleads that Norwegian Engaged in a Deceptive Sales Campaign

The CAC alleges with particularity the dangerously false sales campaign Norwegian's sales force carried out at the behest of Company executives and managers by: (1) quoting the canned responses and "one-liners"; (2) detailing internal Company emails described in news articles; (3) describing sales meetings during which employees were told to be "aggressive" and "hook in customers"; (4) detailing that the deceptive sales script was created and approved by Becker and distributed to Norwegian's Florida-based sales offices; and (5) describing the daily quotas sales personnel were required to meet along with the consequences for failing to do so.

¶¶60-66.  Norwegian is also under investigation by attorneys general in Florida and other states for its "disturbing" sales practices.  ¶¶86-88.

Attempting to discredit these allegations, Defendants criticize Plaintiff for relying on news articles quoting an unnamed Company whistleblower.  MTD at 10.  But "[n]ews articles, which frequently rely upon unnamed sources, constitute reliable bases for allegations."  *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1235-36 (N.D. Ga. 2019) (refusing to discount allegations based on news articles citing anonymous sources).  Nor is there any requirement that Plaintiff name the source of its allegations because the CAC adequately describes the "basis of the whistleblower's knowledge."  *See* ¶¶71-79, 129-130; *City of Sunrise Gen. Emps.' Ret. Plan v. FleetCor Techs., Inc.*, 2018 WL 4293143, at *8 (N.D. Ga. May 15, 2018) (crediting witness allegations and recognizing "the Eleventh Circuit welcomes confidential informants" and "does not take such a 'hard line' on confidential witnesses" (citing *Mizzaro v. Home Depot, Inc.*, 544 F. 3d 1230, 1239 (11th Cir. 2008))).  Moreover, the anonymous whistleblower statements contained in news articles are corroborated by ***internal company emails***.  ¶¶129-130.  Thus, contrary to Defendants' claim, the CAC's allegations are not based solely on a single, unnamed source, but on multiple news articles that rely on both detailed whistleblower accounts ***and*** internal company emails.[3]  *Equifax*, 357 F. Supp. 3d at 1235 ("pleading requirements under the PSLRA can easily be satisfied with references to internal memoranda and news articles"); *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (PSLRA pleading requirements met "by providing documentary evidence and/or a sufficient general description of the personal sources of the plaintiffs' beliefs").

Defendants wrongly contend the CAC fails to demonstrate that the one-liners were actually used and that a "widespread" deceptive sales practice existed.[4]  This highly factual argument is

---

[3]    Thus, unlike *In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006), where the plaintiffs offered "nothing more than conclusory allegations that an anticompetitive scheme existed," the CAC establishes the existence of a deceptive marketing campaign based on detailed whistleblower accounts and internal company emails.  *In re SolarCity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 1000 (N.D. Cal. 2017), where plaintiffs failed to quantify the impact of deceptive sales practices on SolarCity's reported operating metrics, is inapposite because here Plaintiff's claims do not turn on whether Norwegian's reported bookings were artificially inflated by the Company's misleading sales campaign.

[4]    Indeed, in *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *11 (N.D. Cal. Dec. 17, 2019), a case Defendants cite, the court, in "[v]iewing the CAC allegations in the light most favorable to Plaintiff . . . assume[d] that Oracle engaged in the alleged Sales Practices."

inappropriate for resolution on a motion to dismiss.  MTD at 10-11; *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 97 (S.D.N.Y. 2006) ("[W]hether defendants engaged in questionable practices" or if they were "isolated" or "widespread" is a question of fact "manifestly unsuited for resolution on a motion to dismiss.").  Nor is Plaintiff required, at the pleading stage, to **prove** that Norwegian engaged in a deceptive sales campaign.  *Halford v. AtriCure, Inc.*, 2010 WL 8973625, at *9 n.5 (S.D. Ohio Mar. 29, 2010) (because **proof** of falsity is not required at the pleading stage, plaintiff need not allege specific meetings where illegal, off-label use of products were promoted).

Defendants' argument also ignores the CAC's allegations that "[e]very single call" was about the virus; that sales personnel were expected to provide the deceptive one-liners to "all" customers; and that sales personnel were required to hit a quota of 150 calls per day or face negative consequences and thus were "pressured to persuade customers not to cancel their trips." ¶47.  Additionally, customer complaints posted on consumer watchdog websites (¶67) demonstrate that sales personnel actually used the one liners, as does Norwegian's General Counsel's belated directive that the Company stop using the misleading sales pitches "immediately," ¶84; *see also FleetCor Techs.*, 2018 WL 4293143, at *11 (company's "subsequent termination" of deceptive sales pitch "confirms that it existed").

At the motion to dismiss stage, where "the court accepts all factual allegations of the complaint as true and construes them in the light most favorable to the plaintiff," the CAC's allegations are more than sufficient to establish the existence of a misleading sales campaign. *Keippel v. Health Ins. Innovations, Inc.*, 2019 WL 5698329, at *2, *5 (M.D. Fla. Nov. 4, 2019) (upholding securities fraud complaint involving allegations of fraudulent sales practices at call centers and use of misleading sales scripts that deceived customers); *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915, 924 (11th Cir. 2020) ("It may well be that [plaintiff] is wrong on all fronts, as the defendants claim.  But that is for the finder of fact to decide after discovery.").

## B.   The CAC Pleads Actionable Misstatements and Omissions with Particularity

To adequately plead a false statement under Rule 9(b) and the PSLRA, a plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B).  A complaint pleads falsity with the requisite particularity if it specifies the "who, what, when[,] where, and how" of defendants' false statements.  *In re Faro Techs. Sec. Litig.*, 534 F. Supp. 2d 1248, 1255 (M.D. Fla. 2007) (quoting

*Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006)). The CAC readily satisfies this standard.[5]

The CAC identifies with particularity each false or misleading statement (¶¶89-113), states where and when each was made (¶¶89, 92, 105, 109-111), and, contrary to Defendants' argument (MTD at 12), clearly articulates why the statements were false or misleading when made (¶114). Specifically, Defendants' statements were false or misleading because they omitted material facts: "that Norwegian was engaged in a deceptive sales campaign designed to induce customers to purchase or rebook, and not cancel, cruise trips, despite concerns about the COVID-19 outbreak." ¶114; *see also* ¶¶68-70; *Holwill v. AbbVie Inc.*, 2020 WL 5235005, at *3 (N.D. Ill. Sept. 1, 2020) (statements about "promotional programs," "marketing programs," and "strong commercial execution" were misleading by omission of unlawful sales and marketing practices). Additionally, Defendants' statements regarding the Company's bookings (*e.g.*, ¶¶90, 96, 98, 101), marketing strategies (¶¶93, 100, 106, 107), and sales force (¶¶106-107) gave rise to a duty to disclose the Company's dangerously false sales pitch.[6] *See infra* §IV.C.

---

[5]   Contrary to Defendants' argument, Plaintiff is not "relying on the hope" that discovery will support its allegations. MTD at 9 n.3. Rather, the exact language Defendants ***improperly chastise*** Plaintiff for including – that "Plaintiff believes that substantial evidentiary support will exist for the allegations set forth [in the CAC] after a reasonable opportunity for discovery" – specifically tracks and is even ***required*** to be stated in a complaint under Fed. R. Civ. P. 11(b)(3) when pleading on information and belief. As Defendants know, pleading on information and belief is often necessary in securities fraud cases such as this where discovery is automatically stayed by operation of the PSLRA and the ***evidence*** rests in the hands of those who committed the fraud. Despite the lopsided access to ***evidence*** here, the CAC, pleading on information and belief, appropriately includes detailed, non-conclusory factual allegations quoting from internal Company documents and investigative reporting that revealed whistleblower accounts. *See In re Towne Servs., Inc. Sec. Litig.*, 184 F. Supp. 2d 1308, 1318 (N.D. Ga. 2001) (recognizing in actions covered by the PSLRA, information and belief allegations can be satisfied in a variety of ways, including "personal sources . . . newspaper articles, internal documents, etc.").

[6]   Plaintiff does not, as Defendants contend, allege that Norwegian's reported financial results were materially misstated. MTD at 12. Rather, as set forth in §IV.C., by speaking on those topics, Defendants had a duty, but failed, to disclose the Company's deceptive sales campaign. For this reason, Defendants' reliance on *In re Royal Caribbean Cruises Ltd. Sec. Litig.*, 2013 WL 3295951, at *11 (S.D. Fla. Apr. 19, 2013), where "Plaintiffs' allegations center[ed] on whether the Company misrepresented their bookings and earnings potential," is unavailing.

In short, Defendants' feigned inability to identify the false or misleading statements at issue in this case should be rejected.[7]  Because the CAC pleads the who, what, when, where, and how of Defendants' statements, the Motion should be denied.  *Eastwood Enters., LLC v. Farha*, 2009 WL 3157668, at *3 (M.D. Fla. Sept. 28, 2009) (heightened pleading standards of Rule 9(b) and the PSLRA met); *Monroe Cnty. Emps.' Ret. Sys. v. Southern Co.*, 2018 WL 1558577, at *21-23 (N.D. Ga. Mar. 29, 2018) (same).

### C.    Defendants Had a Duty to Disclose Omitted Facts

"Rule 10b-5 prohibits not only literally false statements, but also any omissions of material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Luczak*, 812 F. App'x at 923.  A statement is misleading "if in the light of the facts existing at the time of the statement a reasonable investor, in the exercise of due care, would have been misled by it." *Id.*  "[A] party who discloses material facts in connection with securities transactions assumes a duty to speak fully and truthfully on those subjects." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011).  Thus, a duty to disclose omitted facts is "created by a defendant's previous decision to speak voluntarily." *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1043 (11th Cir. 1986).

Here, Defendants omitted the fact that Norwegian was engaged in a deceptive sales campaign designed to induce customers to continue booking, and stop cancelling, cruises (a known hotbed for the transmission of viral diseases) despite the deadly threat posed by COVID-19.  ¶¶68-70, 114.  The omitted information was material, as reasonable investors surely would have wanted to know the reasons why, in the midst of the rapidly spreading, deadly pandemic, Norwegian had seen "an improvement in week-over-week booking volumes and a decrease in cancellations."  ¶96.  Investors would also find it important to know that, despite Defendants' pledge to protect "the equity of our brands" (¶¶97, 99), the Company's sales force had been instructed to provide blatantly false information about the coronavirus to customers and was aggressively pressuring

---

[7]    Indeed, Defendants' lengthy brief demonstrates they understand Plaintiff's allegations perfectly.  *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 154-55 (D. Conn. 2019) (noting that one purpose of the heightened pleading requirements of Rule 9(b) and the PSLRA is "to provide a defendant with fair notice of a plaintiff's claim," and observing that defendants' briefs, in which they "thoroughly and directly rebut the allegations in the Complaint, prove that the defendants were on notice of the claims against them").

them not to cancel, and continue booking cruises, which violated the Code and created significant reputational risk for the Company that had the potential to (and did) damage shareholders.

Defendants' argument that they had no duty to disclose the deceptive sales campaign (MTD at 13-18) fails for several reasons. First, Defendants' purported "direct nexus" test, based on dicta from an out-of-circuit district court case, has not been adopted by the Eleventh Circuit, which makes clear that a duty to disclose *all* material information relating to a particular subject arises by voluntarily "touting" that subject to investors.[8] *SEC v. Merch. Cap., LLC*, 483 F.3d 747, 770-71 (11th Cir. 2007); *FindWhat*, 658 F.3d at 1305 ("By voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts . . . to ensure that what was revealed is not 'so incomplete as to mislead.'"). By: (1) voluntarily speaking about the Company's handling of, and impact from, the coronavirus (¶¶89-98); (2) boasting about Norwegian's marketing strategies and sales force (¶¶93, 99-100, 106-107); and (3) representing that all employees adhered to the Code (¶¶111-113), Defendants put the deceptive sales campaign in play and had an obligation to disclose it, but failed to do so.[9] *FindWhat*, 658 F.3d at 1298-1299 ("Defendants' statements triggered a duty to disclose the grave defects that existed within the 'enforce[ment]' system they voluntarily touted."); *MAZ Partners LP v. First Choice Healthcare Sols., Inc.*, 2020 WL 1072582, at *5 (M.D. Fla. Feb. 14, 2020) (rejecting argument that defendants had no "duty to disclose uncharged, unadjudicated wrongdoing" where defendants put the cause

---

[8]  Defendants' cases are distinguishable. *See Henningsen v. ADT Corp.*, 161 F. Supp. 3d 1161 (S.D. Fla. 2015) (no duty to disclose problems with ADT's dealer's sales and installation tactics because plaintiff's vague allegations did not demonstrate the materiality of omitted information); *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012) (no duty to disclose hyper aggressive sales tactics because omissions not sufficiently connected to statements regarding source of revenue and enrollment growth).

[9]  Defendants' attempt to contort Plaintiff's allegations to fit part of the fact pattern in *FindWhat* should be rejected. MTD at 14-16. Defendants ignore the *FindWhat* court's conclusion that a different set of statements *were* misleading based on the failure to disclose defects in an enforcement system defendants "voluntarily touted." *FindWhat*, 658 F.3d at 1298-99. Further, unlike the plaintiff in *FindWhat*, the CAC does not make general allegations about Norwegian's total revenue growth. Rather, Defendants' statements about a specific metric – bookings – which are driven by the Company's marketing and sales machine, when considered collectively with Defendants' other statements, gave rise to a duty to disclose facts concerning that metric, *i.e.*, Norwegian's deceptive sales campaign. And, as set forth in §V.A., Defendants' scienter is supported by the fact that they closely monitored, and routinely spoke about, the Company's bookings. ¶¶90, 96, 98, 101, 128.

of company's stock volatility at issue, thereby creating an obligation to make the disclosure "complete and accurate"); *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 824 (E.D. Pa. 2001) (attributing Providian's success to its "customer focused approach" put the "topic of the cause of Providian's success in play" and obligated Providian to disclose that it engaged in illegal and deceptive sales practices); *Halford*, 2010 WL 8973625, at *11 ("Defendants had a duty to speak truthfully about its marketing practices"); *Holwill*, 2020 WL 5235005, at *3 (statements about "promotional programs," "marketing programs," and "strong commercial execution" were misleading by defendants' "omission of the details of AbbVie's sales and marketing practices, particularly the details of AbbVie's alleged unlawful kickback scheme").

Second, even assuming, *arguendo*, that Defendants' "direct nexus" test applies (it does not), Plaintiff established a "direct nexus" between Defendants' Class Period statements and the deceptive sales campaign, which triggered Defendants' duty to disclose. For example, in the face of the greatest crisis to ever face the Company, Defendants told investors that the Company was "working tirelessly to do what is right" for its "shareholders," would not respond to the coronavirus in ways that would hurt the Company's brand equity, and bragged about the Company's marketing prowess. ¶¶97, 100. Defendants, therefore, had a duty to disclose that the Company instructed its sales force to engage in a dangerously false sales campaign that prioritized profits over passengers and risked destroying Norwegian's brand equity and reputation – at a time when investors were already "absolutely panicked" about COVID-19 and how Norwegian would respond to it. *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *9 (M.D. Ga. Mar. 23, 2018) ("[T]he Court finds that Defendants did voluntarily tout the benefits of the . . . model and that their failure to disclose known material problems with that model was materially misleading."); *In re Immucor Inc. Sec. Litig.*, 2006 WL 3000133, at *11-13 (N.D. Ga. Oct. 4, 2006) ("a defendant may not deal in half-truths," and omitted facts rendered defendants' statements misleading).

Third, Defendants' tactic of analyzing each category of statement in isolation (MTD at 14-18) should be rejected, as Defendants' statements must be considered collectively and in context.[10] *Matrixx Initiatives*, 563 U.S. at 44, 47 (holding that the determination of whether statements were

---

[10]   Defendants' own authority recognizes that, "[T]he central inquiry" is "'whether the defendants' representations, ***taken together and in context***, would have misled a reasonable investor . . .'" *Axis Cap. Holdings*, 456 F. Supp. 2d at 588; *Oracle Corp.*, 2019 WL 6877195, at *12 (duty to disclose exists where statements are "misleading ***in light of the context surrounding the statements***").

materially misleading is a "contextual inquiry" looking to "the circumstances under which they were made"); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248 (5th Cir. 2009) ("[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers.").  Context is particularly important in this case because Defendants spoke during a period of crisis and intense scrutiny on the cruise industry's handling of COVID-19, and when Norwegian was experiencing a "severe" impact to its business.  Indeed, Defendants knew that public perception of the Company's response to a viral outbreak like COVID-19 could damage Norwegian's important brand equity and negatively impact its business, and even went out of their way to distinguish Norwegian from other cruise companies that had reported COVID-19 cases on-board their ships.  ¶¶97, 102, 109.

Taken together and in context, Defendants' statements created the misleading impression that Defendants were being "transparent" about Norwegian's handling of the coronavirus, experiencing an improvement in bookings and a moderation of cancellations, taking steps to protect the Company's customers and shareholders, and adhering to the Code.  Defendants, therefore, had a duty to "neutralize" the "natural and normal implication" of their statements by disclosing the deceptive sales campaign.  *FindWhat*, 658 F.3d at 1305.  Their failure to do so rendered their "own prior speech misleading or deceptive." *Rudolph*, 800 F.2d at 1043.

### D.    Defendants' Code of Conduct Statements Are Actionable

Defendants present a straw man of the allegations relating to the Code statements.  Plaintiff does not allege that the Code operated as a "guarantee" or that Norwegian represented it would disclose "all violations" of the Code.  MTD at 18.  Rather, the CAC alleges that Norwegian sanctioned conduct violative of the Code, thus making the Code statements actionable.[11]  *See* ¶¶68-70, 114.  Put differently, accepting as true that a "***top-down*** [sales] initiative ***overseen by Company executives and sales managers . . . with the knowledge and awareness of . . . high-ranking Company executives***" existed (¶114(a)), the Code statements (¶¶111-113, 138, 139, 140), in context, materially and falsely assured investors as to Norwegian's integrity, adherence to the Code, operations or true state of affairs, and protection of its "critically important image, brand equity, and reputation."  ¶¶111, 114(c), 116(vii); *see also In re Tenaris S.A. Sec. Litig.*, 2020 WL 6018919, at *7-8 (E.D.N.Y. Oct. 9, 2020) (code statements actionable "because of the context in

---

[11]  For this reason, as illustrated below, Defendants' assertion that no "widespread noncompliance with the Code" is shown is false.  MTD at 19.

which they were made"); *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *17 (S.D.N.Y. Nov. 26, 2018) ("statements contained in a code of conduct are actionable where they are directly at odds with the conduct alleged in a complaint").

Plaintiff amply alleges facts supporting this context and how it makes the Code statements actionable. ¶¶4, 10, 66, 68, 111-114, 116(vii), 138-145. In fact, under virtually identical circumstances, courts have found in-context code statements not to be generalized, open-ended, or aspirational, but materially misleading as to companies' integrity, state of affairs, or manner of conducting business. *See Tenaris*, 2020 WL 6018919, at *7-8 (code statements actionable because executives were required to "certify compliance with the Code . . . on an annual basis," thus giving the "[false] impression" the company was not "accept[ing] or forgiv[ing]" executives' violative conduct); *Holwill*, 2020 WL 5235005, at *4 (noting code statements not *per se* inactionable; finding such statements actionable as misrepresentations of defendant's "sales and marketing practices and programs" based on allegations that defendant engaged in an unlawful scheme); *In re CenturyLink Sales Practices & Sec. Litig.*, 403 F. Supp. 3d 712, 728 (D. Minn. 2019) (code statements actionable because company conducted and tolerated "unethical or deceptive sales practices" violative of code despite representing "treatment of its customers as critical to its business,); *In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 721-22 (S.D.N.Y. 2019) (code statements actionable as misrepresentations of company's "true state of affairs" because such statements reassured investors about company's integrity and employees were required to "sign and deliver . . . an adherence letter" and "renew their acceptance of the code twice a year").

Critically, not only did the Code's own terms require executives and the Individual Defendants to comply with the Code (as in *CenturyLink*, 403 F. Supp. 3d at 728) but so too did the executives' employment agreements (¶¶112, 138). The Code also required all officers, directors, and the Individual Defendants to certify compliance with the Code (as in *Grupo Televisa*, 368 F. Supp. 3d at 721), and the Individual Defendants were even required to certify this annually (as in *Tenaris*, 2020 WL 6018919, at *7) (¶¶142, 144). These facts, "[t]aken together," show the Code statements were not "generalized" or "aspirational" but statements "investor[s] . . . look[ed] to . . . to evaluate" Norwegian's integrity (*Tenaris*, 2020 WL 6018919, at *7-8), and thus reasonably "rel[ied] on [those statements] as reflective of [Norwegian's] true state of affairs" and

protection of its reputation (*Grupo Televisa*, 368 F. Supp. 3d at 721).[12]  Accordingly, the Code statements are actionable.[13]

### E.   Defendants Cannot Sail into the PSLRA's Safe Harbor

Defendants rewrite the CAC by mischaracterizing their misstatements and omissions as concerning only the "future" (MTD at 2-3, 19-20) and then wrongly claim protection under the PSLRA safe harbor.[14]  MTD at 20; *see also Abrams v. MiMedx Grp., Inc.*, 37 F. Supp. 3d 1271, 1274 (N.D. Ga. 2014) ("[defendant]'s characterizations of the . . . allegations do not capture the extent of the [alleged] misrepresentation").  The claims are expressly premised on misstatements and omissions of historical or present material fact, which are not forward-looking.  ¶¶89-114, 149-152; *see also Harris v. Ivax Corp.*, 182 F.3d 799, 804 (11th Cir. 1999) (limiting forward-looking analysis to "statements on which alleged liability rests").  And, even if they are forward-looking, the purported accompanying cautionary language was not meaningful under the circumstances, and the statements were made with knowledge of their falsity.  *See* ¶¶149-152.  The PSLRA safe harbor thus does not apply.

---

[12]   Investor reliance on the Code statements is even more apparent in the context of the coronavirus and the fact that cruise ships owe their passengers a duty of care.  *See Amy v. Carnival Corp.*, 961 F.3d 1303, 1308 n.4 (11th Cir. 2020).

[13]   Defendants' cited cases are distinguishable.  None involved a certification requirement (¶¶142, 144).  Plus, in *Bondali v. YumA Brands, Inc.*, 620 F. App'x 483, 489-90 (6th Cir. 2015), plaintiffs "alleged **no facts** to suggest that [defendant ultimately] **did not** require . . . adhere[nce] to [mandatory] corporate food standards and safety protocols" (second emphasis in original); whereas, here, Plaintiff has alleged facts showing that Defendants sanctioned violations of the Code despite requiring compliance with it (¶¶112, 114, 138).  In *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 685-86 (D. Colo. 2007), plaintiff alleged omission that "some" officers violated the code from "announcements" of the code's adoption; but here the Code violations were sanctioned (¶¶66, 68, 114) and the misstatements and omissions include the Code itself (¶¶111-113, 138, 139, 140).  And, *ITT Educ. Servs.*, 859 F. Supp. 2d at 581: (1) involved no code of conduct; (2) noncompliance was not alleged; and (3) only "specific instances" of misconduct were alleged, whereas in this case Plaintiff alleges Norwegian "created a pattern and practice of overtly lying to customers" (¶¶10, 114(c), 143-145).

[14]   For this reason, too, Defendants' assertion that Plaintiff fails to allege "Defendants Actually Knew that Their Future Plans Would Not Materialize As Expected" (MTD at 22) has no bearing.

1.      **The Misstatements and Omissions Are Not Forward-Looking**

The CAC alleges multiple misstatements and omissions of historical and contemporaneous material fact (¶¶89-102, 105-108, 111-113).[15]  It is well-established these types of misstatements and omissions fall outside the safe-harbor.[16]  *See, e.g.*, *SEC v. Bankatlantic Bancorp, Inc.*, 2012 WL 1936112, at *15 (S.D. Fla. May 29, 2012) (Scola, J.) (misstatements and omissions held not forward-looking because they "clearly address[ed] existing occurrences, not future projections" and "the risks were already present"); *Schultz v. Applica, Inc.*, 488 F. Supp. 2d 1219, 1229 (S.D. Fla. 2007) (safe harbor does not apply to misstatements of historical or contemporaneous facts). Nor can "[a]n otherwise actionable omission concerning past or present problems" be "sanitized by forward-looking statements" about similar problems."[17]  *In re Towne Servs., Inc. Sec. Litig.*,

---

[15]  Paragraph 114 ties these misstatements and omissions to the allegations concerning the misleading sales campaign.  Unsurprisingly, Defendants' Exhibit 7 does not reference ¶114 because doing so would have illustrated that ¶114 accounts for each statement purported as forward-looking.  Exhibit 7's infirmities do not stop there.  Exhibit 7, to the extent it asserts propositions not asserted within the Motion's body, effectively end-runs the 30-page limit the Court permitted.  *See* ECF No. 58; S.D. FLA. L.R. 7.1(c)(2) (omitting "exhibits" from list of features excepted from page limit); *EEOC v. SunTrust Bank*, 2014 WL 1763200, at *4 (M.D. Fla. Apr. 30, 2014) (additional information "in the guise of an exhibit" is "[in]appropriate" and a "wayward attempt to exceed the page limits established" for motions).  Exhibit 7 also seeks to alter the context of the challenged statements by including an inordinate amount of self-serving or extraneous language.  Exhibit 7 even fails in its fundamental aim of categorizing statements as forward-looking, puffery, or inactionable opinion, among other labels, by failing to carve out the precise language to which each such label purports to apply.  In light of the foregoing, the Court should ignore Exhibit 7.

[16]  Defendants' arguments regarding Norwegian's revenue recognition practices (MTD at 20 n.9) provide them no cover as to whether the "5-Day Booking News" statements were forward-looking because those statements still concealed the misleading sales campaign from investors.  *See* ¶¶114(b), 116.

[17]  While *Carvelli v. Ocwen Fin. Corp.*, ultimately held alleged misstatements inactionable, its reasons are distinguishable on two fronts.  934 F.3d 1307, 1329 (11th Cir. 2019).  First, defendant's statement "[it] is cooperating," though not forward-looking, was held inactionable because plaintiff did not "allege[] facts giving rise to a strong inference that [defendant] was *not* cooperating" (*id.* at 1328 & n.12 (emphasis in original)); whereas here Plaintiff *has* alleged facts supporting a strong inference that contrary historical or contemporaneous material facts existed rendering Defendants' statements false or misleading (*see* ¶¶114, 116).  Second, defendant's statement "we are committed to correcting any servicing deficiencies" was forward-looking because it "convey[ed] management plans for *yet-to-be proven future operations*," *Carvelli*, 934 F.3d at 1329; whereas here the misstatements and omissions pertained to *present* operations (*see* ¶¶91-92, 95-98, 100-101, 114, 116).

184 F. Supp. 2d 1308, 1320 (N.D. Ga. 2001); *SEC v. Revolutions Med. Corp.*, 2015 WL 11199068, at *4 (N.D. Ga. Apr. 3, 2015) (same).  Accordingly, the misstatements and omissions *as pled* are not forward-looking and, therefore, are not entitled to safe harbor protection.[18]

### 2. The Purported Accompanying Cautionary Language Was Not Meaningful

Assuming *arguendo* the misstatements and omissions are forward-looking, the purported accompanying cautionary language was not meaningful and, therefore, does not shield Defendants from liability under the safe harbor.

To begin, the language Defendants claim "warned of other risk factors related to COVID-19" (MTD at 20-21 n.11), on its face, is boilerplate and thus cannot be meaningful (¶150).  *See SEC v. Levin*, 2014 WL 11878357, at *18 (S.D. Fla. Oct. 6, 2014) (finding cautionary language "largely boilerplate" and failed to "warn about the specific issues" alleged); *Merch. Cap.*, 483 F.3d at 767 ("[B]oilerplate will not suffice.").  Nor can any other risk warning language, including that which purportedly "specifically warned investors of the risk associated with COVID-19" (MTD at 20-21), be meaningful because it did not address or even pertain to Norwegian's misleading sales campaign. *See* ¶¶89-114, 116, 149-152; *Flowers Foods*, 2018 WL 1558558, at *11 (warnings must be "*specifically tailored* . . . to the risks *Plaintiff argues existed*.").  Indeed, Defendants' cautionary language failed to warn of the risks to Norwegian's brand image and reputation created by intentionally providing dangerously false COVID-19 information to customers to induce them to book or not cancel reservations in the face of the deadly global pandemic.  ¶114.  The market's reaction to the revelation of Norwegian's deceptive sales campaign evidences these warnings did not adequately inform investors of these risks.  ¶¶115-121, 151.

Moreover, these risk warnings were themselves false or misleading because the sales campaign (and thus the alleged risks) had already materialized by the time the "warnings" were made.  ¶¶114, 152.  For example, in the context of the risks alleged, warning "[p]ublic perception about the safety of travel . . . may" negatively impact shareholders (¶109) was false because Norwegian was already conducting the sales campaign and knew its revelation would damage public perception about Norwegian's handling of COVID-19 and thus damage shareholders

---

[18]  The purported puffery or corporate optimism statements are not within the safe harbor (*see* MTD at 22 n.13) because such statements were not forward-looking for the reasons set forth in this section and ¶¶114 and 151, and they were material for the reasons set forth in §IV.G.

(¶¶114, 152).[19]  *See FindWhat*, 658 F.3d at 1299 (to caution that "unfavorable events [may] happen when they have already occurred is deceit."); *In re 21st Century Holding Co. Sec. Litig.*, 2008 WL 5749572, at *13 (S.D. Fla. Nov. 7, 2008) (same).

Accordingly, even if the alleged misstatements and omissions are forward-looking (they are not), Defendants' purported accompanying cautionary language was not meaningful.

### 3. Any Forward-Looking Statements Were Made with Knowledge of Their Falsity

Finally, "[a] defendant remains liable, even for a forward-looking statement, if the plaintiff shows that the defendant 'knew at the time of the statement of false and misleading content and thus lacked a reasonable basis for making the statement.'" *Primavera Invs. v. Liquidmetal Techs., Inc.*, 403 F. Supp. 2d 1151, 1159 (M.D. Fla. 2005).  Here, the CAC alleges actual knowledge of the falsity of the statements (¶¶114, 152; *see also supra* §IV.A.) and therefore "satisfactorily pleads facts to counter the presumption that the [D]efendants' forward-looking statements are not actionable." *Id.*

### F. Defendants' Purported Opinion Statements Are Actionable

Defendants' sweeping assertion that certain alleged false statements are non-actionable opinions under *Omnicare, Inc. v. Laborers Dist. Counsel Constr. Indus. Pension Fund*, 575 U.S. 175 (2015) is also erroneous.  MTD at 22-23. Defendants cherry-pick and mischaracterize a handful of the challenged statements, which they loosely categorize as opinions or "beliefs."  But merely calling a statement an opinion "does not make it so," and many of the statements Defendants label as opinions are not because they "convey facts."  *Signet*, 2018 WL 6167889, at *13 (statements that "spoke to a present state of affairs, not a belief about future events" were not opinions); *Tung v. Dycom Indus., Inc.*, 454 F. Supp. 3d 1244, 1257 (S.D. Fla. 2020) (rejecting

---

[19]  Defendants' cited cases are inapposite.  *Harris*, 182 F.3d at 807, found cautionary language as to **projections** meaningful because it was "detailed and informative" about "misfortunes [that] **could** befall the company" and thus "warned of risks of a significance similar to [the risks]" that became realized (*Harris* language Defendants omit from their quotation of the same sentence (MTD at 21)); whereas here the claims are not premised on projections, and because the warnings were silent about the misleading sales campaign they failed to warn of any risk already realized by it, let alone ones of "a significance similar."  In *Carvelli*, 934 F.3d at 1327, the court held the cautionary language meaningful in part because defendant, unlike here, **had already** "disclosed [the] present problem."  And, in *Royal Caribbean*, 2013 WL 3295951, at *16, the court held cautionary language meaningful in part because, unlike here, the warnings came "in advance of the risks materializing."

attempt to characterize statements as inactionable opinions because the statements did not imply what the defendant "thinks, believes, or infers").  These include, for example, Defendants' statements that they had "seen an improvement in week-over-week booking volumes and a decrease in cancellations" (¶96) and that Defendants were "working tirelessly to do what is right for our guests, crew and shareholders while protecting the equity of our brands" (¶97).  Thus, "Defendants' blanket characterization of the statements as mere opinions strains credulity," *Okla. Firefighters Pens. & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 32 (S.D.N.Y. 2019). Further, "the characterization of [Defendants'] statement[s] as opinion is not for the Court to make at this stage of the case." *Tung*, 454 F. Supp. at 1257.

Even if Defendants' statements are considered opinions, they are still actionable because Plaintiff identified "particular (and material) facts going to the basis for the issuer's opinion – facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 194; *see also* ¶¶59-66, 68-70, 114.  For example, when Defendants stated that Norwegian would "stay competitive in a way that will 'not hurt the long term brand equity,'" and affirmed that their "go-to-market strategy will serve us well in these challenging times," they omitted material facts that went to the basis of such opinions, including that the Company was engaged in deceptive sales practices designed to secure bookings, minimize cancellations, and buoy revenues.  ¶¶99, 100, 114.  Defendants also failed to disclose the Company's marketing strategy (*e.g.*, misleading sales scripts) undermined the safety and well-being of cruise guests and threatened the Company's brand equity.  ¶¶68-70, 114.  Such omissions were misleading to a reasonable investor and are thus actionable.  *See Omnicare*, 575 U.S. at 188 ("if the real facts are otherwise, but not provided, the opinion statement will mislead its audience"); *Flowers Foods*, 2018 WL 1558558, at *8 (finding defendants' opinion statements to be "misleading in context because they would 'conflict with what a reasonable investor would take from the statement itself'" (quoting *Omnicare*, 575 U.S. at 189)).

### G.     The Misstatements Are Not Puffery or Corporate Optimism

Defendants' statements (*see* MTD at 23 & n.15) are not immaterial puffery or corporate optimism but material misstatements and omissions as to Defendants' misleading sales campaign

and present operational experience (¶¶114, 116).[20]  Whether these statements are material is a question "for the finder of fact" such that the Court "may not dismiss a securities fraud complaint on the basis of materiality unless the alleged misrepresentations are ***so obviously unimportant*** to a reasonable investor that reasonable minds could not differ on the question of their importance." *Luczak*, 812 F. App'x at 924.

Here, it cannot be said as a matter of law that Defendants' statements were so obviously unimportant to investors as to render them immaterial.  First, "the market's reaction to the revelation" of the misleading sales campaign evidences their importance (¶151; *see also* ¶¶115-121).  *SEC v. Ginsburg*, 2000 WL 1299020, at *4 (S.D. Fla. Jan. 10, 2000) (market reaction reveals disclosure was material).  Second, many of the statements "represent tangible, verifiable actions [Norwegian] assured its investors it was taking," and therefore do not constitute puffery.  (¶¶91, 95, 97, 99, 100).  *Tung*, 454 F. Supp. 3d at 1257; *Southern Co.*, 2018 WL 1558577, at *21 (statements capable of objective verification are not puffery).  Third, these statements, especially that Norwegian was protecting brand equity (¶¶97, 99), took on additional importance in the context of a global health crisis that was not only leading to intense scrutiny of the cruise industry (¶¶56-59, 84), but threatened to eliminate ***all*** of Norwegian's revenues.  Accordingly, the Court should find these statements were not immaterial puffery or corporate optimism, or otherwise decline resolving this highly factual inquiry at this stage.[21]  *Merch. Cap.*, 483 F.3d at 769.

## V.   THE CAC ALLEGES FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER

The "strong inference" of scienter standard is satisfied when, accepting the allegations as true and considering them collectively, a reasonable person would deem the inference of scienter at least as strong as an opposing inference.  *Tellabs*, 551 U.S. at 324.  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences. . . ." *Id.*  Further, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.*; *see also Equifax*, 357 F. Supp. 3d at 1232 ("Thus, courts must consider the complaint in its entirety, and not whether any

---

[20]  The Court should ignore Defendants' self-serving characterizations of those statements (*see id.* at 23 ("aspirational"; "goal"; "efforts"; "places")).

[21]  Defendants cite cases, two out-of-circuit, that are distinguishable because their puffery holdings relied on materiality analyses particular to the facts of those cases; so the Court cannot simply "follow suit" on the fact-intensive materiality analysis here.  MTD at 23 & n.16.

individual allegation, scrutinized in isolation, meets that standard.").  In the Eleventh Circuit, allegations of "severe recklessness" – an "extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it" – satisfy the scienter requirement. *Thorpe v. Walter Inv. Mgmt. Corp.*, 111 F. Supp. 3d 1336, 1359 (S.D. Fla. 2015); *see also Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1282 n.18 (11th Cir. 1999).  When "the inference of scienter is equal to the inference of non-fraudulent intent . . . scienter has been adequately pled."  *In re PainCare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1291 (M.D. Fla. 2008).

The CAC pleads detailed allegations establishing that Defendants' false statements and omissions were made with knowledge or severe recklessness.[22]   ¶¶122-145.  In response, Defendants fail to heed *Tellabs* and instead argue that each scienter allegation, in isolation, comes up short.  MTD at 24-29.  The Court should reject Defendants' improper invitation to dissect the CAC in this manner.  *See In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1358 (S.D. Fla. 2005) (scienter "can arise from an aggregation of particularized facts, even if each individual fact standing alone does not create a sufficiently strong inference" and rejecting attempt to "attack[] the sufficiency of the plaintiffs' allegations by examining individual pieces of the complaint and declaring them insufficient for scienter").  Considered holistically, as *Tellabs* requires, Plaintiff's allegations give rise to a strong inference of scienter.

### A.   The Unprecedented Threat to Norwegian's Most Important Source of Revenue Supports an Inference of Scienter

To maximize passenger ticket revenue, the Company's most important revenue source, Norwegian sailed its ships at full capacity and employed a "market-to-fill" strategy supported by "high-frequency marketing campaigns" designed to drive demand and secure advance bookings. ¶¶36-37, 44-47, 106-107, 124.  As a result, Norwegian's sales force was one of the key "drivers of demand" and its marketing and sales efforts were the "engines" that powered the Company's revenues.  ¶¶44-47, 124-125.

Under normal business conditions, therefore, it could easily be inferred that the Individual Defendants, who had long tenures with the Company and spoke knowledgably to investors about

---

[22]   Because Plaintiff adequately pleads scienter as to the Individual Defendants, Norwegian's scienter is also established.  *MAZ Partners*, 2020 WL 1072582, at *7 (imputing to company scienter found as to individual defendant); *see also infra* §V.E.

booking windows, advance ticket sales, and marketing, were informed about the Company's sales efforts. *See Immucor Inc.*, 2006 WL 3000133, at *18 ("Knowledge of facts relating to the core functions of a company can be imputed to a company's key officers."); *Flowers Foods*, 2018 WL 1558558, at *14 (scienter bolstered by allegations that the company's model, which represented 84% of sales, "was a 'core operation' of [the company]"); *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704, 709 (7th Cir. 2008) ("*Tellabs III*") ("That no member of the company's senior management who was involved in authorizing or making public statements about demand for the [company's flagship products] knew that they were false is very hard to credit . . . .").[23]

But the facts of this case do not involve business as usual. Instead, Norwegian faced an unprecedented, global crisis that threatened to ***eliminate*** the Company's revenues and, therefore, amplified Defendants' awareness of the Company's core operations: sales, bookings, and passenger ticket revenue. ¶¶52-58 (discussing "swift and severe" negative impact from COVID-19). Indeed, Defendants' statements during the Class Period demonstrate they were keenly aware of the virus's impact on the Company, including bookings and cancellations, which they were closely monitoring, and they spoke repeatedly about the Company's marketing and sales initiatives. *See, e.g.*, ¶¶94-102. Defendants' statements, in the context of an enormous crisis, support an inference of scienter. *See Local 703 I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 2011 WL 12855820, at *3, *8-9 (N.D. Ala. June 7, 2011) (scienter pleaded where "every single quarterly conversation with the analysts" included discussion about the topic at issue in the alleged fraud, "show[ing] that defendants had access to and were aware of" the alleged fraud); *Holwill*, 2020 WL 5235005, at *5 ("numerous statements" regarding "sales and marketing practices and programs" and the "importance that Defendants placed on those practices

---

[23]   Contrary to Defendants' contention, the core operations doctrine has not been "implicitly rejected" in the Eleventh Circuit. MTD at 26 (citing *Durgin v. Mon*, 415 F. App'x 161, 166 (11th Cir. 2011)). Far from being rejected, it has recently, and consistently, been applied as part of the broader scienter calculus. *See Flowers Foods*, 2018 WL 1558558, at *14 (finding allegations sufficient to show "core operation" of company and "combined with Plaintiff's other allegations, make it more likely that Defendants were aware of the alleged compliance issues"); *In re Acuity Brands, Inc. Sec. Litig.*, 2019 WL 10246166, at *25 (N.D. Ga. Aug. 12, 2019) (denying motion to dismiss in part and considering core operations doctrine as one aspect of scienter). Indeed, in *Plymouth Cnty. Ret. Sys. v. Carter's Inc.*, cited by Defendants (MTD at 26), the court "agree[d] with the basic proposition that a person's status as a corporate officer, when considered alongside other allegations, can help support an inference that this person is familiar with the company's most important operations," 2011 WL 13124501, at *17 (N.D. Ga. Mar. 17, 2011).

and programs" to company's growth and success "constitute strong circumstantial evidence" of scienter).

Seeking a diversion, Defendants claim it is unreasonable to assume they "would be informed of the day-to-day activities of [Norwegian's] 36,000 employees." MTD at 2, 25. However, it is "very hard to credit" Defendants' contention that they were blissfully unaware of how Norwegian instructed its sales force to deal with customers in the face of a financial Armageddon caused by the global pandemic. *Tellabs III*, 513 F.3d at 709 (misstatements concerned company's "flagship" product); *PainCare*, 541 F. Supp. 2d at 1293 ("The Company's implicit assertion that a Company can ignore the elephant in the room, as long as no one **told** them it was there does not negate recklessness." (emphasis in original)). As the court in *In re Toyota Motor Corp. Sec. Litig.* held:

> The magnitude of the problem was overwhelming, both in its potential catastrophic results and the number of vehicles involved. . . . Given the gravity of the issue, it is at least as likely to be true that Defendants were aware of the competing possibility of a serious mechanical design flaw in their vehicles as it is that they remained blissfully unaware of the mounting evidence produced by Toyota engineers and service technicians . . . .

2011 WL 2675395, at *4-5 (C.D. Cal. July 7, 2011). The reasoning of *Toyota* applies with equal, if not greater, force here. *See also Christine Asia Co. Ltd. v. Ma*, 718 F. App'x 20, 23-24 (2d Cir. 2017) (finding scienter because it was "virtually inconceivable" that impact from significant threat to company and IPO was not communicated to the individual defendants).

Relying on *Mizzaro*, Defendants also claim they cannot have scienter for even a widespread scheme.[24] MTD at 25. Unlike *Mizzaro*, the CAC does not allege misconduct by a few employees on one or two cruise ships sailing in international waters, but provides detailed allegations of a **top-down** marketing campaign that took place at Norwegian's Miami-based operations, where Norwegian's principal executive offices are located. ¶¶11, 23, 59-67, 114, 129. Additionally, the deceptive sales campaign was created and approved by the high-ranking Becker (¶¶11, 48-51, 61-

---

[24]   Defendants also rely on *Mogenson v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1220 (M.D. Fla. 2014), a distinguishable case. As Defendants here point out (MTD at 25), that court found the allegations failed to allege detail as to what the reports at issue contained, 15 F. Supp. 3d at 1220. Here, by contrast, the CAC pleads the exact content and wording of internal emails and the Company's fraudulent sales scripts (¶¶71-79), as well as that Norwegian's executives and managers instructed sales teams to use the scripts (¶¶11, 59-67, 71-79).

62, 78-79, 114(a), 129-130, 144), who reported to Sommer (a direct report of Del Rio) (¶¶18, 35, 48, 129), memorialized in emails (¶¶11, 18, 61, 78, 129-130) and discussed at sales meetings (¶¶66, 71, 78, 130), and required Norwegian's sales force to mislead customers – not about minor matters, but about a deadly global pandemic that threatened not only the health and safety of passengers, but also the Company's entire revenue stream (¶¶59-67).   These allegations support a strong inference of the Individual Defendants' scienter.  *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987-89 (9th Cir. 2008) (scienter found where the information misrepresented is readily apparent to the defendant corporation's senior management); *In re ValuJet, Inc. Sec. Litig.*, 984 F. Supp. 1472, 1479-80 (N.D. Ga. 1997) (allegations that defendants were aware of numerous safety-related incidents and problems discovered by FAA, but continued to make representations regarding safety and plans for growth, established scienter); *FleetCor Techs.*, 2018 WL 4293143, at *11 (distinguishing *Mizzaro*).

**B.    Internal Emails, Meetings, and Whistleblower Accounts Contained in Investigative Reports Make Clear the Deceptive Marketing Scheme Was Implemented from the Top Down**

The CAC establishes a compelling inference of scienter based on: (1) the content of an internal email from Becker downplaying the virus and imploring sales staff to "turn it up"; (2) the precise language of deceptive scripts used by sales personnel, which were distributed via email to the sales force, and used to "hook in customers"; (3) an internal email instructing the sales force to create a false sense of increased demand caused by the coronavirus; (4) a whistleblower account of sales department meetings where Company managers instructed the sales force to downplay the risk of coronavirus on cruises; (5) enforcement of sales quotas even in the face of coronavirus, which increased the pressure on the sales force to lie to customers; (6) customer complaints reflecting the Company's lies about coronavirus; and (7) internal directives to "find out who ratted" and conceal the fraud rather than admit the truth.  ¶¶59-88.

These allegations strongly support scienter.  *Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *9 (N.D. Ill. Oct. 30, 2012) (concealed facts "were widely and regularly discussed on weekly conference calls"); *Robb v. Fitbit Inc.*, 2017 WL 219673, at *4, *6-7 (N.D. Cal. Jan. 19, 2017) (that (non-party) senior executive was aware of product defects gave rise to inference that he would not keep that information "secret from the company's, CEO, CFO, and CTO"); *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 667, 671-72 (D.S.C. 2016) (business culture of "looking the other way" carries "weight in a holistic analysis determining the existence of

scienter"); *In re EZCorp, Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 209-10 (S.D.N.Y. 2016) ("a culture of unscrupulous . . . practices . . . so widespread as to be a matter of course," supported scienter); *CenturyLink*, 403 F. Supp. 3d at 730-31 (setting and enforcing sales quotas that could only be met through fraudulent conduct supports a strong inference of scienter).[25]

### C. Norwegian's Attempt to Cover Up Its Serious Misconduct and Becker's Departure Supports an Inference of Scienter

Defendants' response to the potential uncovering of the Company's deceptive marketing campaign also supports a strong inference of scienter. Before investigative reporting exposed Norwegian's deceptive sales practices, the Company refused to respond to the media's "multiple requests for comment," Becker admonished employees to not speak to reporters, and a Company executive sought to determine which "[o]ne of our own ratted." ¶¶75-77. This "evidence of concealment is strongly indicative of scienter." *Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1124 (C.D. Cal. 2012) (finding allegations that defendants "attempted to ensure that investors would not discover [the fraud]" was "strongly indicative of scienter"); *see also Regions Fin. Corp.*, 2011 WL 12855820, at *4, *6-9 (finding scienter where employees said "there should be 'no more emails or memos' about the removal of non-accrual loans from the non-accrual list"); *In re Natures' Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301, 1310 (D. Utah 2007) ("cover-up [of] a misdeed is strong proof of scienter").

That Becker was placed on leave shortly after the revelation of the deceptive sales campaign (¶¶85, 137) – a fact Defendants do not dispute – further bolsters the inference of scienter. *Career Educ.*, 2012 WL 5363431, at *10 (given "allegations regarding [executive's] knowledge of improper practices, the timing of his resignation lends weight to a finding of scienter."); *In re Home Loan Servicing Sols., Ltd. Sec. Litig.*, 2016 WL 10592320, at *7 (S.D. Fla. June 6, 2016) (scienter established as to defendant who, among other things, was "at the epicenter" of the

---

[25] Citing **no** cases, Defendants claim scienter is lacking because the "chain of command imputation theory" fails. MTD at 27. Specifically, Defendants seek to insulate themselves from Becker, arguing that all he did was send an "unrelated innocuous email" shared with NCL CEO Sommer. This overlooks that "the wrongdoing alleged was not a single act of a low-level employee, but rather, an ongoing method of doing business." *Faro Techs.*, 534 F. Supp. 2d at 1262-63 (adopting report and recommendation). In a similar vein, it is of no moment that Becker and Sommer were at NCL, as "a subsidiary's . . . scienter may be imputed to the parent company . . . particularly where the subsidiary is at the center of the alleged fraud." *Grupo Televisa*, 368 F. Supp. 3d at 722.

business, who was "forced to resign," and who regulatory documents indicated was "engaged in improper transactions"); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632 (S.D.N.Y. 2014) (resignation of two executives supported an inference of scienter when the "circumstances and timing of the resignations suggest[ed] that both defendants were terminated in relation to the undisclosed tax issue" underlying the fraud claims).[26]

### D.    Violations of Norwegian's Code of Conduct Are Indicative of Scienter

For the same reasons that the Code statements are actionable, they also support Defendants' scienter.  *See supra* §IV.D.  Where, as here, the statements in the Code are directly at odds with the conduct alleged, violations of the Code support a finding of scienter.  *See CenturyLink*, 403 F. Supp. 3d at 728-735 (finding scienter in case where code of conduct statements held actionable); *Holwill*, 2020 WL 5235005, at *5 (same); *see also In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 532 (S.D.N.Y. 2009) ("[T]here is considerable authority for the proposition that a company's failure to follow an internal policy can form the basis for an inference of recklessness.").[27]

---

[26]    Relying on *Maverick Fund, L.D.C. v. Lender Processing Servs. Inc.*, 2015 WL 5559761, at *12 (M.D. Fla. Sept. 21, 2015), Defendants argue Becker's departure from the Company does not support scienter.  MTD at 26-27.  But in *Maverick*, the officer's resignation occurred more than a year after the last alleged false statement was made.  2015 WL 5559761, at *13.  Here, however, Becker – who approved the false one-liners and directed employees to use them (¶¶11, 61-62, 78-79, 114(a), 129-130) – was ousted approximately a week after the *Miami New Times* revealed the fraud (¶¶136-137).  Thus, unlike in *Maverick*, the proximity of Becker's termination supports an inference of scienter.  *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106 (3d Cir. 2018) also does Defendants no favors.  After the Third Circuit ruled in *Hertz* that the complaint lacked allegations connecting executive departures to the alleged fraud, Hertz sued its former executives to recover $56 million in wrongfully paid incentive compensation and for over $200 million in consequential damages for the executives' misconducted directly related to the fraud alleged by the securities class action plaintiff.  *See* Second Amended Complaint & Jury Demand, ECF No. 109, *Hertz Corp. v. Frissora*, No. 2:19-CV-08927 (D.N.J. May 12, 2020).

[27]    The cases relied on by Defendants are inapposite.  *See* MTD at 28.  *Rok v. Identiv, Inc.*, 2017 WL 35496, at *15 (N.D. Cal. Jan. 4, 2017) involved a "broadly worded ethics code" of a global technology company in a case involving allegations of an executive submitting personal expenses for business reimbursement, and *Fries v. N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 712-15 (S.D.N.Y. 2018) centered on an energy company engaged in the development of oil and natural gas properties where the individual defendants allegedly exercised improper control over another company to obtain financial benefits for themselves.  Moreover, the court in *Fries* recognized that repeated assurance of a company's general integrity and ethical soundness despite knowledge of employee non-compliance may be actionable.  285 F. Supp. 3d at 718.  The misconduct in the instant case was not the action of rogue individuals engaged in self-dealing, but a top-down, deliberate campaign to mislead that unquestionably violated the Code.  *See, e.g.*, ¶¶66, 68.

### E.      Norwegian's Scienter Is Adequately Alleged

"[S]cienter alleged on the part of high level employees of a company may establish institutional scienter on the part of the corporation." *Grand Lodge of Pa. v. Peters*, 550 F. Supp. 2d 1363, 1370 (M.D. Fla. 2008).  Here, the CAC adequately alleges the scienter of "high level employees" – Becker and Sommer – which gives rise to an inference of scienter as to Norwegian. *Faro Techs.*, 534 F. Supp. 2d at 1262-63 (imputing to company scienter of non-party, high-level, non-speaking employee).  Becker, a sales-aggressive NCL executive, in violation of the Code, developed, and directed sales personnel to engage in the misleading sales campaign while downplaying the threat of COVID-19 (¶¶11, 61-65, 78-79, 114, 129-130, 144).  Sommer, NCL's CEO, a direct report of Del Rio and to whom Becker reported (¶¶18, 35, 48, 129), was copied on emails in which Becker instructed sales employees to "turn it up" in the face of the deadly pandemic (¶¶78, 129).  These facts support a strong inference of Becker's and Sommer's scienter, which is imputed to Norwegian.[28]  *See Faro Techs.*, 534 F. Supp. 2d at 1262; *MAZ Partners LP*, 2020 WL 1072582, at *7 (scienter of corporate officers and directors may be imputed to the corporation itself).

### F.      Defendants Fail to Offer a Viable Competing Inference of Scienter

Defendants claim the "only" plausible inference is that Defendants did not know of the "one liners."  MTD at 29.  As set forth above, and given the extraordinary circumstances facing the Company at the time the false and manipulative scripts were implemented, it is more than plausible that the Individual Defendants either knew their Class Period statements and omissions were false or misleading, or were severely reckless.  The CAC's allegations, considered collectively, plead a strong inference of scienter.

## VI.      THE SECTION 20(a) CLAIM IS SUCCESSFULLY STATED

Defendants argue only that the CAC fails to state a predicate primary violation and do not dispute that the Individual Defendants were "control persons."  *See* MTD at 29.  Accordingly, because Plaintiff, as set forth above, has successfully stated the Section 10(b) claim, the Section 20(a) claim, too, is successfully stated and thus should not be dismissed.

---

[28]   Contrary to Defendants' assertion (MTD at 28 n.20), corporate scienter can be established even where, as here, non-party employees whose scienter is imputed did not make the misleading statements, but were "high level employee[s]" acting within the scope of employment, "consistent with generally accepted agency principles."  *Faro Techs.*, 534 F. Supp. 2d at 1262-63.

## VII.    CONCLUSION

For the foregoing reasons, the Court should deny the Motion in its entirety.

DATED:  October 29, 2020                    Respectfully submitted,

ROBBINS GELLER RUDMAN & DOWD LLP

*s/ Robert J. Robbins*
ROBERT J. ROBBINS
(FL Bar No. 0572233)

ROBERT J. ROBBINS (FL Bar No. 0572233)
ELIZABETH A. SHONSON (FL Bar No. 22282)
MAUREEN E. MUELLER (FL Bar No. 110407)
SABRINA E. TIRABASSI (FL Bar No. 0025521)
CHRISTIAN G. MONTELIONE
(FL Bar No. 122511)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
rrobbins@rgrdlaw.com
eshonson@rgrdlaw.com
mmueller@rgrdlaw.com
stirabassi@rgrdlaw.com
cmontelione@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

CICCARELLO DEL GIUDICE & LAFON
MICHAEL J. DEL GIUDICE
1219 Virginia Street, East, Suite 100
Charleston, WV  25301
Telephone:  304/343-4440
304/343-4464 (fax)

*Additional Counsel for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 29, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

*s/ Robert J. Robbins*
_____
ROBERT J. ROBBINS
(FL Bar No. 0572233)
