United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Eric Douglas, Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 20-21107-Civ-Scola |
| | ) |
| Norwegian Cruise Lines and others, | ) |
| Defendants. | ) |

### Order Granting Motion to Dismiss

Lead Plaintiff Employer-Teamsters Local Nos. 175 & 505 Pension Trust Fund ("Plaintiff") brings this putative class action against Defendants Norwegian Cruise Lines ("NCL"), Frank J. Del Rio ("Del Rio"), and Mark A. Kempa ("Kempa") on behalf of all investors who purchased NCL common stock between February 20, 2020 to March 10, 2020 (the "Class Period"). The Plaintiff's two-count amended complaint alleges violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 as a result of the Defendants' misrepresentations and omissions regarding the impact of Covid-19 on the company. (ECF No. 56.) The Defendants moves to dismiss the complaint arguing that the Plaintiff has failed to state a claim. (ECF No. 60.) The Plaintiff filed a response in opposition (ECF No. 68.) For the reasons discussed below, the motion is **granted. (ECF No. 60.)**

### 1. Background[1]

NCL is a cruise line company with headquarters in Miami, Florida. (Am. Compl., ECF No. 56 ¶ 34.) The company's stock is publicly traded on the New York Stock Exchange. (*Id.* ¶ 26.) During the class period, NCL employed Defendant Frank J. Del Rio as chief executive officer ("CEO") and Defendant Mark A. Kempa as chief financial officer ("CFO"). (*Id.* ¶¶ 27, 28.) Harry Sommer was president of NCL and reported directly to Del Rio. (*Id.* ¶ 18.) Robert Becker acted as NCL's vice president of consumer research and passenger sales. (*Id.* ¶ 48.) Becker reported directly to Sommer. (*Id.*)

Near the end of 2019, NCL reported revenue growth from the previous year and rising earnings per share. (*Id.* ¶¶ 39-40.) However, that changed in

---

[1] The Court generally accepts the Plaintiffs' factual allegations as true for the purposes of evaluating the Defendants' motions to dismiss. *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

December 2019 when Covid-19 began spreading globally, including one outbreak on a cruise ship owned by a different company. Consequently, NCL began to see a decrease in bookings and an increase in cancellations. (*Id.* ¶ 9, 59) Ultimately, NCL was forced to cancel 40 voyages. (*Id.* ¶ 95.)

On February 20, 2020 (the first day of the class period), NCL issued a press release announcing results of the fourth quarter and year ending on December 31, 2019. (*Id.* ¶ 89.) The 2019 financial disclosures were intended to serve as an investor guidance for 2020. (*Id.*) NCL also represented that it had entered 2020 "with a record booked position at higher pricing," and assured investors that "despite the current known impact [from Covid-19], the Company's booked position remained ahead of [the] prior year and at higher prices on a comparable basis." (*Id.* ¶ 104.) NCL also represented that it was taking protective steps to ensure the safety of passengers and crew. (*Id.* ¶ 60.)

On that same day, NCL held a conference call for analysts and investors to discuss the company's finances and projections. The call was led by Del Rio, who acknowledged that news coverage on the spread of Covid-19 and the outbreak on an unrelated cruise ship had caused a decrease in bookings and cancellations. (*Id.* ¶94.) Del Rio further stated that despite the negative impacts from Covid-19, NCL had experienced an increase in bookings within the previous five days compared to the prior three weeks. (*Id.* ¶ 97.) Del Rio stated that NCL would continue with its marketing strategy of offering lower prices to encourage advance bookings. (*Id.* ¶ 99.) Del Rio reassured investors that NCL would not act in a manner that would hurt the NCL brand. Kempa shared that sentiment, expressing that NCL would "do right" by its shareholders and protect the equity of the NCL brands. (*Id.*) Based on Del Rio and Kempa's representations during the conference call, analysts were cautiously optimistic about NCL's finances in 2020. (*Id.* ¶¶ 103, 104.)

One week later, NCL filed its Form 10-K with the Securities Exchange Commission for 2019. The form was executed by Del Rio and Kempa, certifying that the information therein was accurate to their knowledge. (*Id.* ¶ 105.) The form indicated that NCL intended to utilize effective marketing and sales initiatives with a market-to-fill strategy to drive up consumer demand. (*Id.* ¶ 106.) With respect to NCL's operating procedures, NCL reported it would continue practicing techniques to ensure the safety of guests and crew members (*Id.* ¶ 108.) NCL also identified a list of risk factors for potential and current investors, which included "the recent outbreak of COVID-19 coronavirus [which] has resulted in costs and lost revenue related to customer compensation, itinerary modifications, travel restrictions and advisories, the unavailability of ports and/or destinations, cancellations, and redeployments and has impacted consumer sentiment regarding cruise travel." (*Id.* ¶ 109.)

On March 11, 2020, the Miami New Times, a local newspaper, published an article titled: "*Leaked Emails: Norwegian Pressures Sales Team to Mislead Potential Customers About Coronavirus.*" (*Id.* ¶ 71.) The article reported a whistleblower employee's account that NCL instructed its sales staff to lie to customers regarding the risks of Covid-19 in order to increase booking sales. (*Id.*) NCL circulated an email to sales staff including "one liners" to help convince customers who are unsure about booking a cruise. (*Id.* ¶ 72.) The email indicated that the statements should only be used if a customer was concerned with the coronavirus. (*Id.*) The statements included: "the only thing you need to worry about for your cruise is do you have enough sunscreen," "the coronavirus can only survive in cold temperatures, so the Caribbean is a fantastic choice for your next cruise," "scientists and medical professionals have confirmed that the warm weather of the spring will be the end of the coronavirus," and "coronavirus cannot live in the amazingly warm and tropical temperatures that your cruise will be sailing to." (*Id.* ¶ 73.)

The Miami New Times article was followed by other unfavorable publications in the Washington Post and the Miami Herald. (*Id.* ¶ 76.) The Miami Herald reported that "senior vice president in the marketing department Bob Becker repeatedly downplayed the virus to employees," including an email expressing that "[n]o one knows or cares about the coronavirus." (*Id.* ¶ 78.) The article also indicated that Sommer and "other executives" were copied on the email containing the scripted one-liners. (*Id.*) As a result of the negative press, NCL common stock fell by approximately 27% on March 11, 2020 and by 36% on March 12, 2020. (*Id.* ¶ 80.)

Around the same time, customers posted negative reviews on websites like www.consumeraffairs.com. (*Id.* ¶ 67.) The reviews indicated that the sales staff was using the one line statements: "We were assured everything was fine and that the virus would not affect the area we were traveling to due to warmer climate," and "I would never book NCL again…I started calling in February to ask about their policy and they assured me that all was well and I would not get sick on my April 26 cruise." (*Id.*)

The Plaintiff initiated this putative class action on behalf of all persons who purchased NCL shares from February 20, 2020 (the date of the press release and conference call) and March 10, 2020 (the day before The Miami New Times Article was published). (ECF No. 1.) The operative complaint alleges that NCL used a deceptive marketing scheme to increase bookings despite the growing health concerns related to Covid-19. The Amended Complaint claims NCL, Del Rio, and Kempa committed securities fraud because despite knowing the negative impacts and dangers of Covid-19, the Defendants carried out

deceptive sales practices, which resulted in a loss to the Plaintiff and other similarly situated shareholders.

### 2. Applicable Law
#### A. Securities Fraud

To state a claim of securities fraud under Section 10(b) and Rule 10b-5, the Plaintiff must allege: (1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called "loss causation." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236–1237 (11th Cir. 2008); *see also* 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5.

Additionally, to state a claim under Section 20(a), the Plaintiff must allege that: (1) NCL committed a primary violation of the securities laws; (2) Del Rio and Kempa had the power to control the general business affairs of NCL; and (3) Del Rio and Kempa "had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability." *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1274 (S.D. Fla. 2017) (Rosenberg, J.) If the Plaintiff fails to plead a violation of Section 10(b), a claim under Section 20(a) necessarily fails as well. *Id.* (citing *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006))

Here, Defendants move to dismiss the amended complaint based on Federal Rule of Civil Procedure 12(b)(6) and 9(b), and the Private Securities Litigation Reform Act ("PSLRA").

#### B. Rule 12(b)(6)

A court considering a motion to dismiss, filed under Federal Rule of Civil Procedure 12(b)(6), must accept all the complaint's allegations as true, construing them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). Although a pleading need only contain a short and plain statement of the claim showing that the pleader is entitled to relief, a plaintiff must nevertheless articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Fed. R. Civ. P. 8(a)(2)) (internal punctuation omitted). A court must dismiss a plaintiff's claims if it fails to

nudge its "claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

### C. Rule 9(b) and Private Securities Litigation Reform Act

The Amended Complaint is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PLSRA. *Mizzaro*, 544 F.3d at 1237. Rule 9(b) requires that a complaint set out "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Id.*

The PLSRA requires that in addition to pleading all other requisite elements, the complaint must "plead with particularity facts giving rise to a strong inference that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements." *Id.* at 1238. In reviewing an alleged violation of securities law, a court must ask itself: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 1239.

### 3. Analysis

The Defendants move to dismiss the amended complaint in its entirety for a failure to state a claim of securities fraud. In particular, the Defendants argue that the Plaintiff has failed to allege any material misrepresentations or omissions, and scienter.

While all of the allegations of the operative complaint should be taken into consideration to determine whether or not they give rise to a strong inference of scienter, the Plaintiff must still allege with particularity the specific facts that underlie each alleged misstatement, misrepresentation, or omissions. *In re Royal Caribbean Cruises Ltd. Sec. Litig.*, No. 1:11-22855-CIV, 2013 WL 3295951, at *11 (S.D. Fla. Apr. 19, 2013) (Williams, J.). The Plaintiff has not met its burden at this stage. Accordingly, the Defendants' motion to dismiss is **granted**. **(ECF No. 60.)**

### A. The Plaintiff Fails to Plead Misstatements or Omissions

Only misrepresentations or omissions that are "material" give rise to a securities fraud cause of action. 17 C.F.R. § 240.10b–5 ("It shall be unlawful for any person … [t]o make any untrue statement of a material fact or to omit to state a material fact[.]"). In determining whether the public statements made were "material," the Court must make an "'objective' inquiry [into] the significance of an omitted or misrepresented fact to a reasonable investor." *SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1245 (11th Cir.2012) (quoting *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 445, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). "In other words, a misstatement or omission is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Id.* (internal quotations omitted) A statement that is vague, generalized, or "mere corporate puffery" is immaterial because a reasonable investor would not base a decision on such statements. *In re Royal Caribbean Cruises Ltd. Sec. Litig.*, No. 1:11-22855-CIV, 2013 WL 3295951, at *12 (S.D. Fla. Apr. 19, 2013) (Williams, J.).

Here, all the challenged statements constitute corporate puffery because they are vague and so broad that no reasonable investor would have relied on them to make a decision on whether to invest or not.

#### 1. Statements About Marketing Strategies

The Plaintiff alleges that during the conference call Del Rio represented that the company "did not intend to deviate from its long-term proven go-to market strategy of focusing on value to consumers over using low price as a lever to stimulate demand" and that they "would not do it in a way in which we believe will hurt the long-term brand equity." (ECF No. 56 ¶¶ 93, 99, 100.) This sentiment was also incorporated in the company's Form 10-K, which states: "the Company seeks to attract vacationers to our products and services in several ways, including utilizing effective marketing and sales initiatives with a market-to-fill strategy" and "the Company seeks to increase demand via effective marketing campaigns across various channels." (*Id.* ¶ 106.) The Form10-K, also indicated that NCL would engage in targeted and high-frequency marketing campaigns using a call center to call potential customers. (*Id.* ¶ 107.)

The Plaintiff argues that because the Defendants generally referred to the marketing strategy, the Defendants had a duty to disclose the specifics of the deceptive marketing scheme, i.e. the one-line statements. This argument is unavailing. The challenged statements constitute nothing more than corporate

puffery and as such are immaterial and did not have to be disclosed. The statements generally reference the Defendants' marketing strategy and Del Rio and Kempa's intention that their efforts not adversely affect the NCL brand. *See Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1320 (11th Cir. 2019) (recognizing that proclamations of a company's regulatory compliance or transparency and responsibility constitute corporate puffery and are not actionable); *see also Thorpe v. Walter Mgmt., Corp.*, No. 14-CV-20880, 2014 WL 11961964, at *11 (S.D. Fla. Dec. 23, 2014) (Ungaro, J.) (finding that statements touting the defendant's "active portfolio management—to improve servicing, regulatory compliance and credit performance," "grounded in the long-term value proposition we offer clients for improved credit performance and regulatory compliance," were puffery), *compare with FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1298 (11th Cir. 2011) (finding that representations in a Form 10-K that the company "employs an integrated system…that continually monitors traffic quality" and that the company enforces "strict guidelines…to ensure the quality of traffic" were misleading because they could mislead a reasonable investor into believing that the defendants had systems in place that would detect and remove fraudulent revenue-generating practices). Although the marketing strategies are arguably important to the success of NCL's business, the challenged statements do not assert specific, verifiable facts that reasonable investors would rely on in deciding whether to buy or sell NCL stock. *See Philadelphia Fin. Mgmt. of San Francisco, LLC v. DJSP Enterprises, Inc.*, 572 F. App'x 713, 716 (11th Cir. 2014).

    The Plaintiff's reliance on *FindWhat* to support its claim is misplaced. There, the defendant, an internet-commerce company that provided pay-per-click advertising services, made affirmative representations that it employed strict controls and monitoring over its Internet click-systems to ensure quality of traffic. *FindWhat.*, 658 F.3d at 1298. In reality, however, two employees were committing click-fraud in a bid to generate fake traffic. *Id.* at 1292. The instant case is distinguishable because the Defendants' statements concerning their use of market-to-fill sales strategies did not constitute affirmative representations concerning the particular mechanisms of the sales techniques or actual results that were projected, but instead were general statement regarding the use of a marketing to drive bookings and opinions regarding the quality of the marketing techniques. *Philadelphia Fin. Mgmt. of San Francisco, LLC*, 572 F. App'x at 716. Unlike *FindWhat*, in which the plaintiff alleged a clear fraudulent scheme, the Plaintiff here travels under the *assumption* that at the time they were circulated the one-line statements were false or deceptive. It is worth noting that at the time the alleged marketing scheme was taking place, then-President Donald Trump made similar statements regarding Covid-19 and

therefore it is arguable that these statements were not even deceptive, insofar as they aligned with the pronouncements of our nation's President. Newsweek (February 11, 2020), *Could Coronavirus Really Be Killed by Hot Weather? Scientist Weigh In*, https://www.newsweek.com/could-coronavirus-really-killed-hot-weather-scientists-weigh-1486709 ; Fox 8 (Apr. 4, 2020), *President Trump showcases idea heat, humidity could help fight coronavirus*, https://fox8.com/news/president-trump-showcases-idea-heat-humidity-could-help-fight-coronavirus/, (last visited Apr. 9, 2021).

Lastly, the Plaintiff also argues that even if the statements themselves are not actionable as misleading, the omission of the deceptive marketing strategy is actionable. This argument is unavailing because the omission relies on the same statements the Plaintiff claims are misleading or false. *Philadelphia Fin. Mgmt. of San Francisco, LLC*, 572 F. App'x at 717.

### 2. Statements Regarding Improvement in Bookings

The Plaintiff also claims that statements made by Del Rio in the conference call and press release on February 20, 2020 regarding improvement in bookings are misleading or false. The amended complaint alleges that the Defendants represented that NCL entered 2020 "with a record booked position and higher pricing," assuring investors that "despite the current known impact" from Covid-19, NCL's booked position remained ahead of the prior year. (ECF No. 56 ¶ 90.) On the conference call, Del Rio attributed the record bookings to the "strength and resilience" of NCL's business model. (*Id.* ¶ 93.) Del Rio also stated that despite the impacts of Covid-19, that there were still some "silver linings," including that "in the previous 5 days the Company had seen an improvement in week-over-week booking volumes and a decrease in cancellations when compared to the prior 3 weeks." (*Id.* ¶¶ 96, 98.)

The Plaintiff argues that the challenged statements were false or misleading because they omitted material facts, namely, that NCL was engaged in a deceptive sales campaign to induce customers to purchase stock and book trips. (ECF No. 68 at 18.) The Plaintiff explains that the Defendants' statements regarding the company's bookings gave rise to a duty to disclose the deceptive marketing techniques.

At best, the challenged statements constitute a general report of the bookings from the prior week. Moreover, the statements regarding the Defendants' intention to successfully market the value of NCL cruises constitute mere corporate puffery on which a reasonable investor would not rely. *In re Royal Caribbean Cruises Ltd. Sec. Litig.*, 2013 WL 3295951, at *12 ("Plaintiffs must look beyond these optimistic characterizations to the specific,

verifiable statements made by Defendants if they are to successfully allege a violation of the federal securities laws."); *see also Southland Securities Corp. v. INSpire Ins. Solutions, Inc. .*, 365 F.3d 353, 372 (5th Cir.2004) ("analysts rely on facts in determining the value of a security" and "generalized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial."). Considering the Defendants' undisputed acknowledgement of the pandemic's impact on bookings during the conference call, press release, and Form 10-K, no reasonable investor would believe that a statement regarding a brief window of improvement in bookings during a global pandemic implied that all was well within the company and that its marketing strategies were not accounting for customer concerns regarding Covid-19.

### 3. Proactive Safety Measures

The Plaintiff claims that Del Rio's statements that the company had taken proactive safety measures are misleading and actionable under securities law. The amended complaint alleges that in the press release and conference call on February 20, Del Rio stated that NCL had taken several proactive measures to protect the health and safety of its guests and crew. (ECF No. 56 ¶¶ 91, 95.) The Form 10-K also indicated that NCL "places the utmost importance on the safety of our guests and crew." (*Id.* ¶ 108.) The Plaintiff argues that because the deceptive sales campaign contradicted the challenged statements, the Defendants had a duty to disclose it. (*Id.* ¶ 84.)

First, the amended complaint does not allege that the statements are false, in other words, that the Defendants did not in fact take any steps to protect guests and crew members. Additionally, the challenged statements are extremely vague and constitute corporate puffery and thus, are not actionable. *In re Royal Caribbean Cruises Ltd. Sec. Litig.*, at *12. It is unclear from the amended complaint, what the proactive safety measures entailed or whether any were in fact implemented. Without more information, no reasonable investor would have relied the challenged statements.

### 4. NCL's Code of Ethical Business Conduct

Lastly, the Plaintiff alleges that there was a duty to disclose the deceptive marketing scheme because the Form 10-K represented that NCL's Code of Ethical Business Conduct "applies to all of our employees, including our principal executive officer, principal financial officer…and persons performing similar functions, and our directors." (ECF No. 56 ¶ 111.) This representation likewise constitutes corporate puffery and is not actionable. *Carvelli*, 934 F.3d

1307, 1320 (11th Cir. 2019) (recognizing that proclamations of a company's regulatory compliance or transparency and responsibility constitute corporate puffery and are not actionable).

The Plaintiff also argues that NCL's Code of Conduct was rendered materially misleading by failing to disclose the deceptive marketing scheme, but that argument fails too. The Code provides in relevant part: "You are expected to observe the highest standards of ethics and integrity in your conduct. Conduct that may raise questions as to NCLH's honesty, integrity, impartiality, reputation or activities that could cause embarrassment to NCLH or damage its reputation are prohibited," and "You shall comply with all applicable laws and regulations and are expected to deal honestly, ethically and fairly with customers, clients and fellow NCLH team members, NCLH management and the general public." (ECF No. 56 ¶ 113.)

The Defendants argue that these policies constitute corporate puffery and aspirational statements, rendering them non-actionable. (ECF No. 60 at 18-19.) Indeed, the Code language cited in the amended complaint contains the types of aspirational statements that courts have found are not actionable. *MAZ Partners LP v. First Choice Healthcare Sols., Inc.*, No. 619CV619ORL40LRH, 2019 WL 5394011, at *14 (M.D. Fla. Oct. 16, 2019), *report and recommendation adopted*, No. 619CV619ORL40LRH, 2020 WL 1072582 (M.D. Fla. Feb. 14, 2020) (Hoffman, J.); *see also City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 415 (D. Del. 2009).

Because the Court finds that the amended complaint does not allege material misstatements or omissions, it fails to state a claim for a violation of the securities laws and the Court need not continue its analysis. However, for the sake of completion, the Court will do so.

### B. The PSLRA's Safe Harbor Provision

The PSLRA contains two safe harbor provisions that the Court may consider in deciding a motion to dismiss in a securities fraud case. *Royal Caribbean*, 2013 WL 3295951, at *16; *Philadelphia Fin. Mgmt. of San Francisco, LLC v. DJSP Enterprises, Inc.*, 572 F. App'x. 713, 717 (11th Cir. 2014). The first safe harbor provision protects "forward looking statements" if accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). Scienter is not pertinent to this provision. *Harris v. IVAX Corp.*, 182 F.3d 799, 803 (11th Cir. 1999). The second safe harbor provision, on the other hand, protects forward looking statements, even absent cautionary language, unless the plaintiff shows that the statement

was made with actual knowledge that the statement was false or misleading. *Harris*, 182 F.3d at 803.

The Defendant argues that most of the statements at issue are within the purview of the safe harbor provisions because the challenged statements directly involve NCL's future operational plans, particularly those in response to Covid-19, and were accompanied by sufficient cautionary language. For example, the complaint alleges that Del Rio stated in the conference call that despite the negative impact of Covid-19, there had been some "silver linings," such as a recent 5-day improvement in booking volumes, hinting at a decrease to future cancellations and increase in new bookings. (ECF No. 56 ¶ 96.) Likewise, Del Rio and Kempa repeatedly stated in the conference call and indicated on the Form 10-K that the company was working tirelessly to do right by their customers, employees, and their shareholders; and that they would continue their marketing efforts to see the company through the pandemic. (*Id.* ¶¶ 100, 106, 107.) During the same conference call, Del Rio acknowledged the negative impacts on the company as a result of Covid-19, noting that NCL would continue to monitor the Covid-19 outbreak and its potential impact to our results. (*Id.* ¶ 97.)

On the other hand, the Plaintiff contends that the statements at issue relate to historical and contemporaneous acts and therefore are not entitled to protection. However, the Plaintiff fails to appreciate that "when a forward-looking statement is of the sort that, by its nature rolls in present circumstances—that is, when a statement forecasts in a tentative way a future state of affairs in which a present commitment unfolds into action—the statement isn't barred from safe-harbor protection solely on that ground." *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1329 (11th Cir. 2019). Moreover, the challenged statements were accompanied by meaningful cautionary language. Indeed, during the press conference, Del Rio acknowledged that Covid-19 had caused a decrease in bookings and resulted in cancellation of 40 voyages. The challenged statements in the Form 10-K were also accompanied by sufficient cautionary language: "For example, the recent outbreak of the COVID-19 coronavirus has resulted in costs and lost revenue related to…travel restrictions and advisories, the unavailability of ports and/or destinations, cancellations and redeployments and has impacted consumer sentiment regarding cruise travel" and "[t]he Company has experienced costs and lost revenue …[t]he COVID-19 coronavirus is also impacting consumer sentiment regarding cruise travel generally, and the full impact of this indirect effect cannot be quantified at this time."   (ECF No. 56 ¶¶ 109, 110.) *See In re Royal Caribbean Cruises Ltd. Sec. Litig.*, 2013 WL 3295951, at *15 (finding the cruise line's cautionary sufficient because they "were specifically tailored to the

Company's international presence, reliance on customers, reliance on port availability and vulnerability to the influence of local political factors."). It is hard to argue that this is not meaningful cautionary language, as it warns investors of the very harms NCL suffered as a result of the Covid-19 pandemic.

Alternatively, the Plaintiff argues that the safe harbors do not apply because he has alleged that the statements were false when they were made. A defendant is entitled to protection under the PSLRA's safe harbor provisions if the plaintiff fails to prove that the forward-looking statement was made with *actual* knowledge that the statement was false. 15 U.S.C. § 78u–5(c)(1)(B). Having found that the challenged statements are protected by the cautionary language safe harbor, under which Defendants' state of mind is irrelevant, the Court need not consider whether these same statements are protected by the failure to plead actual falsity. *In re Royal Caribbean Cruises Ltd. Sec. Litig.*, 2013 WL 3295951, at *16.

### C. The Plaintiff Fails to Plead Scienter

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). A "strong inference" of scienter under the PSLRA "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1281 (S.D. Fla. 2017) (Rosenberg, J.); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) ("Yet the inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations.") Under the PSLRA, a complaint will survive a motion to dismiss, only if a reasonable person would, not just could, deem the inference of scienter cogent and as compelling as any opposing inference one could draw from the facts alleged. *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d at 1281 (citing *Brophy v. Jiangbo Pharm., Inc.*, 781 F.3d 1296, 1302 (11th Cir. 2015)). Stated differently, in order to sufficiently allege scienter, a plaintiff must allege facts from which a reasonable person would infer that it is at least as likely as not that the individual high-ranking defendants either orchestrated the alleged fraud (and thus always knew about it), learned about the alleged fraud, or were otherwise severely reckless in not learning of the alleged fraud when they made the purportedly false or misleading statements. *Thorpe*, 2014 WL 11961964, at *15 (S.D. Fla. Dec. 23, 2014). Additionally, the "complaint must allege facts supporting a strong inference of scienter for each defendant with respect to each violation." *Mizzaro*, 544 F.3d at 1238. Thus, the group pleading doctrine

does not apply to the PSLRA's scienter requirements. *Thorpe*, 2014 WL 11961964, at *16.

The Defendants move to dismiss because the Plaintiff has not alleged sufficient facts that each of the Defendants acted with scienter or an intent to deceive. (ECF No. 60 at 24.) Of course, the Plaintiff argues that he did. The Plaintiff relies on the following allegations: (1) that NCL's revenue is primarily based on customer bookings, which exclusively relies on a market-to-fill strategy (ECF No. 56 ¶¶ 36-37, 44-47, 124-125); (2) Defendants Del Rio and Kempa were top NCL executives (*Id.* ¶¶ 5, 28); (3) NCL sales force, including Bob Becker, created the one-line statements that make up the deceptive sales campaign and Becker reported to Sommer who reported directly to Del Rio (*Id.* ¶¶ 18, 62, 78); (4) under the direction of Becker and other sales managers, NCL's sales personnel were directed to use one-line statements to assuage customer concerns over Covid-19 (*Id.* ¶ 11.); (5) Becker wrote an email copying Sommer stating that "no one cares about the Coronavirus" and adding that "this is where we turn it up, for every cancellation you get, work harder for your next 3 bookings," (*Id.* ¶¶ 18, 61); and (6) Becker left the company after various publications published articles exposing his deceptive marketing technique (*Id.* ¶ 18.)

The Court finds that the Plaintiff's allegations with respect to scienter are insufficient to survive the subject motion to dismiss. Although the Plaintiff's allegations, if accepted as true as the Court must, demonstrate a troublesome and widespread scheme to minimize the effects of Covid-19 in order to avoid cancellations and drive bookings, the allegations are insufficient to show that the Defendants had the requisite intent to deceive or defraud. *Mizzaro*, 544 F.3d at 1247.

For example, the Plaintiff argues that Del Rio and Kempa's positions in the company constitute a strong inference that they knew of the deceptive marketing scheme. (ECF No. 68 at 22.) However, scienter cannot be inferred solely on a defendant's position. *Thorpe*, 2014 WL 11961964, at *17 (finding that defendant's position as chief executive officer, alone, was insufficient to establish a finding of scienter); *Durgin v. Mon*, 415 F. App'x 161, 165 (11th Cir. 2011) (recognizing that defendants' positions in the company was not evidence that defendants knew of the alleged fraud and therefore, could not support a finding of scienter).

Next, the Plaintiff argues that internal emails, meetings, and whistleblower accounts make it clear that the marketing scheme was implemented from the "top down," meaning that Del Rio and Kempa were aware of the deceptive marketing strategies. (ECF No. 68 at 24.) However, there are no claimed emails or communications from any of the individual

defendants expressly ordering sales employees to use the one-line statements or participate in any other type of deceptive scheme. *Mizzaro*, 544 F.3d at 1248. Indeed, none of the articles reporting on the whistleblower's account provided the identity of the executives who disseminated the one-line statements and only mentioned Sommer has having knowledge of Becker's email communicating that "no one cares about the Coronavirus." *Id.* That alone does not amount to a strong inference that any of the Defendants acted with scienter. *Id.* at 1247-48.

Notwithstanding, the lack of direct evidence connecting Del Rio and Kempa to the alleged fraud is not fatal because the Plaintiff may create a strong inference of scienter through circumstantial evidence alone. *Id.* Thus, the issue before the Court is whether based on the allegations in the amended complaint, a reasonable person would infer that there was at least a fifty-fifty chance that the individual defendants knew about the alleged fraud or were severely reckless in not knowing about it based on the nature and duration of the alleged fraud before the Class Period. In short, no.

The amended complaint does not allege when deceptive marketing strategy commenced. At best, the complaint alleges that the scheme began sometime before the New Times Article was published on March 11, 2020. This deficiency is further exacerbated by the fact that the amended complaint does not cite the actual communication directing sales employees to use the scripted statements. Instead, the amended complaint relies on the reports of three different publications—none of which identify who created the one-line statements, who required their use, or which of individual defendants knew of their existence and use. The amended complaint vaguely alleges "Under the direction of the Company's sales managers, including ...Becker, Norwegian's sales personnel were directed to like and mislead the Company's customers in order to protect its bookings and combat the negative financial effects of Covid-19 on the company. Specifically, the Company's sales force was provided with canned response and one-liners and were instructed to... 'not use these unless the coronavirus is brought up.'" (ECF No. 56 ¶ 11.) Even assuming without deciding that Becker created the one-liners and led the deceptive marketing strategy, the amended complaint has not alleged sufficient facts impute that knowledge on the Defendants under the circumstances. *Mizzaro*, 544 F.3d at 1254.

Moreover, the alleged fraudulent marketing scheme is fairly simple: ease consumer concerns about Covid-19 and increase bookings by using scripted one-line statements regarding the dangers and impact of the virus. This marketing strategy plainly did not require the participating of upper management, let alone the CEO or CFO of the company. *Mizzaro*, 544 F.3d at

1249. "The more complex an idea, the less likely it is that many people will stumble onto it simultaneously. So if the fraud alleged here were complex, then it would be more likely that it originated from one or a few persons at the top … as opposed to a number of store managers devising the scheme themselves." *Id*. The most plausible inference to draw from the amended complaint is that the deceptive marketing scheme began at the sales level in response to pressure to increase bookings. *Id*. at 1251. Indeed, the amended complaint alleges as much: "According to the Company whistleblower, sales personnel, who were concerned about meeting sales quotas, losing previously earned commissions, being put on a personal improvement plan, or being fired, felt 'pressured to persuade customers not to cancel their trips.'" (ECF No. 56 ¶ 74.)

Moreover, even if the individual defendants did not arrange the marketing scheme, it is possible they could have learned about it sometime before the Class Period, which would have made their challenged statements misleading and false. However, the amended complaint makes little effort to explain how Del Rio or Kempa would have learned of the scheme apart from relying on their executive position or that they supervised Becker's direct superior. *Mizzaro*, 544 F.3d at 1250-51; *Thorpe*, 2014 WL 11961964, at *17.

### B. Section 20(a) Claim

Because the viability of a Section 20(a) claim is dependent on the successful pleading of a primary violation under Section 10(a) of the Exchange Act. *Mizzaro,* 544 F.3d at 1237. "Therefore, the pivotal issue in this case [is] whether [Plaintiffs] have adequately pleaded a violation of § 10(b) and Rule 10b–5." *Id.* As the Court has determined Plaintiff has not adequately pled his substantive securities allegations, the secondary liability claim is also properly dismissed.

### 5. Conclusion

For the reasons discussed above, the Defendants' motion to dismiss is **granted**. **(ECF No. 60.)** The Plaintiff did not seek leave to amend in its response in opposition, nor has he filed a motion to that effect since the filing of the subject motion. Accordingly, the Clerk is directed to **close** this case and **deny** any pending motions as moot.

**Done and ordered** at Miami, Florida, on April 10, 2021.

Robert N. Scola, Jr.
United States District Judge